# EXHIBIT 1

# DECLARATION OF MICHAEL L. HENDRICKS, PH.D, ABPP

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

THOMAS PORTER, et al.,          :
                                :
              Plaintiffs,       :
                                :
vs.                             :
                                :        Civil Action No. 1:14cv1588
HAROLD C. CLARKE, et al.        :
                                :
              Defendants.       :
                                :

DECLARATION OF
MICHAEL L. HENDRICKS, PH.D., ABPP

I, Michael L. Hendricks, Ph.D., ABPP, declare under penalty of perjury that the

following is true:

1.      I am a Board-Certified Clinical Psychologist, licensed to practice in Virginia,

Maryland, and the District of Columbia.  I have been practicing since 1995.  Attached is a copy

of my Curriculum Vitae (Appendix 1).  My qualifications and experience are further detailed in

the expert report that I previously submitted in the above-captioned case (Appendix 2), which

was attached to the Plaintiffs' Motion for Summary Judgment as Exhibit 7.  From 1996 to 2000,

I worked at the District of Columbia Central Detention Facility, serving as the Chief of

Outpatient Mental Health Services for most of that time.  In that capacity, I supervised mental

health services in the D.C. Jail, and directly served two lock-down cell blocks, one of which was

the jail's "supermax" unit.  Since leaving the D.C. Jail, I have received additional training and

ongoing experience in the field of criminal forensic psychology, through which I have

Ex. 1

maintained familiarity with the professional literature on the psychological effects of isolation and reduced environmental stimulation. I am over the age of eighteen and competent to make this declaration.

2.      The attorneys for Plaintiffs Thomas Porter, Ricky Gray, Anthony Juniper, and Mark Lawlor requested that I provide expert consultation on whether 23-hour per day solitary confinement on Death Row for a period of years, to which each of the plaintiffs has been subjected, has led to any mental health consequences for the plaintiffs. I am being compensated at my usual rate of $320 per hour.

3.      My opinions in this case are based on my review of numerous publications and other professional materials, my ongoing education in clinical and forensic psychology, as well as neuropsychology, my experience as a clinical psychologist, my interviews and psychological testing of each plaintiff, and my review of Plaintiffs' mental-health records. I also visited Virginia's Death Row, located at Sussex I State Prison in Waverly, Virginia, on five occasions—March 4, May 14, June 4, June 5, and June 26, 2015—for a total of 27 hours. During this time, I observed the physical conditions and sensory deprivations on Death Row, interviewed each of the plaintiffs, and witnessed the operations of prison staff. Finally, I have reviewed Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment and the Expert Report of Dr. Gregory B. Saathoff MD, filed in the above-referenced case on December 21, 2015.

4.      I have been made aware that as of August 6, 2015 the conditions on Death Row were somewhat relaxed on an "interim" or temporary basis. I have not revisited Death Row since that date because, in my professional opinion, it would be impossible to determine at this early stage whether the changes have had any significant impact on the plaintiffs' condition as recited in my opinion of July 13, 2015 (Appendix 2) or whether they will have any significant

Ex. 1

future impact.

Folstein Mini-Mental Status Exam

5.     The Folstein Mini-Mental Status Exam ("MMSE"), administered to Plaintiffs by Dr. Saathoff, is designed as a screening test for dementia.  It is not designed to detect cognitive impairment caused by emotional distress, psychotic process, dissociative experience, suicide risk, or other mental-health problems.

6.     The items on the MMSE are intentionally easy for individuals without dementia to complete.  For example, in one item, the administrator gives the subject three words; asks the subject to confirm that they heard those words and repeat them; administers a "distractor," such as asking the subject to spell a common five-letter word backwards; and then asks the subject to repeat the original three words.  Other items include asking the subject the date and where they are currently.  This level of simplicity is consistent throughout the exam, a sample of which is attached (Appendix 3).  The most complex tasks involve asking the subject to perform a two-part task and to copy a simple geometric line drawing.

7.     Because the MMSE only detects the severe cognitive deterioration symptomatic of dementia, an individual with at least borderline intelligence can usually be expected to get a perfect or near-perfect score, notwithstanding other mental-health conditions that cause degrees of cognitive impairment.

8.     None of the Plaintiffs have shown signs of dementia or other forms of memory loss.

9.     The MMSE administered by Dr. Saathoff does not have norms to which an individual's score can be compared, and therefore does not account for age, level of education, and other factors.  The purpose of the test is not to reliably measure cognitive function, but to

Ex. 1

indicate a need for further evaluation for dementia when a subject falls below a certain threshold score. As such, the significance of a subject's score is assessed on a pass-fail dichotomy: a score above the cut-off is not an indication of cognitive health but rather a lack of indication of the cognitive impairment associated specifically with dementia.

Social Interaction on Death Row

10.   At the time of my visits to Virginia's Death Row, Plaintiffs were deprived of virtually any meaningful human interaction. Plaintiffs' extended period of isolation had caused serious psychological and/or physical distress and impairment in functioning.

11.   Watching television, listening to music, and reading books are passive activities. They are not a substitute for live, engaging interaction with another person.

12.   Plaintiffs' access to telephones does not remedy the restrictions on in-person human interaction. The most important social interactions for Plaintiffs' mental health are in-person conversations with one another and their loved ones (i.e., persons with whom they have a real relationship). These interactions permit Plaintiffs to relate and converse with others in a way that telephone conversations cannot replicate.

Appearance of Mental Health

13.   Individuals suffering severe psychological harm due to protracted solitary confinement may nonetheless show outward signs of mental health, such as appearing friendly, eating, sharing interests, maintaining an exercise routine, or recreating. Individuals often adopt these behaviors as a survival mechanism, an attempt to maintain normalcy. They do not demonstrate stable mental health or the absence of trauma.

14.   A similar phenomenon is seen in military service-members held as prisoners of war ("POWs"). While suffering the traumas associated with war-time confinement, POWs often

Ex. 1

strive to continue eating, exercising, interacting with others, and generally maintaining optimism. This behavior is generally a survival mechanism, not proof of the absence of psychological harm. Indeed, the psychological damage caused by such trauma is frequently not immediately apparent when the source of trauma is still present.

15.     That Mr. Juniper is friendly to outside observers and prison staff, participates in coordinated exercises, and formerly played cards with fellow inmates is not evidence that Mr. Juniper lacks depression and other psychological impairments.

16.     That Mr. Gray coordinates exercises, played chess with other inmates, and makes phone calls is not evidence that Mr. Gray lacks depression and other psychological impairments.

17.     That Mr. Porter smiles at prison staff, leads exercises, and discusses sports with other inmates is not evidence that Mr. Porter lacks depression and other psychological impairments.


I swear under penalty of perjury that the information I have provided is true to my best recollection.




Michael L. Hendricks, Ph.D., ABPP


Ex. 1

# APPENDIX 1
# TO DECLARATION OF
# MICHAEL L. HENDRICKS, PH.D., ABPP

Ex. 1

# CURRICULUM VITAE

## MICHAEL LAWRENCE HENDRICKS, PH.D., ABPP

Washington Psychological Center, P.C.
Suite 513
5225 Wisconsin Avenue, NW
Washington, D.C.  20015
Phone (202) 364-1575; fax (202) 364-0561
www.wpcdc.com

## EDUCATION

1986 - 1993   **The American University**, College of Arts and Sciences. Ph.D. in psychology (clinical track). APA accredited program.

1986 - 1990   **The American University**, College of Arts and Sciences. M.A. in psychology. APA accredited program.

1979 - 1983   **Michigan State University**, College of Social Science. B.A. with high honors in psychology.

## HONORS AND AWARDS

2015          American Psychological Association, Presidential Citation.

2013          American Psychological Association, Fellow status.

1983          Phi Kappa Phi.

1983          Phi Beta Kappa.

1982          Psi Chi.

1982          Tau Sigma Honor Society.

1982          Golden Key Honor Society.

1979          Michigan State University Academic Excellence Award.

## LICENSURE

Virginia license: Clinical Psychologist #2098

Maryland license: Psychologist #03197

District of Columbia license: Psychologist #PSY1789

## BOARD CERTIFICATION

**Certified specialist (Diplomate) in Clinical Psychology** by the American Board of Clinical Psychology, American Board of Professional Psychology (ABPP): certification #5841

Ex. 1

## CERTIFICATION COURSES

| | |
|---|---|
| 2014 | **Conducting Mental Health Evaluations for Capital Sentencing Proceedings**. Institute of Law, Psyhciatry & Public Policy, University of Virginia. |
| 2013 | **Collaborative Divorce Indisciplinary Team Training**. Virginia Collaborative Professionals, Fairfax, Virginia. |
| 2010 | **Hare Psychopathy Checklist-Revised**. Training by Adelle Forth, Ph.D., approved by Darkstone Research Group, Ltd.  Institute of Law, Psychiatry & Public Policy, University of Virginia. |
| 2010 | **Risk Assessment of Sexually Violent Predators**. Institute of Law, Psychiatry & Public Policy, University of Virginia. |
| 2009 | **Juvenile Forensic Evaluation**. Institute of Law, Psychiatry & Public Policy, University of Virginia. |
| 2008 | **Collaborative Assessment and Management of Suicide (CAMS)**, training by David A. Jobes, Ph.D. American Association of Suicidology, Washington, D.C. |
| 2003 | **Sex Offender Evaluation and Treatment**. Institute of Law, Psychiatry & Public Policy, University of Virginia. |
| 2001 – 2002 | **Basic and Advanced Adult and Juvenile Forensic Evaluation**. Institute of Law, Psychiatry & Public Policy, University of Virginia. |

## PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| 2013 - | World Professional Association for Transgender Health, member. |
| 2004 - | American Academy of Clinical Psychology, fellow. |
| 2000 - 2006 | District of Columbia Psychological Association, member. |
| 1999 - | National Register of Health Service Providers in Psychology, registrant #45922. |
| 1994 - | American Psychological Association, fellow. Also fellow of Divisions 12 (including Section VII) & 44, and member of Divisions 41 and 42. |
| 1992 - | American Association of Suicidology, member. Also member of the Clinical and Research Divisions. |

## COMMUNITY/ PROFESSIONAL SERVICE

| | |
|---|---|
| 2016 - | American Psychological Association Council of Representatives. **Member** (elected in 2015). |
| 2015 - | *Psychology of Sexual Orientation and Gender Diversity*, a peer-reviewed journal of APA Division 44. **Consulting Editor**. |
| 2014 - | *International Journal of Transgenderism*, a peer-reviewed journal of the World Professional Association for Transgender Health.  **Peer reviewer**. |
| 2014 - | Medical Reserve Corps, Arlington County, Virginia. **Volunteer**. |

Ex. 1

2012 - 2015   Society for the Psychological Study of Lesbian, Gay, Bisexual and Transgender Issues (APA Division 44). **President**. This is a three-year elected position, serving one year each as President-Elect, President, and Past President.

## COMMUNITY/ PROFESSIONAL SERVICE (continued)

2011 - 2015   American Psychological Association Task Force on Guidelines for Psychological Practice with Transgender and Gender Non-Conforming Clients. **Member**.

2009 - 2012   American Psychological Association Committee on Lesbian, Gay, Bisexual and Transgender Concerns. **Liaison** from the Society for the Psychological Study of Lesbian, Gay, Bisexual and Transgender Issues (APA Division 44) to the Committee.

2009 - 2011   Society of Clinical Psychology (APA Division 12), Section VII—Clinical Emergencies and Crises. **President**. This is a three-year elected position, serving one calendar year each as President-Elect, President, and Past President.

2008 -        American Board of Clinical Psychology, American Board of Professional Psychology. **Examiner and Examination Committee Chair**.

2007 -        *Professional Psychology: Research and Practice*, a peer-reviewed journal of the American Psychological Association. **Peer reviewer**.

2007 - 2010   Virginia Supreme Court Commission on Mental Health Law Reform, Civil Commitment Task Force (2007-2008) and Future Commitment Reforms Task Forces (2008-2010). **Member**.

2004 - 2005   Council of Delegates, American Association of Suicidology. **Member at Large**.

2003 - 2004   American Association of Suicidology. **Treasurer**.

2001 - 2003   Nominations Committee, American Association of Suicidology. **Member**.

1999 - 2002   Transgender Task Force, Division 44 of the American Psychological Association. **Founding co-chair**.

1997 - 1999   Conference Committee for 1999 Annual AAS Conference; American Association of Suicidology. **Conference Program Chair**.

1994 - 2004   HIV Community Planning Committee, Virginia Department of Health. **Member**. **Chair** of Research Subcommittee; **member** of Ryan White Care Subcommittee.

1994 - 1998   Mental Health Services Advisory Committee, Whitman-Walker Clinic of Northern Virginia. **Member**.

## ACADEMIC POSITIONS

2007 -        **Adjunct Professor**. Psychology Department, The Catholic University of America, Washington, D.C. Graduate psychology course: Clinical Psychopharmacology.

2000 - 2002   **Adjunct Professor**. Argosy University, Arlington, Virginia. Graduate psychology course: Clinical Psychopharmacology.

1997 - 2000   **Clinical Adjunct Professor**. Psychology Department, Howard University, Washington, D.C.

Ex. 1

1997 - 1999   **Adjunct Professor**. Graduate College, Union Institute, Cincinnatti, Ohio.

1994 - 1995   **Adjunct Faculty Member**. National Center for the Prevention and Study of Suicide, Washington School of Psychiatry.

## ACADEMIC POSITIONS (continued)

1990 & 1991   **Adjunct Instructor**. Department of Psychology, The American University. Undergraduate course: Theories of Personality.

1986 - 1987   **Graduate Teaching Assistant**. Department of Psychology, The American University. Courses: Psychopharmacology; Suicide and Life-Threatening Behavior.

1981 - 1982   **Teaching Assistant**. Department of American Thought and Language, Michigan State University. Taught writing workshop for freshman literature courses.

## CLINICAL EXPERIENCE

2000 - 2012   **Independent Mental Health Evaluator/Independent Forensic Evaluator**. Fairfax-Falls Church Community Services Board, Fairfax, VA. Conducted evaluations of adolescents and adults held on temporary detention orders and testified as expert witness at civil commitment hearings; performed criminal forensic evaluations for Fairfax County, Virginia, courts.

2000 - 2002   **Clinical Psychologist**. Counseling and Rehabilitation Services, Inc., Burke, VA. Provision of clinical psychological services, including assessments and treatment, to geriatric and rehabilitation patients at Integrated Health Services nursing facility in Alexandria, VA.

1999 -        **Clinical Psychologist (partner)**. Washington Psychological Center, P.C., Washington, D.C. Provision of individual, group and couples psychotherapy; and psychological, neuropsychological, and forensic evaluations for adolescents and adults. A referral psychologist for the U.S. Postal Service for postal inspectors and for the Federal Aviation Administration. Independent evaluator for American University.

1997 - 2000   **Chief, Outpatient Mental Health Services, and Director of Psychology Training**. Mental Health Services, D.C. Central Detention Facility, Washington, D.C. Management of mental health clinic that provides services to D.C. Jail adult inmate population and juvenile detention unit, supervision of multidisciplinary mental health team, provision of psychotherapy and psychological evaluations for adolescents and adults, policy development, staff and officer training in mental health and suicide prevention, and direction of  clinical psychology graduate student training program.

1996 - 1997   **Treatment Team Coordinator, and Director of Psychology Training**. Mental Health Services, D.C. Central Detention Facility, Washington, D.C. Direction of multidisciplinary team for 80 bed mental health unit within the D.C. Jail, provision of psychotherapy and psychological evaluations, policy development, and direction of clinical psychology graduate student training program.

1995 - 1999   **Clinical Psychologist**. Private practice in Arlington, Virginia, and Washington, D.C. Provision of individual and couples psychotherapy; and psychological, neuropsychological, and forensic evaluations for adolescents and adults.

1994 - 1996   **Psychologist**. Umoja Treatment Services Center, Providence Hospital, Washington, D.C. Provision of individual, couples, family, and group psychotherapy, and psychological evaluations;

Ex. 1

M. L. Hendricks  p. 5

development and teaching of staff training; leadership of clinical case discussions and treatment planning conferences; direction of quality improvement program, development of clinically related policies, and development of curricula for psycho-educational groups in this outpatient methadone maintenance program.

Ex. 1

## CLINICAL EXPERIENCE (continued)

1993 - 1994    **Vocational Consultant**. Life Experiences Activities Program, Silver Spring, Maryland. Evaluation of client applicants to vocational rehabilitation program to determine areas of functional strength and deficit, for development of individualized programs. Assessment involved vocational, cognitive, personality, and psychomotor testing, and coordination of evaluation results with other assessment team members.

1992 - 1993    **Clinical Psychology Intern**. Spring Grove Hospital Center, Catonsville, Maryland. Provision of psychotherapy, and psychological and neuropsychological evaluations with inpatients; direction of weekly process group and case presentation seminar for psychology externs. APA approved internship. *Internship included rotation one day per week, described below.*

1992 - 1993    **Clinical Psychology Intern**. Whitman-Walker Clinic, Department of Mental Health Services, Washington, D.C. *As part of internship at Spring Grove Hospital Center:* Provision of outpatient psychotherapy and neuropsychological evaluations.

1989 - 1992    **Research Psychologist**. Medical Illness Counseling Center, Chevy Chase, Maryland, at Pediatric Branch, National Cancer Institute, National Institutes of Health, Bethesda, Maryland. Provision of psychological and neuropsychological evaluations for clinical and research purposes, design and management of research protocols, data analysis, and writing.

1989 - 1990    **Clinical Psychology Extern**. Alexandria Community Mental Health Center, Alexandria, Virginia. Provision of individual psychotherapy and intake assessments, and psychological assessments; co-facilitation of geriatric supportive therapy group.

1988 - 1989    **Clinical Psychology Extern**. Georgetown University Counseling Center, Georgetown University. Provision of individual psychotherapy; co-facilitation of insight-oriented psychotherapy group for ACOAs; and attendance of mini-courses.

1987 - 1990    **Neuropsychological Psychometrist**. HIV Clinic, Georgetown University Medical Center. Provision of neuropsychological evaluations for research and clinical purposes.

1987 - 1988    **Practicum Therapist**. The American University. Provision of individual, insight-oriented psychotherapy (clients were seen in the private practice of David Gage, Ph.D.).

1987 - 1989    **Graduate Advisor to Student Hotline**. Center for Psychological and Learning Services and the Department of Psychology, The American University. Facilitation of group dynamics in administrative-supervisory structure of hotline, provision of professional consultation and computer support, training of peer counselors, and course instruction to class.

1987    **Neuropsychological Assessment Extern**. William A. White Building, St. Elizabeths Hospital, Washington, D.C. Received didactic training and administered, scored, and interpreted neuropsychological assessment batteries of normals and hospitalized patients.

1986 - 1987    **Practicum Therapist**. Center for Psychological and Learning Services, The American University. Provision of nondirective and cognitive-behavioral therapy (part of a course that included group supervision).

## RESEARCH

2003 - 2008    **Virginia Transgender Health Initiative**. Survey and Evaluation Research Laboratory, Virginia Commonwealth University, and the Virginia HIV Community Planning Committee, Virginia Department of Health. Co-investigator.

Ex. 1

M. L. Hendricks  p. 7

Ex. 1

**RESEARCH (continued)**

1997 - 1999   **Effects on recidivism of the criminal justice system versus the juvenile justice system on juvenile offenders**. Central Detention Facility, Washington, D.C. Research conducted with Andrea Weisman, Ph.D., and Clark Jones, Ph.D.

1994 - 2004   **HIV prevention research**. Multiple research projects conducted at the Survey and Evaluation Research Lab at Virginia Commonwealth University, in conjunction with the Research Subcommittee of the Virginia HIV Community Planning Committee.

1991 - 1993   **The occurrence of suicidal ideation over the course of HIV infection in gay men.** National Cancer Institute, National Institutes of Health. Doctoral dissertation research.

1991 - 1992   **Mood-altering effects of 3TC.** National Cancer Institute, National Institutes of Health. Study conducted with Pim Brouwers, Ph.D.

1991 - 1992   **Effects of primary treatment with anti-retroviral therapies on encephalopathy as detected by CT scans in pediatric HIV-positive patients.** National Cancer Institute, National Institutes of Health. Study conducted with Pim Brouwers, Ph.D.; Charles DeCarli, M.D.; and Lucy Civitello, M.D.

1990 - 1992   **Behavioral changes in children associated with HIV-related encephalopathy as a result of anti-retroviral therapy.** National Cancer Institute, National Institutes of Health. Study conducted with Howard Moss, Ph.D.; Pim Brouwers, Ph.D.; and Pam Wolters, Ph.D.

1989 - 1992   **Neuropsychological effects of treatment with various anti-retroviral therapies in adults with HIV infection.** National Cancer Institute, National Institutes of Health. Study conducted with Pim Brouwers, Ph.D.

1988 - 1990   **Mood predictors of immune functioning in persons with HIV infection.** Georgetown University Medical Center. Master's thesis research.

1987 - 1990   **Neuropsychological changes in HIV infection:  comparing patients with AIDS dementia to patients with Alzheimer's Disease, Huntington's Chorea, and normal controls in a discriminant analysis.** Georgetown University Medical Center. Research assistant to Pim Brouwers, Ph.D.

1983 - 1984   **Attitude changes in medical students as a result of education on lesbian and gay health issues.** College of Human Medicine and College of Osteopathic Medicine, Michigan State University. Study conducted with Janice Sperling, M.D.

1983 - 1984   **Effects of radiation on the mental capacities of pediatric leukemia patients.** Clinical Center, Michigan State University. Research assistant to Robert Noll, Ph.D.

1982   **Effects of helping behavior on mood.** Department of Psychology, Michigan State University. Senior research project.

**PUBLICATIONS**

dickey, l. m., **Hendricks, M. L.**, & Bockting, W. O. (in press). Innovations in research with transgender and gender nonconforming people and their communities. *Psychology of Sexual Orientation and Gender Diversity.*

Ex. 1

Testa, R. J., & **Hendricks, M. L.** (2014). Suicide risk among transgender and gender-nonconforming youth. Invited chapter in Goldblum, P., Espelage, D. L., Chu, J., & Bongar, B. (Eds.), *Youth Suicide and Bullying: Challenges and Strategies for Prevention and Intervention* (pp. 121-133), Oxford: Oxford University Press.

## PUBLICATIONS (continued)

Xavier, J., Bradford, J., **Hendricks, M.**, Safford. L., McKee, R., Martin, E. & Honnold, J. A. (2013). Transgender Health Care Access in Virginia: A Qualitative Study. *International Journal of Transgenderism, 14*(1), 3-17.

**Hendricks, M. L.**, & Testa, R. J. (2012). A Conceptual framework for clinical work with transgender and gender nonconforming clients: An adaptation of the minority stress model. *Professional Psychology: Research and Practice, 43*(5), 460-467.

Goldblum, P., Testa, R. J., Pflum, S., **Hendricks, M. L.**, Bradford, J., & Bongar, B. (2012). The relationship between gender-based victimization and suicide attempts in transgender people. *Professional Psychology: Research and Practice, 43*(5), 452-459.

Testa, R. J., Sciacca, L. M., Wang, F., **Hendricks, M. L.**, Goldblum, P., Bradford, J., & Bongar, B. (2012). Effects of Violence on Transgender People. *Professional Psychology: Research and Practice, 43*(5), 468-475.

Bradford, J., Xavier, J., **Hendricks, M.**, Rives, M. E., & Honnold, J. A. (2007). The health, health-related needs, and lifecourse experiences of transgender Virginians. *Virginia Transgender Health Initiative Study Statewide Survey Report*.

**Hendricks, M. L.** (2001). Clinical issues in the treatment of transgender clients. *Psychology and AIDS Exchange*, Summer 2001/Issue 30.

Kennamer, J. D., Honnold, J., Bradford, J., & **Hendricks, M. L.** (2000). Differences in disclosure of sexuality among African American and white gay/bisexual men: Implications for HIV/AIDS prevention. *AIDS Education and Prevention, 3*(2), 164-180.

Moss, H. A., Wolters, P. L., Brouwers, P., **Hendricks, M. L.**, & Pizzo, P. A. (1996). Impairment of expressive behavior in pediatric HIV-infected patients with evidence of CNS disease. *Journal of Pediatric Psychology*.

Brouwers, P., Mohr, E., Hildebrand, D., **Hendricks, M.**, Claus, J. J., Baron, I. S., Young, M., & Pierce, P. (1996). A novel approach to the determination and characterization of HIV dementia. *Canadian Journal of Neurological Sciences*.

Brouwers, P., Mohr, E., **Hendricks, M.**, & Baron, I. (1989). The use of discriminant analysis to differentiate the neuropsychological profile of HIV patients. *Journal of Clinical Experimental Neuropsychology, 11*, 35.

## PRESENTATIONS

dickey, l. m., Singh, A. A., & Hendricks, M. L. **Affirmative Counseling with Trans and Gender Nonconforming Clients: From Genderqueer to Letter Writing**. Pre-convention workshop given at the annual  American Psychological Association Convention, Toronto, Ontario, August 2015.

Singh, A. A., dickey, l. m., & Hendricks, M. L. **Affirmative Counseling with Trans and Gender Nonconforming Clients: From Genderqueer to Letter Writing**. Pre-conference workshop given at the biennial National Multicultural Conference and Summit, Atlanta, Georgia, January 2015.

Singh, A. A., dickey, l. m., Ducheny, K., Chang, S., Hendricks, M. L., & Bockting, W. **Trans-affirmative psychological practice guidelines for working with trans clients**. International Symposium of the World Professional Association for Transgender Health (WPATH). Bangkok, Thailand, February 2014.

Ex. 1

dickey, l. m., & Hendricks, M. L. **Beyond Trans 101: Psychological Practice and Advocacy with Transgender and Gender Non-Confirming (TGNC) clients**. Workshop given at the American Psychological Association, January 2014 and again in August 2014.

Ex. 1

## PRESENTATIONS (continued)

dickey, l., Singh, A. A., Ducheny, K., & Hendricks, M. L. **Practice guidelines for trans clients: Developing affirmative approaches**. Invited pre-conference workshop given at the biennial National Multicultural Conference and Summit, Houston, Texas, January 2013.

Hendricks, M. L. **Risk and resilience in LGBT populations: Clinical applications of a minority stress model**. Workshop given at the Maryland Psychological Association Annual Convention, Annapolis, Maryland, October 2012.

Hendricks, M. L. **A model for understanding risk and resiliency in transgender and gender-nonconforming individuals**. Part of symposium on Risk and resilience in transgender populations, at the American Psychological Association Annual Convention, Orlando, Florida, August 2012.

Hendricks, M. L. **Suicide risk among transgender individuals.** Colloquium given at Palo Alto University, Department of Psychology, Palo Alto, California, May 2011.

Hendricks, M. L. **Giving expert testimony** (three workshops). Fairfax-Falls Church Community Services Board Emergency Services, Fairfax, Virginia, February 2011.

Hendricks, M. L. **Suicide risk in a transgender population.** American Psychological Association Annual Convention, San Diego, California, August 2010.

Hendricks, M. L. **Suicide assessment and treatment: Basic skills training & Advanced skills training** (two workshops). Association of Community Mental Health Centers of Kansas, Inc., Kansas City, Kansas, September 2008.

Hendricks, M. L. **Suicide assessment, treatment, and Virginia's new civil commitment laws.** Northern Virginia Academy of Clinical Psychologists, Tyson's Corner, Virginia, September 2008.

Hendricks, M. L. **Suicide risk: What you should know. What you can do.** Workshop for Pretrial Services staff of the D.C. Superior Court, Washington, D.C., May 2007.

Hendricks, M. L. **Capacity evaluations in older adults.** Seminar for Elder Law Consortium, Arlington, Virginia, June 2006.

Bradford, J., Xavier, J.M., & Hendricks, M.L. **Community-based infrastructure for transgender care—a model public health initiative.** American Public Health Association Annual Meeting, Philadelphia, Pennsylvania, December 2005.

Hendricks, M. L., Bradford, J., & Xavier, J. **The Virginia Transgender Health Initiative: Assessing needs.** Symposium at the American Psychological Association Annual Convention, Honolulu, Hawaii, August 2004.

Hendricks, M. L. **Internet compulsive sexual behavior.** Workshop sponsored by the Child Center and Adult Services, Inc., and presented at Johns Hopkins University, Rockville, Maryland, November 2003.

Hendricks, M. L. **Psychiatric Issues in the Elderly**. Workshop for inpatient psychiatric unit staff.  Mt. Vernon Hospital, Alexandria, VA, August 2002.

Hendricks, M. L. **Suicide assessment, prevention and intervention.** 2-3 hour workshop presented to various professional groups on various dates.

Ex. 1

Weisman, A., Hendricks, M., Mebane, W., & Jackson, D. **The behavioral management of malingerers.** Annual Conference of the National Commission for Correctional Health Care, San Antonio, TX, November 1997.

## PRESENTATIONS (continued)

Hendricks, M. L. **The influence of incarceration on the suicide rate among African Americans.** *Proceedings of the 30th Annual Conference of the American Association of Suicidology*, Memphis, TN, April 1997.

Hendricks, M. L. **Development of a mental health services program at the D.C. Jail.** Annual Convention of the American Psychological Association, Toronto, Ontario, August 1996.

Hendricks, M. L. **Suicide assessment among adolescents.** Prefessional development series at Regional Institute for Children and Adolescents, Rockville, MD, July 1996.

Gregory, M., Hendricks, M., Izzo, J., Lopresti, J., & Young, E. **Strengthening our communities through group work.** *Proceedings of the 51st Conference of the American Group Psychotherapy Association*, Washington, D.C., February 1994.

Hendricks, M. L. **Assessment of suicide risk in clients with HIV.** Mental Health Services, Whitman-Walker Clinic, Washington, D.C., May 1993 & September 1994 (workshop).

Hendricks, M. L. **HIV-associated suicidal ideation in gay men.** *Proceedings of the 26th Annual Conference of the American Association of Suicidology*, San Francisco, CA, April 1993 (paper).

Hendricks, M. L. **Neuropsychological considerations in the treatment of HIV.** Referral Therapists Group, Whitman-Walker Clinic, Washington, D.C., May 1992 (lecture and discussion).

Brouwers, P., Mohr, E., Hendricks, M., Cox, C., Young, M., Baron, I., Fedio, P., & Pierce, P. **Comparison of HIV to Huntington's and Alzheimer's dementias: Differential neuropsychological patterns.** *Proceedings of the IVth International Conference on AIDS, 1*, #7046:389. Stockholm, Sweden, June 1988.

Ex. 1

# APPENDIX 2
# TO DECLARATION OF
# MICHAEL L. HENDRICKS, PH.D., ABPP

Ex. 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| **THOMAS PORTER, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Civil Action No. 1:14cv1588** |
| **vs.** | : | |
| | : | |
| **HAROLD C. CLARKE, et al.** | : | |
| | : | |
| **Defendants.** | : | |

### REPORT OF
### MICHAEL L. HENDRICKS, PH.D., ABPP

At the request of plaintiffs' attorneys, I evaluated Thomas A. Porter, Ricky J. Gray, Anthony B. Juniper, and Mark E. Lawlor, plaintiffs in the above-referenced suit, and reviewed numerous relevant records and articles from the professional literature in preparation for the possibility of providing expert testimony in this case. Specifically, I was asked to assess whether 23-hour per day solitary confinement for a period of years on death row, to which each of the plaintiffs has been subjected, has led to any mental health consequences on the plaintiffs.[1]  I have been retained by plaintiffs' attorneys to conduct these evaluations and am being paid at my usual rate of $320 per hour. This statement is accompanied by several appendices, which provide further information, and which are cited in the text of this statement.

---

[1]  Plaintiffs Anthony Juniper, Ricky Gray, Thomas Porter, and Mark Lawlor have spent, respectively, more than nine, eight, seven, and three years in solitary confinement on Virginia's death row

Ex. 1

## I.    QUALIFICATIONS AND EXPERIENCE

I am a licensed and Board-Certified Clinical Psychologist and have been practicing since 1995. Attached is a copy of my Curriculum Vitae (Appendix 1), which summarizes my scholarly and professional credentials. I would like to highlight information from my C.V. that is particularly relevant to my involvement in this case, to explain particular areas of relevant expertise that I possess.

As noted on my C.V., from 1996 to 2000—for a period of approximately four and a half years—I worked at the District of Columbia Central Detention Facility. For the majority of that time, I was the Chief of Outpatient Mental Health Services. This involved managing a mental health clinic that served the needs of 16 of the 18 cell blocks in the D.C. Jail (the other two units were mental health blocks, where services were provided on the unit) and supervising a psychiatrist, a psychiatric nurse, and several mental health clinicians (psychologists, social workers, and licensed professional counselors). I assigned each clinician to two or three cell blocks for which they served as the primary respondent for requests for mental health services. The two blocks that I served directly were both lock-down blocks; one of these was the jail's "supermax" unit.

The supermax unit at the D.C. Central Detention Facility was a typical jail cell block that had been converted to supermax specifications. Inmates were confined to their cells for 23 hours per day, similar to death row at Sussex I State Prison. However, inmates were placed on the supermax unit at the D.C. jail based solely upon institutional behavior (i.e., not based upon the nature of their legal charges), the cell doors were constructed of steel bars (not a solid panel), inmates were typically housed in adjacent cells as well as cells that were directly across the tier

2

Ex. 1

from each other, and, because this was a jail, confinement on this unit typically lasted a matter of months rather than years. Because of the proximity of the inmates to each other and the open structure of the cell doors, communication was relatively easy, which allowed for at least this level of human interaction.

For each of the lock-down blocks (including the supermax unit), I worked closely with correctional staff and in collaboration with the Court Monitor[2] to develop a level of mental health assessment and management that allowed for close tracking of inmates' mental status, which involved a mental health clinician visiting each cell and engaging in meaningful interaction (including but not limited to: announcing their presence as they entered each tier of the unit and stopping at each cell and addressing each inmate by name, with the expectation of a response and participation in, at minimum, a mental status evaluation) with each inmate on these units at least once per week (three times per week on the supermax unit) to assess any changes in mental status. This level of frequency was determined, after a close examination of the research literature regarding the psychological consequences of social isolation and consultation with several experts in this field, to be the minimum necessary because of the negative psychological effects of solitary confinement (specifically, the dramatic reduction in human interaction and environmental stimulation that prisoners experience in solitary confinement) that are well-established in the professional literature. It was further determined that for an adequate assessment and tracking of each inmate's mental status on the supermax unit, a genuine attempt to engage each inmate on each of the three visits per week was necessary—and at least two of

---

[2] I was hired into my position at the D.C. jail under the auspices of a Court-appointed receiver. The Court had installed a receiver to operate medical and mental health services at the jail after a spate of 19 suicides in a little more than a year. The task for those employed by the receiver was to bring medical and mental health services up to a reasonable standard of care within the constraints of the jail setting. A part of determining the standard of care involved a thorough review of the relevant extant research and profession literature for each of the policies and procedures that were enacted; each of these policies and procedures, as well as their justification, was then reviewed by a Court-appointed Monitor, whose approval was required before implementation.

Ex. 1

those attempts needed to result in in interpersonal exchange sufficient to conduct a brief mental status examination. Achieving this level of interaction required that each inmate be informed (i) of the purpose of these visits, (ii) that mental health services (including counseling or therapy) were available if indicated, and (iii) that the ultimate goal of this approach was the maintenance of their mental health despite the difficulty of the housing situation.

I worked closely with the supermax unit for more than three years, which allowed me to observe directly many of the clinical effects of isolation described in the literature and to develop procedures and strategies for mitigating, at least in part, many of these effects—typically by offering psychological and psychiatric services as appropriate. For inmates who exhibited changes in mental status due to isolation that did not respond to treatment approaches, I communicated these changes to the Warden of the jail and consulted with the Warden to determine whether a change in housing was appropriate or, if not, what other environmental measures might be initiated to mitigate the negative effects of isolation.

After leaving the D.C. Jail, I went into full-time private practice at the Washington Psychological Center, P.C., in Washington, D.C. I continued to obtain training in forensic evaluations to maintain competence in this specialized area of psychology. Among the training that I received were courses in forensic psychology at the Institute of Law, Psychiatry and Public Policy at the University of Virginia. These courses provided the requisite training to be placed on the Virginia Supreme Court's list of qualified evaluators for criminal forensic cases—a list on which I remain. My practice currently consists of approximately 60% forensic evaluations and 40% clinical treatment (psychotherapy).

Both because of my work in the D.C. Jail and because of my ongoing forensic work, I

4

Ex. 1

have maintained a familiarity with the professional literature that addresses the psychological

effects of isolation and reduced environmental stimulation, such as what inmates on special

housing units experience. I have included a number of references to the most pertinent research

in Appendix 2. I have also testified in numerous cases. The cases in which I have testified in the

last four years are presented in Appendix 3. I have been qualified and testified as an expert

witness more than 1,600 times on mental health issues in Virginia and federal courts, among

other jurisdictions.

I am licensed in three jurisdictions (Virginia, Maryland, and D.C.), am board-certified in

Clinical Psychology, and am a Fellow of the American Psychological Association as well as

being a member of, among other divisions, the APA divisions for clinical psychology and

forensic psychology.

## II.    BASES FOR FINDINGS AND OPINIONS

My opinions in this case are based on my review of a number of publications and other

materials, ongoing continuing education that I have received throughout the course of my career,

my experience as a clinical psychologist, and my interviews of the plaintiffs in this case. I began

by reviewing the findings of fact made by the District Court in Prieto v. Clarke, which were

helpful to me, in large part because the findings of fact were confirmed in all respects pertinent

to my review. I visited Virginia's death row, located at Sussex I State Prison in Waverly,

Virginia, on March 4, May 14, June 4, June 5 and June 26, 2015. Over the course of these five

visits, I had an opportunity to personally observe the physical construct of death row and the

sensory deprivations created by the system in place. On each visit, I conducted detailed

interviews of each of the plaintiffs in this case and also conducted psychological testing as part

5

Ex. 1

of my assessment. In total, I spent nearly 27 hours in the death row unit at Sussex I State Prison, the vast majority of which time was spent conducting my assessments.

I also received and reviewed numerous documents that address each plaintiff's mental state prior to arriving at death row and during each man's stay on death row. For each plaintiff, these records include at least one formal report that includes an assessment of individual functioning prior to placement on death row (in most of the cases, this report is a Presentence Investigation Report). I have included as Appendix 4 an itemized list of the documentation that I reviewed prior to reaching my conclusions and opinions in this evaluation.

## III.   OBSERVATIONS AND RESULTS OF EVALUATIONS

The effects of psychological harm from long term isolation have been well studied. In the last 15 years or so, that research has focused increasingly on isolation that resulted from conditions in U.S. prisons and jails, in response to a dramatic increase in supermax units that began in the 1990s.[3] It is worth noting that the research, particularly as it relates to special housing units in jails and prisons, has advanced greatly in the last 15 years, furthering the scientific understanding of the harmful effects of solitary confinement and social isolation in these facilities. Indeed, much of what we now know about these effects is relatively new. Among the more notable and noteworthy of these studies were those conducted under the leadership of Dr. Craig Haney, a psychologist who has spent much of his career studying the various effects of incarceration and ways to ameliorate the negative psychological effects of incarceration. Dr. Haney's work is well-known in the field of psychology. Among his other work, Dr. Haney studied the psychological effects of being on the Special Housing Unit at Pelican Bay.[4]

---

[3] See King, R. (2000). The rise and rise of supermax: An American solution in search of a problem? *Pushishment and Society, 1*, 163-186.

[4] See, e.g., Haney, C. (2003). Mental health issues in long-term solitary and "supermax" confinement, *Crime and*

6

Ex. 1

Generally speaking, common adverse psychological effects of isolation housing in prison and jail settings (i.e., typically found to have been experienced by at least half of inmates in these settings) include anxiety, headaches and other psychosomatic symptoms[5], lethargy, insomnia, decreased appetite, and nightmares. Less common (though not rare) effects include hallucinations, psychotic paranoia, delusions, dissociation, and suicidal ideations. These adverse effects have been shown to result from deprivation of both (i) sensory or environmental stimulation and (ii) social interaction.

It is worth noting my observations of the housing unit where plaintiffs are located while visiting death row. The District Court's description of the conditions of Virginia's death row in its Prieto decision captured the essence of Virginia's death row and lines up with my observations. When I arrived on death row I was first struck by the cavernous structure, which is comprised of two tiers containing 44 cells spread over two levels but houses only seven men. All of the cells were aligned along two axes, forming roughly a right angle, and all faced the large, open common area. The floor of the common area was barren except for one octagonal steel table, fixed to the floor, with four attached seats also fixed to the floor. The walls of the unit were barren other than a clock, security cameras, a drinking fountain on the lower level, several telephones, and signs (indicating e.g., "No smoking," "how to report sexual abuse"). Six of the seven inmates were housed on the upper tier; one on the lower tier. Most of those on the upper tier were on the same axis, meaning that all their doors faced the same direction, such that it was not possible to view the doors of other occupied cells from inside these cells. In addition, there was at least one empty cell separating the occupied cells, which would serve to limit auditory communication between the occupied cells.

---

*Delinquency, 49*(1), 124-156.
[5] Psychosomatic symptoms are symptoms with physical manifestations for which no physical cause can be found.

7

Ex. 1

I was able to look in on an empty sample cell and saw its tiny confined space, which appeared to measure about seven feet wide by ten feet deep and contained a steel bed attached to one wall, a small "desk" adjacent to the bed, and a commode/sink combination. There was no seating in the cell other than the bed and the commode. On the far wall of the cell was a narrow horizontal window that was covered with steel mesh through which a minimal amount of light may pass, and with limited visibility. There was a large light fixture attached to the wall across from the bed that is controlled by correctional officers. The cell door was a solid steel door with a vertical plexiglas window approximately four inches wide by 20 inches high and with a tray slot (large enough to fit a serving tray). The tray slots on all the occupied cell doors were bolted from outside the cell and kept locked closed.

During one visit, I was escorted outside the unit, where I was able to observe the outdoor recreation "cages" in which each of the plaintiffs is afforded outside recreation time. Each cage was about eight feet wide by about ten feet deep and was surrounded on four sides and on the top by steel cyclone fencing. The plaintiffs reported that while in the past they had been allowed recreation in adjacent cages (which would allow them to engage in interpersonal activity, such as playing board games), they now are placed in cages with at least one empty cage between every two occupied cages, thereby rendering interpersonal interaction and communication difficult to impossible. Additionally, it was only since the filing of this lawsuit that water was being denied to those who took exercise outside (i.e., water previously was provided during their exercise time, but now is no longer permitted).

The profound lack of environmental and other sensory stimulation on the death row unit hews closely to the sensory deprivation described in the studies in the research literature that

8

Ex. 1

ultimately resulted in the adverse psychological effects noted above.

On two occasions, I was on the unit when Ms. Lyons, the mental health staff person who visits the unit, arrived on the unit. Both occasions occurred on Thursdays. This is notable because each of the plaintiffs had informed me that Ms. Lyons visits the unit once per week, typically on Thursdays. Consistent with this, I did not observe her presence on the unit on Wednesday or Friday visits. On both occasions when I did see her, I observed her approach each occupied cell, briefly peer into the cell, and then make a notation on the clipboard that resides on the outside of the occupied cell doors. In all but one case, she spent a total of less than one minute at each cell door. In no case did I see her enter any of the cells. The brevity of her visit to each cell seemed to indicate that she engaged in no discussion with the inmates. This is consistent with the description that each plaintiff provided upon questioning: Each plaintiff reported that Ms. Lyons only engages in conversation with them if they initiate the conversation. Since they are often unaware that she has even been at their cell door (they all indicated that she does not say, "hello," or initiate any conversation) they are deprived of this opportunity for interaction, even if only on a weekly basis.

On my first two visits, my meetings with the plaintiffs all shared a common thread. Each man described the intense loneliness he felt by the lack of opportunity to engage with another human being. I was advised by those who had been there longer (seven and eight years respectively) that they formerly were permitted to have contact visits with immediate family members, but that those visits had been rescinded some years back. The inmates also reported that fairly recently their placement in the outdoor recreation cages was changed so that they are now no longer in adjacent cages but rather are separated by at least one empty cage when

9

Ex. 1

outside.

Each of the plaintiffs in our initial meetings described symptoms that occurred only after their arrival on death row and which are consistent with the types of symptoms that have been described in the research literature on the psychological effects of isolation. Two of the men reported being able to sleep no more than four hours in a 24-hour period.[6] One inmate reported nightmares. Three of the men reported severe anxiety symptoms, three reported severely decreased appetite (including eating only because it is physically necessary), all four reported suicidal ideation (with one having engaged in deliberate self-harm while on death row), two reported visual hallucinations, one reported auditory hallucinations, one reported paranoid symptoms, and one reported hives that were later determined to be psychogenic (and which were unresponsive to topical treatments but resolved after treatment with antianxiety medication). All of these symptoms were described as either having occurred only since placement on death row or (in one case only) having been greatly exaggerated compared to prior symptoms after placement on death row. More detailed descriptions of each plaintiff's symptoms and mental state are provided below.

Each of the men described a great amount of difficulty being able to obtain and maintain mental health treatment for their symptoms, which mostly involved only the use of psychiatric medication. Treatment was reported to have begun only after more than a month of requesting such treatment, and in a couple of cases, medication was stopped suddenly without notice or explanation for a long period of time before it was resumed after repeated attempts to re-obtain treatment.

Each plaintiff, when asked what he would want to do if he could, while remaining on

---

[6] Five hours of sleep is generally considered the minimum necessary to maintain physical health; six to seven hours of sleep is considered the minimum necessary to maintain mental health.

10

Ex. 1

death row, described a longing for some sort of human interaction. All of the plaintiffs said that they would like contact visits with family, and most said that they would like to have some interaction with other inmates on the unit. The inmates described how they had once been placed in adjacent cells on the unit, which allowed for at least auditory communication. Because of this proximity, they were able to engage in conversation and to play games (such as chess, by each man having a chess board and pieces and calling out moves). Now, they report that they cannot hear each other well (one inmate noted that he got a headache from trying to hear) because of the echo that is created by any noise on the unit and they are also no longer allowed to purchase games from the commissary. They reported that their only human interaction is brief and cursory conversations with the correctional officers, and focused interactions with the medical staff, when they do have appointments.

I reviewed the institutional disciplinary records of each plaintiff, which might account for restrictions that exceed those typically required on a maximum security unit. I noted that one inmate (Gray) has no institutional infractions and one inmate (Lawlor) has one minor infraction, for possession of tobacco. The other two inmates (Porter and Juniper) have numerous disciplinary infractions, although none are violent offenses and nearly all of those infractions occurred more than five years ago.

Following is a more detailed account of the psychological symptoms and state of mind for each of the plaintiffs. In these accounts, I have focused on changes to their psychological condition since arrival on death row, so that symptoms reported below are either new or represent a significant exacerbation of previous symptoms.

Thomas A. Porter. Mr. Porter, according to records and to his self-report, had the least

11

Ex. 1

amount of psychological symptomatology prior to his placement on death row. Indeed, his only prior interaction with mental health services occurred when he was a child and was briefly prescribed stimulant medication for suspected Attention Deficit/Hyperactivity Disorder.

Mr. Porter reported that he currently gets only about three hours of sleep per 24-hour period, that it takes him hours to fall asleep, that he wakes before he needs to, and that he feels "like a gerbil on a wheel." He noted that even the correctional officers on the unit have asked him why he never seems to sleep. Mr. Porter said that he feels restless and anxious nearly all of the time, which he attributed to being alone all of the time. Mr. Porter reported that food all tastes pretty much the same to him now. This is noteworthy because food always had great meaning for him and represented one of his greatest pleasures. He noted that this loss of pleasure applies to everything else that he once enjoyed, including listening to music and watching movies. As a result, he no longer is able to find enjoyment in even the most basic of activities and now feels sad all of the time. He noted that he eats to create a semblance of normalcy, but that it usually does not accomplish that aim. Mr. Porter reported a dramatic decrease in his motivation, noting that this affects a number of activities, including maintaining his hygiene. He reported that he also has become quite a procrastinator—something that he never used to be. He noted that he procrastinates on virtually everything (e.g., correspondence with family, maintaining his hygiene), simply because he lacks motivation to do anything. Mr. Porter also reported a dramatic decrease in his concentration, noting that he misses critical information even when watching a movie or television show, making it difficult for him to make sense of the outcome of a plot.

When asked about his mood, Mr. Porter noted that he feels depressed and angry all the

12

Ex. 1

time, but does not know how to deal with these feelings. He also reported feelings of hopelessness and insecurity. When asked to explain, he said that he feels that there is no point in his trying to do things that he should do (like maintain correspondence with his family) because of his belief that others do not deem him worthy of their time and attention. In this way, he feels worthless as a person. He noted that this feeling of worthlessness has surfaced only in the last few years, and long after his initial placement on death row. In this way, he was able to clarify that it was not attributable to his death sentence. Mr. Porter also reported having frequent suicidal ideation, though he noted that he would never act on these thoughts because he views suicide as a coward's way out. When queried further, he stated that his thoughts of suicide are not because of his sentence, but rather because the lack of social interaction on death row deprives him of material he can use to distract himself from these thoughts when he is alone.

Ricky J. Gray. Mr. Gray's notable prior mental health history consisted of the administration of Risperdal, an antipsychotic medication, while he was at the Richmond City Jail. While at the jail, he spent approximately 10 months in isolation and he reported to staff that he was hearing voices. Mr. Gray explained that he thinks that the voices he heard then, which he said were fairly minimal and infrequent, might have actually been a lingering effect of the multiple drugs that he had been using while on the street prior to his incarceration. He reported that for at least the last couple of years, he has experienced visual hallucinations "all the time" that drive him "a whole lot mad." Additionally, he related thoughts that he has that are clearly paranoid in nature.

Mr. Gray reported that he typically gets four to five hours of sleep in a 24-hour period, noting that when he first arrived on death row he typically got six to eight hours of sleep. He

13

Ex. 1

noted that even fairly quiet noises now wake him up, and that if he wakes during the night he is unable to get back to sleep. He reported that occasionally he goes up to 48 hours without sleep. He also reported that he tends to have intense dreams that are sometimes violent in their content. Mr. Gray reported that food no longer tastes good to him, but that he tends to eat to counteract constant depression. Relatedly, he noted that while he has struggled with weight issues since adolescence, he typically weighs about 230 pounds. Since arriving on death row, he has gained a considerable amount of weight, not weighing between 300 and 320 pounds. He said that he has been unable to lose weight despite concerted attempts to do so.

Mr. Gray reported that he spends nearly all day lying on his bed in his cell, that he has no energy or motivation to do anything, and that he has reached the point where his procrastination has reached a whole new level. As an example, he related that he has Christmas cards from two years ago that he has not opened because of lack of motivation to do so. He noted that his concentration is impaired to the point that he has repeatedly turned the channel while watching a television show or movie, often just when the plot is reaching its conclusion and thereby depriving himself of knowing what happened. He described how he gets very frustrated with himself for doing this, but can't seem to prevent it from happening because he loses his concentration and his mind wanders. Additionally, Mr. Gray noted that he even has difficulty now following conversations he has with people. Mr. Gray reported feeling depressed nearly constantly and reported that he fantasizes about how he might injure himself in his cell sufficiently to cause his own death. While he said he spends a fair amount of time with these fantasies, he noted that he has never acted on these thoughts because he has not figured out a surefire way to kill himself.

14

Ex. 1

Besides psychological symptoms, Mr. Gray also reported that he has constant back pain and frequent headaches because of having no place in his cell where he can sit with back support. As a result, he remains lying down on his bed most of the time, but this results in his back pain and headaches. In addition, he reported that he often sweats a lot in his cell, even though he is not engaging in any form of exercise, and that he has periodic episodes when his heart races. He was unsure whether this latter symptom was the result of heart problems or represented a panic attack. Mr. Gray also reported that since being on death row he has experienced multiple episodes of hives and rashes on various parts of his body. After topical treatments failed, he said that the medical staff concluded that this was psychogenic in nature. However, it then took six months of repeated requests before he was finally able to see the psychiatrist, who ultimately prescribed an anti-anxiety medication that largely resolved the issue.

Anthony B. Juniper. Mr. Juniper reported, and records reflect, that he had a history of depression prior to his arrival on death row. Specifically, he had been previously diagnosed with having Dysthymia, which is a constant form of depression, but typically without any vegetative symptoms, such as changes in appetite, energy level, motivation, and concentration. Prior test results indicate that he exhibited no psychosis or thought disorder, or any suicide ideation or intent.

Mr. Juniper reported that his sleep follows an irregular pattern and that he typically is able to sleep for only a couple of hours at a time. He also noted that he has sleep apnea and that this contributes to his difficulty sleeping. Nonetheless, he noted that in the last nine months or so, he has not been able to fall asleep unless he is thoroughly exhausted; this sometimes results in his going up to 24 hours without going to sleep. Mr. Juniper reported that while food has lost

15

Ex. 1

much of its taste for him, he tends to eat to comfort himself. He noted that this is particularly problematic because he has insulin-dependent diabetes mellitus and so this can wreak havoc with his blood glucose levels. As a result of his eating for comfort, he has gained considerable weight since arriving on death row: going from 276 pounds to his current 310 pounds. He did report that he has tried to lose weight, but that the lack of ability to get a sufficient amount of exercise has largely thwarted his attempts.

Mr. Juniper reported feeling depressed all the time. He also reported having very little motivation to do much of anything. He described how his most recent letter to his mother took him two weeks longer to write than it would have when he had first arrived on death row. He also noted that his concentration has diminished, such that it is difficult for him to follow a conversation, and his mind wanders from topic to topic—a clear departure from his previously goal-oriented style of thinking. Mr. Juniper reported that he previously worked out and meditated daily, but that he rarely engages in either of these activities anymore due to a lack of interest and motivation. When asked how his current depression compares with his state of depression prior to death row, Mr. Juniper said that it is now "more intense." When asked to give examples of how it is more intense, he related that he has greater difficulty falling asleep, that he has notably decreased concentration, and that he now has frequent suicidal ideation—something he said he never had before arriving at death row. He reported that he cut his wrists while on death row a couple of years ago, for which action he was charged for self-mutilation. Mr. Juniper also reported that for at least the last couple of years he has experienced auditory hallucinations, which consist mostly of voices providing commentary on various topics and on what he is experiencing, and visual hallucinations that consist of shadowy objects seen in his cell. When

16

Ex. 1

asked, he confirmed that he had never before experienced any hallucinations prior to being housed on death row.

Mark E. Lawlor. Mr. Lawlor has a long-standing diagnosis of Major Depressive Disorder with a question of whether he might have Bipolar Disorder. He received treatment for years for his depression before arriving on death row, and was also previously treated for Attention Deficit/Hyperactivity Disorder. Because of this, his prior diagnoses were taken into account in a way that what is presented here focuses on any notable differences in his mental status or symptoms since being on death row.

Mr. Lawlor continues to receive antidepressant medication for his psychiatric diagnosis of Major Depressive Disorder while on death row. He reported that he currently gets five or six hours of sleep at night, though he is awakened at 3:00 a.m. for a check of his blood glucose level, because he has insulin-dependent diabetes mellitus. He reported that since arrival on death row, he awakens with a sense of "doom and dread," which he had not experienced before. He also reported that he typically has bad dreams nearly every night. He reported that he lately finds it difficult to motivate himself to do things he normally would have done with ease, such as writing letters to family members, drawing, and reading. Similarly, he noted that he now tends to procrastinate, which is a new phenomenon for him. In describing a marked decrease in his concentration, Mr. Lawlor described how he now has to re-read whole sections of a book and is no longer able to follow the plot on a serial or mini-series show on television. He also noted that he sometimes loses track in the middle of a conversation. He noted that the things that he once enjoyed now feel like chores to him. Perhaps most notably, Mr. Lawlor has in the last few months withdrawn from nearly all social interaction on the unit at all.

17

Ex. 1

In my considerable work with individuals confined to small, sensory-limited cells with little natural light, I have observed that it is not unusual for symptoms like those described above to occur when a combination of sensory deprivation and social isolation is maintained over the course of months or longer.

## IV.   FINDINGS

Based upon all of the information that I collected over the course of these evaluations, including psychological testing and extensive, detailed interviews with each plaintiff, and my observations of the death row unit, I have concluded that:

1. All plaintiffs have been subjected to years of isolation as a result of spending 23 hours per day in their cells, with very limited contact with each other or with prison staff. It is noteworthy that much of the research conducted on the deleterious effects of isolation examined the effects of isolation for a period of a few days to up to a month; years of isolation, like what the plaintiffs in this case have experienced, far exceeds the duration of isolation examined under typical experimental procedures.

2. Extended periods of isolation lead to adverse mental health, and sometimes physical health, consequences in even previously healthy individuals. Protracted periods of isolation (those that exceed what has been studied experimentally) have similar results but with a greater magnitude of symptomatology. Furthermore, the effects of extended periods of isolation on individuals who have a pre-existing mental illness are generally greater than the effects experienced by previously healthy individuals. This is largely attributable to the typically reduced capacity for coping and resilience in persons with mental illness.

18

Ex. 1

3.  As a result of protracted isolation, each plaintiff has developed serious psychological and/or physical distress and impairment in functioning. This distress and impairment exceeds any distress and impairment that was evident prior to each man's arrival on death row.

4.  To the extent that each of the plaintiffs has maintained any amount of mental health, it is because humans are by nature resilient and develop coping mechanisms for dealing with even very harsh and harmful conditions. Each of the plaintiffs described at least some coping strategies for dealing with the effects of isolation over a long period of time. The coping strategies that the plaintiffs have developed and employed include creative use of the limited items available to them (such as using M&Ms for their color in drawings) and devising ways of distracting themselves from boredom by relying on forms of self-entertainment. However, such coping mechanisms make people less social precisely because they thwart basic desire for human interaction and instead rely on internal resources that have no connection with meaningful social interaction with others. In this way, the very coping mechanisms that the plaintiffs have employed have ultimately deprived them of a core element of what it means to be human. These coping strategies also are now a part of the personality expression for each of the plaintiffs and so have a lasting effect on each man's personality functioning, much the same way that soldiers are forever changed by the coping strategies that they acquire when at war—which is to say that this become part of the new "baseline" from which any attempts at reversal of these changes must begin.

19

Ex. 1

5.  The mental health services offered on the unit consist of a weekly visit by a staff person who makes no attempt to engage any of the inmates, though she reportedly does talk to them if they initiate the conversation. There is also a psychiatrist who prescribes medication, but it can take a month or longer to get an appointment with him.

## V.   OPINIONS

Following from the findings and conclusions detailed above, it is my professional opinion that the 23-hour per day solitary confinement in which the plaintiffs have been kept on death row is seriously damaging to their mental and physical health in the following ways:

1.  It has created a profound disturbance in sleep patterns and total sleep time. This disturbance exceeds that which is commonly observed in inmates in prison and jail settings that are due to institutional schedules that can interrupt sleep at various times.

2.  It has led to clinical levels of depression that include dysphoric mood, constricted affect, hopelessness, feelings of worthlessness, anhedonia (loss of enjoyment in even basic pleasures), anergia (a low level or lack of energy), and suicidal ideation.

3.  It has substantially reduced initiative and motivation to maintain a healthy physical condition. This results in inadequate amounts of exercise (even within the restrictions of what can be accomplished in a confined space), unhealthy dietary practices, and reduced attention to hygiene and self-care.

4.  It has substantially reduced initiative and motivation to maintain contact with family members and other loved ones, including through correspondence.

5.  It has caused impairment in concentration and attention.

20

Ex. 1

6. It has caused inmates to develop and exhibit pathological adaptations to their confinement, which make them less social and strips them of fundamentally "human" characteristics.

7. Based upon my conclusion about the lasting effects of isolation on each of the plaintiffs and the extent to which these effects have now been incorporated into each man's personality functioning, and based upon what is known about the large measure of change that it takes to alter an individual's personality functioning, in my professional opinion, correction or mitigation of these effects would require substantial changes to the current factors that have contributed to the isolation of inmates on Virginia's death row. Relatively minor modifications to the conditions imposed on inmates on death row that contribute to their isolation would likely have little to no effect in abating the deleterious impact the plaintiffs have suffered. Furthermore, because of the reliably negative impact of extended isolation on humans, there is no basis on which to conclude that any inmates on death row who are not a part of the current civil action would be affected significantly differently than those who are a part of the current civil action.

8. It is my professional opinion that the level and quality of attention to inmates' mental health status by a trained mental health professional who visits the unit weekly is woefully inadequate for either proper monitoring of mental status or for amelioration of any of the deleterious effects of isolation that are predictable, if not inevitable, and have been experienced by plaintiffs. Not only is the frequency of visits to the unit by a mental health professional insufficient, but the lack of deliberate, material

21

Ex. 1

engagement with each inmate on the unit leaves no opportunity for either assessment or treatment of any sort. One of the often more subtle effects of isolation is learned helplessness. Because of this, inmates who are kept in isolation for more than a few weeks cannot be relied upon to reach out for help when they need it. It is therefore necessary that a mental health professional reach out to the inmates, establish an ongoing rapport with them, and garner trust so that they are able to disclose symptoms that to them may feel like failures or which they may be afraid will be punished.

The conclusions and opinions rendered in this report are to a reasonable degree of psychological certainty, taking into account all of the information available to me at this time.

I declare this statement to be true under the pain and penalty of perjury.

_Michael L. Hendricks, Ph.D., ABPP_                    July 13, 2015
Michael L. Hendricks, Ph.D., ABPP

22

Ex. 1

# APPENDIX 3
# TO DECLARATION OF
# MICHAEL L. HENDRICKS, PH.D., ABPP

Ex. 1

# The Mini-Mental State Exam

Patient_____ Examiner _____ Date_____

| Maximum | Score | |
|---|---|---|

**Orientation**

5   ( )   What is the (year) (season) (date) (day) (month)?
5   ( )   Where are we (state) (country) (town) (hospital) (floor)?

**Registration**

3   ( )   Name 3 objects: 1 second to say each.  Then ask the patient
     all 3 after you have said them.  Give 1 point for each correct answer.
     Then repeat them until he/she learns all 3. Count trials and record.
     Trials _____

**Attention and Calculation**

5   ( )   Serial 7's.  1 point for each correct answer.  Stop after 5 answers.
     Alternatively spell "world" backward.

**Recall**

3   ( )   Ask for the 3 objects repeated above.  Give 1 point for each correct answer.

**Language**

2   ( )   Name a pencil and watch.
1   ( )   Repeat the following "No ifs, ands, or buts"
3   ( )   Follow a 3-stage command:
     "Take a paper in your hand, fold it in half, and put it on the floor."
1   ( )   Read and obey the following:  CLOSE YOUR EYES
1   ( )   Write a sentence.
1   ( )   Copy the design shown.

_____   Total Score
ASSESS level of consciousness along a continuum _____

          Alert   Drowsy   Stupor   Coma

"MINI-MENTAL STATE." A PRACTICAL METHOD FOR GRADING THE COGNITIVE STATE OF PATIENTS FOR THE CLINICIAN.
*Journal of Psychiatric Research*, 12(3): 189-198, 1975. Used by permission.



*try this:* Best Practices in Nursing Care to Older Adults

A series provided by
*The Hartford Institute for Geriatric Nursing*
(hartford.ign@nyu.edu)
**www.hartfordign.org**

Ex. 1