# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

THOMAS PORTER *et al.*,

      Plaintiffs,

v.                                   Civil Action No: 1:14-CV-1588 (LMB/IDD)

HAROLD W. CLARKE, *et al.*,

      Defendants.

## RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs assert that they are entitled to summary judgment and an injunction prohibiting the Virginia Department of Corrections from returning to the conditions of confinement existing on death row at the time this suit was initiated.  Plaintiffs, however, are asking this Court to insert itself into policy decisions and prison management affairs predicated on evidence that falls far short of establishing that they have been subjected to unconstitutional conditions of confinement.  At its heart, Plaintiffs' case is grounded on contested expert opinions that it might be better, from an institutional perspective, to house death-row inmates in a different way.  But the question before this Court is not whether there might be a "better way."  What Plaintiffs are required—and have failed—to do is marshal evidence that VDOC's policies subjected them to cruel and unusual punishment within the meaning of the Eighth Amendment.

Because Plaintiffs' evidence—particularly when contrasted against the evidence Defendants submitted in support of their cross-motion for summary judgment—fails to establish that VDOC policies and procedures subjected them to a substantial risk of serious harm, and because Defendants' policies do not demonstrate deliberate indifference to any risk that might

1

exist, Plaintiffs' motion for summary judgment fails.  This Court cannot be used as a forum for deciding whether, as a matter of policy or politics, VDOC might be able to safely and effectively house death row inmates in a different manner.  The sole question before the Court is whether there is constitutional harm that must be addressed—and there is not.  For this reason, Plaintiffs' motion for summary judgment should be denied.

**CONSTESTED FACTUAL REPRESENTATIONS
AND STATEMENT OF GENUINE ISSUES**

Pursuant to Local Rule 56(B), Defendants contest the following factual representations presented in the Memorandum in Support of Plaintiffs' Motion for Summary Judgment:

1.      In paragraph 6, Plaintiffs state that, "[i]n 1984, several Death Row prisoners attempted to escape from the Mecklenburg Correctional Center."  The use of the word "attempted" in this sentence is erroneous, for six Death Row inmates *successfully* escaped from Mecklenburg in 1984, four of whom evaded capture long enough to travel to other states.[1]

2.      In paragraph 7, Plaintiffs state that "[a] review by the VDOC Board concluded that the escape resulted from the failure of at least seven staff members to follow fifteen separate policies."  The referenced report, a summary of which is appended to the report of Toni Bair,[2] was completed by a study committee convened by the Board of Corrections.  Although the committee found that staff members failed to follow certain security measures, that failure did not cause the escape.  The escape "resulted from" the actions of six death row inmates, who were able to formulate and enact a detailed, multi-step escape plan.  Their ability to hatch that escape plot was facilitated by their then-existing conditions of confinement.[3]

---

[1] Robinson Aff. ¶ 16 (Exhibit 2 to Defs' Mem. in Support of Mot. for S.J., ECF No. 110-12).

[2] Exhibit 5 to Plfs' Mem. in Support of Mot. for S.J. (ECF No. 115-5).

[3] *See* Expert Report of S. Dodrill, at p. 11 (Exhibit 10 to Defs' Mem. in Support of Mot. for S.J., ECF No. 110-12).

3.      In paragraph 8, Plaintiffs state that, "[p]rior to the escape at Meckenburg, Death Row operated as a 'general population area separate from the other inmate populations' at Mecklenburg."  Defendants dispute that death row inmates at Mecklenburg were in a "general population area."  Although death row offenders had certain privileges similar to the general population, some of the restrictions imposed on death row offenders differed.  Specifically, death row offenders were not permitted contact visitation, were only permitted two non-attorney telephone calls per month, and did not have general library privileges.[4]

4.      In paragraph 10, Plaintiffs state that, in January 1985, death row was returned "to 'general population' conditions."  For the reasons discussed in the preceding paragraph, the conditions of confinement on death row shared some characteristics with the general population, but differed with respect to certain privileges that were extended to the offenders.

5.      In paragraph 11, Plaintiffs state that "Death Row prisoners were allowed out of their cells for 14-15 hours per day, and were permitted to exercise outdoors in groups of up to six, congregate indoors, and take classes together in the pods of the prison."  Defendants dispute that the conditions of death row in the late 1980s were as open as portrayed by Mr. Bair in his report.  For example, in July 1989, the European Court on Human Rights made the following factual findings pertaining to Virginia's death row:

> There are currently 40 people under sentence of death in Virginia. The majority are detained in Mecklenburg Correctional Center . . . . The size of a death row inmate's cell is 3m by 2.2m [9.84 feet by 7.216 feet].  Prisoners have an opportunity for approximately 7 ½ hours' recreation per week in summer and approximately 6 hours' per week, weather permitting, in winter. . . . Inmates are also permitted to leave their cells on other occasions, such as to receive visits, to visit the law library or to attend the prison infirmary.  In addition, death row inmates are given one hour out-of-cell time in

---

[4] *See, e.g.*, *Brown v. Landon*, No. 81-0853 (E.D. Va.), Settlement Agreement of 4/5/85, at ¶¶ 23, 27, 29 (Exhibit 18 to Plfs' Mem. in Support of S.J., ECF No. 115-20).

> the morning in a common area. . . . When prisoners move around
> the prison they are handcuffed, with special shackles around the
> waist. . . . Death row inmates receive the same medical services as
> inmates in the general population.  Mecklenburg also provides
> psychological and psychiatric services to death row inmates. . . .
> Inmates are allowed non-contact visits in a visiting room on
> Saturdays, Sundays and holidays . . . Death row inmates who have
> a record of good behaviour are eligible for contact visits with
> members of their immediate family two days per week.[5]

Based on this information, death row inmates were allowed congregate outdoor recreation

approximately one hour per day, and they were allowed congregate indoor recreation

approximately one hour per day.  Even factoring in the other reasons an inmate might have been

outside his cell, this falls far short of the fourteen to fifteen hours per day stated by Mr. Bair.

6.    Also in paragraph 11, Plaintiffs state that "[d]isciplinary infractions, particularly

violent infractions, remained low after these changes."  This statement neglects to account for the

fact that, during the period that Mr. Bair was regional administrator for VDOC, he placed certain

death row offenders who were deemed a particular security risk in segregated confinement at

Powhatan Correctional Center rather than permitting them to remain in the more open conditions

at Mecklenburg.[6]  It is therefore not clear from this factual statement whether the alleged lack of

---

[5] *Soering v. The United Kingdom*, No. 14038/88, European Court of Human Rights, Judgment of July 7, 1989, at ¶¶ 61-68.

[6] *See, e.g., Turner v. Jabe*, 58 F.3d 924, 930 (4th Cir. 1995) (habeas petition filed by death row inmate alleging that his execution would constitute cruel and unusual punishment, "emphasiz[ing] his detention from April 1987 through February 1994 in the terrible 'M-building' at Powhatan Correctional Center," also "focus[ing] on his stay in the isolation area of the M-building, which lasted from April 1987 through early 1991, when he was transferred to the M-building's segregation area"); *see also* Dennis Stockton, *A Life on Death Row*, THE VIRGINIAN-PILOT, Aug. 6, 1995 (article by death-row inmate Dennis Stockton, noting that, between 1985 and 1995, he was primarily incarcerated in the M-building at Powhatan Correctional Center), *available at* https://scholar.lib.vt.edu/VA-news/VA-Pilot/issues/1995/vp950806/08060123.htm. Some of these inmates were likely transferred following a second, thwarted escape attempt in November 1985—a security incident also not referenced in Mr. Bair's report.  *See* Donald P. Baker, *6 Va. Death Row Prisoners Fail in Escape Attempt*, THE WASHINGTON POST, Nov. 28,

disciplinary infractions refers to the death row inmates who were permitted to remain at Mecklenburg, or all inmates facing a sentence of death, including those who were determined to be a security risk and transferred to a different institution.  Defendants therefore dispute this assertion as misleading and unsubstantiated by the evidence offered in support.

7.     In paragraph 13, Plaintiffs allege that, in 2010, VDOC "implemented 23-hour solitary confinement and otherwise reinstated the highly-restrictive conditions in effect prior to Warden Bair's tenure."  For the reasons discussed in their Memorandum in Support of Defendants' Motion for Summary Judgment, Defendants dispute that the conditions of confinement as of March 2010 constituted "23-hour solitary confinement."[7]  Defendants also dispute that the conditions of confinement as of March 2010 were equivalent to the lockdown conditions that were temporarily imposed throughout all of Mecklenburg Correctional Center following the death row escape, the discovery of a cache of homemade weapons inside the death row housing unit, and a hostage situation at the facility.[8]  Lockdown conditions include, for example, suspension of visitation and non-attorney telephone privileges, both of which were permitted for death row offenders in March 2010.

8.     In paragraph 15, Plaintiffs state that the fact of being housed in non-adjacent cells "limits auditory communication between the occupied cells."  Although the non-adjacent cell

---

1985, *available at* https://www.washingtonpost.com/archive/local/1985/11/28/6-va-death-row-prisoners-fail-in-escape-attempt/dd4a7450-c004-4b58-8eb7-3efe6d55883b/

[7] *See* Defs' Mem. in Support of Mot. for S.J. at pp. 25-26 (ECF No. 110).

[8] *See* Robinson Aff. ¶ 17 (ECF No. 110-2); *see also Callahan Calls for Va. Prison Probe*, THE WASHINGTON POST, Aug. 14, 1984 (describing circumstances surrounding the lockdown), *available at* https://www.washingtonpost.com/archive/local/1984/08/14/callahan-calls-for-va-prison-probe/3875c7c0-25f9-47c8-a41f-442c8b6b07eb/

placement may have made it more difficult for inmates to communicate with each other, communication is both possible and realized.[9]

9.      In paragraph 16, Plaintiffs describe the exterior window in the cell as a "window in name only."  Defendants dispute this description.  The exterior window in the cell is "partially screened," but, "[d]uring the day, and without the benefit of artificial light, the light that enters the room from the window is sufficient to allow reading."[10]  Also, when looking out the window, an inmate is "able to clearly see grass, trees, sky and the basketball court used by those who are housed in general population."[11]

10.     In paragraph 18, Plaintiffs state that, "[i]f Plaintiffs desired to eat while sitting, Plaintiffs were forced to eat while sitting on the toilet."  This statement entirely overlooks the presence of a bed inside the cell, which offenders could clearly utilize if they desired to sit while eating.  Similarly, there is no reason that inmates could not sit on the floor or on the boxes and cartons that many of them use to store material within their cell.

11.     In paragraph 19, Plaintiffs state that "VDOC policy permitted contact visits from immediate family, but the warden of SISP allowed contact visitation only if a prisoner's death were imminent."  The cited deposition testimony is from Keith Davis, who was warden of SISP for approximately two years, and was in response to a question asking for an example of what would constitute a circumstance that would subjectively justify, in his mind, permitting contact visitation with a death row inmate.  The testimony therefore involved Mr. Davis' personal interpretation of how he would elect to exercise the discretion vested in him by Operating

---

[9] *See, e.g.*, Expert Report of Dr. Saathoff at pp. 23-24 (Exhibit 6 to Defs' Mem. in Support of Mot. for S.J., ECF No. 110-10).

[10] Saathoff Rep. at p. 5; *see also* Clarke Aff. ¶ 14 (Exhibit 1 to Defs' Mem. in Support of Mot. for S.J., ECF No. 110-1).

[11] Saathoff Rep. at p. 5.

Procedure 460.A.  As Plaintiffs note elsewhere, Mr. Davis was not the only warden of SISP during the period of Plaintiffs' incarceration, and other wardens applied the operating procedure differently.  For example, in his conversations with Dr. Saathoff, Plaintiff Ricky Gray "recalled a previous time on Death Row when he was able to have contact visits with family members."[12] Accordingly, Defendants dispute the factual representations of paragraph 19 to the extent that this paragraph attempts to attribute Mr. Davis' subjective decision-making to every warden of Sussex I State Prison.

12.    In paragraph 22, Plaintiffs state that "[t]he Fourth Circuit did not disagree with this Court's findings that Death Row conditions were 'undeniably severe' and 'dehumanizing.'" The specific language utilized in the majority opinion is as follows:  "We do not in any way minimize the harshness of Virginia's regime.  Prieto's conditions of confinement are undeniably severe.  Indeed, the district court, *perhaps* correctly, described the isolation that characterizes Virginia's death row as 'dehumanizing.'"[13]

13.    In paragraph 23, 24, and 25, Plaintiffs recite the findings of Dr. Michael Hendricks.  Defendants dispute the accuracy of his findings, for the reasons explained in detail in the expert report of Dr. Saathoff.[14]

14.    In paragraph 26, Plaintiffs discuss the deleterious effects of "isolation and stimulus deprivation" on inmates.  Defendants dispute the applicability of this research to the Plaintiffs—Dr. Cunningham's report does not review the actual conditions of Virginia's death row inmates, relying, instead, on data from other jurisdictions with different inmate populations and circumstances.

---

[12] Saathoff Rep. at p. 14.

[13] *Prieto v. Clarke*, 780 F.3d 245, 254 (4th Cir. 2015) (emphasis added).

[14] Saathoff Rep. at pp. 25-28.

15.     In paragraph 28, Plaintiffs report the findings of Mr. Aiken regarding the

conditions of confinement on Virginia's death row.  Defendants dispute Mr. Aiken's

conclusions, particularly in light of the fact that he neglected to include, as part of his

assessment, three critical operating procedures:  (1) Operating Procedure 730.2, *Mental Health*

*Services:  Screening, Assessment, and Classification*, (2)  Operating Procedure 730.3, *Mental*

*Health Services: Levels of Service*, and (3) Operating Procedure 730.7, *Psychiatric Services*.

16.     In paragraph 30, Plaintiffs report the findings of Dr. Cunningham, who opined

that death-sentenced inmates are not disproportionately likely to perpetuate serious violence

when confined in less restrictive conditions.  As with paragraph 26, Defendants dispute this

conclusion with respect to Virginia inmates, because Dr. Cunningham relies solely upon data

from other jurisdictions with different inmate populations and circumstances.  Indeed, data from

Virginia's inmate populations demonstrates that inmates sentenced to life-without-parole commit

more serious—or "Category I"—disciplinary infractions, per capita, than the remaining prison

population.  This information is summarized on the chart appended as Exhibit 1 to this response,

and is analogous to data obtained from the Federal Bureau of Prisons, as set forth in Attachment

B to Mr. Dodrill's expert report.[15]

17.     In paragraph 32, Plaintiffs report that "Illinois, Maryland, and other states have

transferred, without incident, Death Row prisoners from solitary confinement to general

population after abolishing the death penalty."  The cited newspaper article from Illinois is dated

2011, and there is no reference to any data from the State of Maryland.  Defendants therefore

dispute this factual representation as unsubstantiated by the evidence offered in support.

_____

[15] *See* Dodrill Rep. at p. 17 & Attachment B.  The chart attached as Exhibit 1 is based on the data
provided in Director Clarke's Supplementary Response to Plaintiffs' First Set of Interrogatories,
a copy of which is attached as Exhibit 2.

18.     In paragraph 33, Plaintiffs state that "Defendants house offenders serving life without parole in the same conditions as those in the general population."  In support of this statement, Plaintiffs cite to an interrogatory response provided by Director Clarke.  The complete interrogatory response reads as follows:  "Conditions of confinement are the same for offenders serving life without parole as those in general population *with similar security classifications*."  For this reason, not every offender who is serving life without parole is housed in the general population—some are housed in administrative segregation as level "S" offenders, and, therefore, have fewer privileges than offenders housed on death row.

19.     In paragraph 34, Plaintiffs state that "VDOC's disciplinary segregation policies require that all non-Death-Row prisoners receive a 15-day rest period between stays in segregation, which are capped at 30 days."  Plaintiffs' recitation of the VDOC segregation policy is misleading and, therefore, disputed.  An offender who is placed in *disciplinary* segregation, as a result of a disciplinary infraction, is confined without privileges—the offender is denied bedding during the daytime, has very restricted personal property privileges, entirely forfeits all visitation privileges, is only permitted to purchase a limited subset of items from the commissary, and has no personal telephone privileges.  Offenders who have received, as a sanction, more than 30 days placement in *disciplinary* segregation are therefore granted a 15-day "rest" period, after 30 days, before being returned to those very restrictive conditions.  By contrast, offenders who are placed in *administrative* segregation—those offenders designated as security level "S"—are continuously confined in segregated housing without this 15-day rest period.  Offenders housed in administrative segregation have limited personal property privileges, limited commissary privileges, are allowed three showers per week, are given restricted, non-contact visitation, are allowed one hour of individual outdoor recreation five days

per week, and are allowed to place two telephone calls per month.  Although the conditions in administrative segregation are, therefore, more restrictive than those under which death row operated at the time this suit was filed, level "S" offenders, too, do not receive any "rest period" from their conditions of confinement.[16]

20.      In paragraph 36, Plaintiffs state that Director Clarke has failed to "identify the authority under which the Interim Regulations are purportedly adopted."  To the extent this assertion implies that Director Clarke lacked the authority to authorize the Interim Rules and Regulations, this statement is disputed.  The Director of the Department of Corrections is statutorily-vested with the authority "[t]o supervise and manage the Department and its system of state correctional facilities,"[17] including the express authority to "prescribe rules" for the "government" of "state correctional facilities."[18]

21.      In paragraph 38, Plaintiffs state that "VDOC defended the constitutionality of the conditions on Death Row in place at the time of this suit all the way to the Supreme Court in *Prieto*."  The controlling legal issue in *Prieto* did not involve conditions of confinement—that case was, rather, a Fourteenth Amendment challenge questioning whether death row inmates were entitled to procedural due process prior to being confined on death row.  To the extent Plaintiffs' paragraph 38 implies that Defendants actively litigated the Eighth Amendment conditions-of-confinement issue in the *Prieto* litigation, that statement is disputed.

22.      In paragraph 41, Plaintiffs state that "VDOC policies are subject to change at the discretion of each warden, who have routinely made policy changes related to contact visits, cell

---

[16] *See* Operating Procedure 861.3, *Special Housing* (Exhibit 17 to Defs' Mem. in Support Mot. for S.J., ECF No. 110-19); *see also* Clarke Aff. ¶¶ 20, 41, 42, 43.

[17] Va. Code § 53.1-10(1).

[18] Va. Code § 53.1-25; *see also Wenzler v. Warden of GRCC*, 949 F. Supp. 399, 402 (E.D. Va. 1996) ("The pertinent Virginia statutes give[] the Director of the Virginia Department of Corrections the authority to promulgate rules regarding the governance of prisons.").

lighting, legal visits, and recreation activities." To the extent that this statement implies that all

VDOC policies are subject to alteration depending on the whim of a particular warden, that

statement is disputed. A warden has control over local operating procedures that pertain solely

to his or her institution. However, wardens do not have the authority or discretion to alter

department-wide operating procedures—that authority is vested solely in the Director of the

Department of Corrections.

23.     In paragraph 45, Plaintiffs state that "Plaintiffs still do not have access to the

outdoor recreation yard." The permitting and inspection procedure for the outdoor recreation

yard was completed on Friday, January 8, 2016. Death row offenders will be permitted

congregate outdoor activity in the new recreation yard beginning the week of Monday, January

11, 2016.[19]

24.     In paragraph 46, Plaintiffs state that their experts "are unable to express any

opinion" as to whether the altered conditions of confinement "would successfully ameliorate the

impacts of the past regulations to which Plaintiffs have been subjected for years." To the extent

that paragraph 46 implies that Plaintiffs have been deleteriously affected by their prior conditions

of confinement, Defendants dispute that factual assertion. For the reasons set forth in the expert

report of Dr. Saathoff,[20] Defendants maintain that the prior conditions of confinement did not

significantly and adversely affect these Plaintiffs.

## ARGUMENT

Without question, being confined in a prison cell is not a particularly pleasant or

enjoyable experience. It is not intended to be. But the harshness or severity of a prison

---

[19] Upon information and belief, the first congregate outdoor recreation will occur on Tuesday, January 12, 2016, all other circumstances permitting.

[20] Saathoff Rep. at pp. 25-29.

condition does not make it, *ipso facto*, unconstitutional.  Rather, the Eighth Amendment proscription against cruel and unusual punishment is implicated only by conditions of confinement that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime warranting imprisonment."[21]

To resolve the question of whether a condition of confinement is unconstitutional, courts consider whether that condition "can result in physical torture," "can result in pain without any penological purpose," or "resulted in unquestioned and serious deprivations of basic human needs."[22]  For example, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates."[23]  If a prison condition does not deprive an inmate of the "minimal civilized measure of life's necessities," that condition will not offend the Eighth Amendment:  "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."[24]

In the memorandum in support of their motion for summary judgment, Plaintiffs argue at length that "solitary confinement" on Virginia's death row constitutes cruel and unusual punishment under evolving standards of decency.  Yet, Plaintiffs' argument misconstrues the applicable VDOC policies, misstates the actual conditions under which Plaintiffs are confined, ignores the significance of permitted visitation and telephone privileges, and fails to account for VDOC policies regarding mental health monitoring and psychiatric care.  In short, Plaintiffs' memorandum is heavy on rhetoric, and short on fact.

---

[21] *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

[22] *Id.*

[23] *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotations omitted).

[24] *Rhodes*, 452 U.S. at 347.

Plaintiffs are not now, and have not been, in "solitary confinement." They also have not

incurred any serious or significant harm as a result of their incarceration on Virginia's death row.

Plaintiffs have proffered insufficient justification for their argument that the conditions of

confinement constitute cruel and unusual punishment, and they have not addressed the

significance of the remedy they seek. As the Supreme Court has warned, "[t]his Court must

proceed cautiously in making an Eighth Amendment judgment because, unless we reverse it, '[a]

decision that a given punishment is impermissible under the Eighth Amendment cannot be

reversed short of a constitutional amendment,' and thus '[revisions] cannot be made in light of

further experience.'"[25]

It is for this reason that the Supreme Court has cautioned, "[i]n assessing claims that

conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries

'spring from constitutional requirements and that judicial answers to them must reflect that fact

rather than a court's idea of how best to operate a [correctional] facility."[26] This Court may very

well agree that VDOC should administer its death row policies and procedures in a different

manner. But that does not entitle Plaintiffs to the extraordinary remedy of injunctive relief.

Because the prior conditions of death row did not involve the "wanton and unnecessary

infliction of pain," and because those conditions were not "grossly disproportionate to the

severity of the crime warranting imprisonment,"[27] they did not expose Plaintiffs to an objectively

intolerable risk of harm. Moreover, because VDOC policies were reasonably tailored to ensure

the continuing mental health of death row inmates, Defendants were not deliberately indifferent

---

[25] *Rhodes*, 452 U.S. at 351 (quoting *Gregg v. Georgia*, 428 U.S. 153, 176 (1976) (alterations in original)).

[26] *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)).

[27] *Rhodes*, 452 U.S. at 347.

within the meaning of the Eighth Amendment.  For these reasons, Plaintiffs cannot establish that they have been subjected to cruel and unusual punishment, and their motion for summary judgment should be denied.

## I.    Plaintiffs were not housed in "solitary confinement."

"Solitary confinement," historically, involved "complete isolation of the prisoner from all human society, and his confinement in a cell of considerable size, so arranged that he had no direct intercourse with or sight of any human being, and no employment or instruction."[28]  More recently, Justice Kennedy interpreted "solitary confinement" as being held "20 years or more in a windowless cell no larger than a typical parking spot for 23 hours a day; and in the one hour when he leaves it, he likely is allowed little or no opportunity for conversation or interaction with anyone."[29]  In other words, "solitary confinement," at least to Justice Kennedy, involves "[y]ears on end of near-total isolation . . . ."[30]

For the reasons discussed in detail in Defendants' cross-motion for summary judgment, Plaintiffs have not been subjected to "near-total isolation," nor have they been completely isolated from all society and denied any means of entertainment or occupation.  Rather, Plaintiffs have been afforded weekly visitation with family members.  They are allowed to use the telephone, seven days per week, to call and speak with whomever they wish.  They are allowed regular mail and library privileges.  They have contact visitation with their attorneys.  They regularly interact with corrections officers, counselors, supervisory staff, medical staff, mental

---

[28] *In re Medley*, 134 U.S. 160, 167 (1890).  *Cf. McElvaine v. Brush*, 142 U.S. 155, 158 (1891) (upholding against an Eighth Amendment challenge a statute providing that a prisoner awaiting execution "shall be kept in solitary confinement, . . . and no person shall be allowed access to him without an order of the court, except the officers of the prison, his counsel, his physician, a priest or minister of religion, if he shall desire one, and the members of his family").

[29] *Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015) (Kennedy, J., concurring).

[30] *Id.* at 2210.

health staff, and the institutional chaplain, and they are allowed to request a meeting with any of

those individuals, who will then come to their cell to speak about whatever issue the inmate

wants to discuss.  Plaintiffs have televisions, CD players, books, playing cards, and other items

that they can use to occupy their time.  Because all of the inmates are taken to outdoor recreation

at the same time, and because the inmates have no difficulty communicating in that setting, they

have coordinated exercise programs even though they are placed in individual recreation

enclosures.  And within the housing unit, they speak to each other and to the offenders housed in

the segregation unit above them.

Considering Plaintiffs' demonstrated ability to communicate with one another,

communicate with their attorneys, communicate (via telephone, correspondence, and visitation)

with people outside the prison, and communicate with VDOC officers and employees, it is

evident that they have not been held in "near-total isolation."  Moreover, because they have the

same personal property privileges as the general population, death-row offenders have varied

items at their disposal to entertain themselves and their minds—including the televisions each

possesses in his cell.

A substantial portion of Plaintiffs' argument is devoted to the harms "inherent in solitary

confinement."  Many of the authorities and much—if not all—of the rationale advanced by

Plaintiffs therefore fails for the simple reason that it is not tailored to Plaintiffs' actual conditions

of confinement.  This Court should reject their perfunctory characterization of Plaintiffs'

conditions as "solitary confinement" and, instead, tailor the Eighth Amendment analysis in this

case to the actual conditions of confinement on Virginia's death row.

**II.   This Court's findings in *Prieto v. Clarke* do not substitute for making an adequate factual record in this case.**

Throughout their memorandum in support, Plaintiffs repeatedly refer to this Court's findings in *Prieto v. Clarke*, arguing, for example, that "[t]his Court in Prieto already made many of the factual findings required to support a determination that the prior conditions were unconstitutional . . . ."[31] *Prieto v. Clarke*, however, was a different case, involving a different litigant, a different constitutional issue, and a different factual record.  Plaintiffs cannot bolster their record in this case by simply incorporating those findings by reference.  This Court should make the required Eighth Amendment factual findings predicated on the record now before the Court—not evidence, admissions, or findings involving a different litigant appearing in a different context.

**III.   Plaintiffs ignore binding Fourth Circuit precedent.**

Plaintiffs urge this Court to discount binding Fourth Circuit precedent, reasoning that a court faced with an Eighth Amendment inquiry must "bring its own judgment to bear"[32] on the question of whether an inmate's conditions of confinement constitute cruel and unusual punishment.  Although courts should make an individualized inquiry into the specific circumstances allegedly giving rise to a constitutional violation, this is not a license to discard controlling precedent from the appellate courts.[33]  Plaintiffs have failed to adequately distinguish *Mickle v. Moore*, 174 F.3d 464 (4th Cir. 1999), and *Sweet v. South Carolina Dep't of Corrections*, 529 F.2d 854 (4th Cir. 1975), cases in which the Fourth Circuit explicitly held that "the isolation inherent in administrative segregation or maximum custody is not itself

---

[31] Plfs' Mem in Support of Mot. for S.J., at 10.

[32] *Roper v. Simmons*, 543 U.S. 551, 563 (2005).

[33] *Comdisco, Inc. v. General Servs. Admin.*, 864 F. Supp. 510, 517 (E.D. Va. 1994) ("On the most fundamental level, this Court is bound by Fourth Circuit precedent.").

16

constitutionally objectionable."[34]  This Court should reject Plaintiffs' attempt to discard this

binding precedent, and should instead interpret the facts of this case in accordance with the

principles announced in the applicable Fourth Circuit precedent.

**IV.    Plaintiffs have presented insufficient evidence that their conditions of confinement posed an objectively unreasonable risk of harm.**

Conditions-of-confinement cases "are not decided in the abstract.  A court is under the

obligation to examine the *actual effect* of challenged conditions upon the well-being of the

prisoners."[35]  Moreover, although "[s]ome conditions of confinement may establish an Eighth

Amendment violation 'in combination' when each would not do so alone," this is only true

"when they have a mutually enforcing effect that produces the deprivation of a single,

identifiable human need such as food, warmth, or exercise . . . ."[36]  For this reason, "[n]othing so

amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no

specific deprivation of a single human need exists."[37]

Here, Plaintiffs have not established that they were actually deprived of a "human need."

Although they allege that they have been deprived of "human contact," Plaintiffs have been

allowed to interact with each other, with prison staff, and with individuals in the outside world.

The fact that their ability to communicate with each other has been limited does not mean that it

has been wholly absent.  Because Plaintiffs have not been deprived of a "single, identifiable

human need," their conditions of confinement do not amount to a constitutional violation.

Moreover, Plaintiffs have not suffered a sufficiently serious harm for purposes of the

Eighth Amendment.  The conclusory assertions in Dr. Hendricks' report were amply rebutted by

---

[34] *Mickle*, 174 F.3d at 472.

[35] *Rhodes*, 452 U.S. at 367 (Brennan, J., concurring) (emphasis in original).

[36] *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

[37] *Id.*

17

Dr. Saathoff, a recognized expert with extensive experience assessing prisoners who have been held in segregated confinement. Dr. Saathoff reviewed numerous collateral sources of information in the preparation of his report—including many materials that were ignored by Dr. Hendricks. In contrast to Dr. Hendricks, Dr. Saathoff accounted for the full, prior psychological history of each individual plaintiff. And Dr. Hendricks' report—finding, in essence, that Plaintiffs had insomnia, depression, reduced motivation, and problems concentrating—does not address whether these symptoms might be attributable to the fact that Plaintiffs have committed unspeakable crimes and are awaiting execution, rather than being directly caused by the prison conditions under which they are held.

Dr. Saathoff, by contrast, individually met with Plaintiffs, reviewed extensive collateral materials regarding their history of incarceration, and reviewed their individual medical and mental health files and records. Based upon his observations and interactions, he opines that Plaintiffs are not suffering, mentally, from their conditions of confinement. Of note, Plaintiffs did not file an expert report rebutting Dr. Saathoff's conclusions.

Because, considering the record in its totality, Plaintiffs have produced insufficient evidence of individualized and actual harm, and because Plaintiffs have not been deprived of a "single, identifiable human need," they have not carried their burden of establishing that they have been incarcerated under conditions posing an objectively intolerable risk of harm. For this reason, they cannot establish an Eighth Amendment violation, and their motion for summary judgment must fail.

## V.    Plaintiffs have not established that Defendants, in their official capacities, were deliberately indifferent.

Plaintiffs' argument that Defendants were deliberately indifferent to a substantial risk of harm is predicated on the mischaracterization of death row conditions as "solitary confinement."

Moreover, Plaintiffs fail to recognize that, in this official capacity suit, it is the VDOC institutional policies and procedures that are at issue—not the defendants' individualized subjective knowledge. By neglecting to reference or analyze the impact of VDOC's mental-health policies and procedures, Plaintiffs ignore the fact that VDOC has implemented a reasonable response to any risk of mental harm for inmates incarcerated on death row.

Plaintiffs' argument that deliberate indifference may be inferred from the differing treatment afforded inmates in disciplinary segregation fails because of the fundamentally different nature of the relative conditions of confinement. Inmates in disciplinary segregation have no visitation or phone privileges, no televisions in their cells, and greatly restricted personal property and commissary privileges. An inmate in disciplinary segregation is, therefore, placed in much more onerous conditions of confinement than a death row inmate. That is, an inmate in disciplinary segregation has limited ability to contact the outside world or entertain himself while in his cell, whereas the privileges afforded to death row inmates are much more lenient. VDOC could reasonably conclude that the risk of harm is much greater for an inmate in disciplinary segregation, who is much closer to being housed in "solitary confinement" than an inmate on death row.

For the reasons discussed in more detail in Defendants' cross-motion for summary judgment,[38] VDOC policies and procedures are reasonably calculated to identify and treat any mental health issues that might arise while an offender is housed on death row. Accordingly, Defendants have not been deliberately indifferent to any risk of harm posed by Plaintiffs' conditions-of-confinement. And absent deliberate indifference, Plaintiffs cannot establish that they have been purposefully subjected to cruel and unusual punishment. Plaintiffs, therefore,

---

[38] Defs' Mem. in Support of Mot. for S.J. at pp. 28-29 (ECF No. 110).

cannot sustain their burden of proving an Eighth Amendment violation, and their motion for

summary judgment should be denied.

**VI.     The conditions of confinement on Virginia's death row are not without penological justification.**

Plaintiffs devote substantial argument to the question of whether death row inmates may

be safely housed in a less-restrictive manner.  They conclude that, because other jurisdictions

have successfully extended additional privileges to death row inmates, Virginia's conditions of

confinement cannot withstand constitutional scrutiny.  Yet, the fact that a handful of other

jurisdictions house death-row inmates in a different manner does not mean that Virginia's

segregated conditions are either "cruel" or "unusual."  Rather, for a condition to be invalidated

under the Eighth Amendment, it must be "'*totally without* penological justification.'"[39]  In other

words, "the sanction imposed cannot be so totally without penological justification that it results

in the gratuitous infliction of suffering."[40]

Although other jurisdictions house death-row inmates in less-restrictive conditions, it

does not follow that VDOC's policies and procedures are "totally without penological

justification."  As discussed in detail in Mr. Dodrill's expert report,[41] there are sound correctional

justifications for limiting the privileges extended to death row offenders, all of whom have

committed murderous acts and all of whom, in light of their impending sentence, have an

incentive to escape from custody.  Indeed, Plaintiffs neglect to mention that Texas revoked its

---

[39] *Rhodes*, 452 U.S. at 346 (quoting *Gregg*, 428 U.S. at 183) (emphasis added).

[40] *Gregg*, 428 U.S. at 183.

[41] Dodrill Rep. at pp. 9-15.

open conditions of confinement on death row following an escape attempt involving seven of its death-row inmates.[42]

It also bears noting, in this context, that many individuals who have resided on Virginia's death row have committed murder either while in custody or in the process of escaping from custody. One current death-row inmate killed two officers while attempting to escape from incarceration.[43] Another recent death-row inmate killed two offenders while housed at different institutions, and one of those murders occurred inside the recreation enclosures used for offenders in administrative segregation.[44] Still another recent death-row inmate murdered another offender during an institutional religious service, stabbing him 68 times.[45] And at least two of these Plaintiffs have a documented history of violence while incarcerated.[46] Considering the demonstrated propensities of offenders who are housed on Virginia's death row, VDOC is justified in limiting the ability of these convicted murderers to physically interact with each other.

---

[42] *See* Dodrill Rep. at p.16 & n.15; *see also* Rick Lyman, *Texas Death Row Inmate Pulls Off Escape*, THE NEW YORK TIMES, Nov. 28, 1998, available at http://www.nytimes.com/1998/11/28/us/texas-death-row-inmate-pulls-off-escape.html

[43] *See Morva v. Commonwealth*, 278 Va. 329, 683 S.E.2d 553 (2009).

[44] *See Gleason v. Commonwealth*, 284 Va. 166, 726 S.E.2d 351 (2012).

[45] *See Lenz v. Commonwealth*, 261 Va. 451; 544 S.E.2d 299 (2001).

[46] *See Juniper v. Commonwealth*, 271 Va. 362, 382, 626 S.E.2d 383, 397 (2006) ("In October 2004, Juniper attacked a sleeping inmate with a pillowcase containing dominoes and kicked the inmate in the ribs. Juniper left the scene of the attack when challenged by another inmate and ran into an elderly inmate's cell, whereupon he took the footrest from the inmate's wheelchair. Juniper then confronted the other inmates with the wheelchair footrest, threatening, 'I kill you.' It required several officers fifteen to twenty minutes to stop Juniper's attack."); *Porter v. Commonwealth*, 276 Va. 203, 224, 661 S.E.2d 415, 424 (2008) ("The Commonwealth presented evidence of several incidents while Porter was incarcerated, including altercations between Porter, fellow inmates, and prison guards.").

Further, in making this determination, VDOC permissibly considered the fact that offenders typically remain on Virginia's death row for seven years, and that the average death-row offender is only 30 to 40 years old.[47]  These are not geriatric offenders who have been confined for decades, long after the murder or murders that resulted in the imposition of their death sentence.  For this reason, statistics and rationales from other jurisdictions—where the average inmate could remain on death row for 20 years or more—do not necessarily translate to Virginia's death-row population.

For these reasons, Plaintiffs' argument that VDOC *might* be able to safely house them in less restrictive conditions does not compel the conclusion that it *must*.  Because the conditions of confinement in effect at the time this suit was filed were not "*totally without* penological justification," Plaintiffs' argument that those conditions were unconstitutional must fail.  Because Plaintiffs cannot establish that the prior conditions of confinement amounted to the "gratuitous infliction of suffering," completely divorced from legitimate security concerns, they cannot sustain an Eighth Amendment challenge.

## VII.    Injunctive relief should not issue.

Plaintiffs seek equitable relief in the form of an injunction prohibiting VDOC from returning to the prior conditions of confinement on death row.  Plaintiffs imply that this order would be "no big deal," considering that VDOC has already extended additional privileges that seem to satisfy Plaintiffs' constitutional concerns.[48]  Plaintiffs, however, are not entitled to the relief they seek, which is vague, overbroad, and would have profound collateral effects that Plaintiffs fail to acknowledge.

---

[47] *See* Celi Aff. ¶ 6 (Exhibit 5 to Defs' Mem. in Support Mot. for S.J., ECF No. 110-5).

[48] Plfs' Mem. in Supp. of Mot. for S.J. at 28 ("VDOC's voluntary adoption of the Interim Regulations has already brought VDOC into compliance.")

First, an injunction prohibiting VDOC from re-instituting prior conditions of confinement could only issue upon an express finding that those conditions violated the Eighth Amendment. For the reasons discussed above and in Defendants' cross-motion for summary judgment, the prior conditions of confinement did not constitute cruel and unusual punishment. Plaintiffs are not entitled to an injunction to remedy constitutional harm that does not exist.

Second, Plaintiffs' requested relief—prohibiting VDOC from returning, generally, to prior conditions of confinement—is not narrowly drawn. Plaintiffs have not specified what conditions, precisely, they find constitutionally objectionable, and what policy, specifically, VDOC should be prohibited from re-instituting. Under the Prisoner Litigation Reform Act, injunctive relief must be narrowly drawn to remedy the precise condition that has been deemed unconstitutional.[49] Because the equitable relief suggested by Plaintiffs is not narrowly-tailored to remedy the alleged constitutional violation, it should not issue.

Third, Plaintiffs do not have a right to any of the privileges that their requested injunction would presumably mandate. Inmates have no right to visitation generally,[50] much less contact visitation.[51] Inmates have no right to freely associate with one another,[52] nor do they have a right

_____

[49] 18 U.S.C. § 3626(a)(1)(A).

[50] *Harris v. Murray*, 761 F. Supp. 409, 412 (E.D. Va. 1990) ("Matters of visitation are within the discretion of prison administrators and should only be subject to federal court supervision if a prison's practice in this field interferes with the attorney-client relationship. Further, neither prisoners nor visitors have a constitutional right to prison visitation."); *see also Shrader v. White*, No. 82-0247-R, 1983 U.S. Dist. LEXIS 15888, at *18 (E.D. Va. June 29, 1983) (upholding challenged conditions of confinement at the Virginia State Penitentiary, and noting that, "[i]f the state grants visitation privileges, it may place restrictions, even harsh conditions, upon the exercise of that privilege").

[51] "That there is a valid, rational connection between a ban on contact visits and internal security of a [correctional] facility is too obvious to warrant extended discussion." *Block v. Rutherford*, 468 U.S. 576, 586-87 (1984) (upholding ban on contact visitation for pretrial detainees, and listing justifications for denial of contact visits).

to programming, education, or institutional employment.[53]  The injunctive relief requested,

therefore, would compel VDOC to provide death row inmates with privileges to which they are

not otherwise entitled.  An injunction of this nature would be overbroad and impose a substantial

burden on VDOC.

Fourth, Plaintiffs also fail to appreciate the significant burden that their requested

injunction would impose upon VDOC.  The proposed remedy would prohibit VDOC from

implementing a reasonable response if there were a change in circumstances on death row—for

example, another escape attempt, the arrival of an offender (like Gleason) who poses a

significant risk to other inmates, or a sudden influx of multiple death-sentenced offenders.

Requiring VDOC to return to court and petition for a modification of an existing court order

every time a new security issue develops would impose a significant burden on VDOC and run

counter to the general proposition that courts should not unnecessarily insert themselves into

affairs of prison management.[54]  An intrusion of this magnitude is unwarranted by the

circumstances of this case.

---

[52] *See Overton v. Bazetta*, 529 U.S. 126, 131 (2003) ("Freedom of association is among the rights least compatible with incarceration.  Some curtailment of that freedom must be expected in the prison context."); *White v. Keller*, 438 F. Supp. 110, 117 (D. Md. 1977) ("Freedom of physical association is inconsistent with an incarcerative penal system.")

[53] *See, e.g.*, *Harris*, 761 F. Supp. at 415 ("[T]here is no constitutional right to an institutional job or, in fact, to any rehabilitation at all."); *Shrader*, 1983 U.S. Dist. LEXIS 15888, at *29, 31 ("In this Circuit, at least, an inmate has no constitutional right to any prison job," and "the failure to provide meaningful jobs, vocational programs, or educational training does not, under the circumstances of this case, amount to the willful and wanton infliction of unnecessary pain."); *see also Hoglan v. Robinson*, No. 7:13cv00258, 2014 U.S. Dist. LEXIS 131975, at *30 (W.D. Va. Sept. 19, 2014) ("Plaintiff also does not have a federal right to prison privileges like a prison job, commissary, recreation, visitation, or general prison programming." (citing cases)).

[54] Defendants recognize the "heavy burden" they would be required to shoulder if they were to ask for outright dismissal on the grounds of mootness—which is why they have not, at this juncture, made that request.  Defendants do, however, take issue with Plaintiffs' characterization of the new conditions of confinement on death row as "mere litigation strategy."  Plfs' Mem. in

For these reasons, Plaintiffs have not established that they are entitled to the extraordinary remedy of equitable relief—their requested injunction is not narrowly drawn, would substantially burden VDOC, would not serve the public interest, and would attempt to remedy a constitutional harm that does not exist.

## CONCLUSION

Plaintiffs' motion for summary judgment is predicated on generalizations about "solitary confinement" and its theoretical effects on theoretical offenders. Viewed in the light most favorable to Defendants, Plaintiffs have not produced sufficient evidence from which it could be determined that *these* inmates have been subjected to an objectively intolerable risk of harm from *these* conditions of confinement, nor have they established that VDOC's policies and procedures fail to adequately account for any actual risk of serious and significant mental injury.

Plaintiffs' motion is predicated on their proffered evidence that, in accordance with emerging correctional trends, it might be better to house them differently. Yet,

> [The] problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism."[55]

---

Supp. of Mot. for S.J. at 24. State agencies do not spend $1.6 million on new construction simply as a matter of "litigation strategy."

[55] *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974); *see Dennis v. United States*, 341 U.S. 494, 525 (1951) (Frankfurter, J., concurring) ("History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic, and social pressures."); *see also Rummel v. Estelle*, 445 U.S. 263, 275 (1980) ("Eighth Amendment judgments should neither be nor appear to be merely the subjective views [of the judiciary].")

Evidence that merely "reflect[s] an aspiration toward an ideal environment for long-term confinement" is, therefore, insufficient to establish an Eighth Amendment claim, because "these considerations properly are weighed by the legislature and prison administration rather than a court."[56]

As this Court recognized over thirty years ago, most prisons

> cannot be described as cheerful – hardly. . . . However, it is not by the standards of the ACA, nor by the opinion of the experts, nor even by the personal opinion of the Court, that the conditions of confinement are to be judged; rather, it is by the Constitution.
>
> * * * *
>
> [Prison] is not a nice place, [and] the conditions of confinement may even be harsh, but that is simply part of the price that those who choose not to abide by the rules of society must pay for their actions.
>
> Society, too, has its rights.[57]

For these reasons, Plaintiffs' Motion for Summary Judgment should be DENIED.

Respectfully submitted,

HAROLD W. CLARKE and DAVID ZOOK, Defendants.

_____/s/_____

Margaret O'Shea, AAG, VSB # 66611
Attorney for Defendants
Office of the Attorney General
Criminal Justice & Public Safety Division
900 East Main Street
Richmond, Virginia 23219
Phone:  (804) 225-2206
Fax:  (804) 786-4239
Email:  moshea@oag.state.va.us

---

[56] *Rhodes*, 452 U.S. at 349.

[57] *Shrader*, 1983 U.S. Dist. LEXIS 15888, at *37, *58-59.

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of January, 2016, I electronically filed the foregoing Response in Opposition to Plaintiffs' Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Victor M. Glasberg, Esq.
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, Virginia 22314
vmg@robinhoodesq.com

 Jeffery E. Fogel, Esq.
913 E. Jefferson Street
Charlottesville, Virginia 22902
jeff.fogel@gmail.com

Steven D. Rosenfield, Esq.
913 E. Jefferson Street
Charlottesville, Virginia 22902
attyrosen@aol.com

And I hereby certify that I have mailed the document by United States Postal Service to the following non-filing user:  N/A

_____/s/_____
Margaret O'Shea, AAG, VSB #66611
Attorney for Defendants
Office of the Attorney General
Criminal Justice & Public Safety Division
900 East Main Street
Richmond, Virginia 23219
Phone:  (804) 225-2206
Fax:  (804) 786-4239
Email:  moshea@oag.state.va.us
