IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

THOMAS PORTER, et al.,                    )
                                          )
          Plaintiffs,                     )
                                          )
     v.                                   )      1:14-cv-1588 (LMB/IDD)
                                          )
HAROLD W. CLARKE, et al.,                 )
                                          )
          Defendants.                     )

## MEMORANDUM OPINION

Before the Court are the parties' cross-motions for summary judgment. All of the four

plaintiffs in this civil action have been convicted of capital murder, sentenced to death, and are

awaiting execution of that sentence while confined in a single unit ("death row") at Virginia's

Sussex I State Prison ("SISP"). Plaintiffs claim that the conditions of their confinement at SISP

at the time they filed this civil action violated the Eighth Amendment. In the intervening period

between when plaintiffs' Complaint was filed and the motions for summary judgment were filed,

defendants made several significant changes to those conditions, resulting in new conditions of

confinement that plaintiffs concede do not violate the Eighth Amendment. Nevertheless,

plaintiffs argue that they are entitled to an injunction, the issuance and scope of which would be

governed by the Prison Litigation Reform Act of 1995 ("the PLRA"), to ensure that defendants

do not reinstate the allegedly unconstitutional conditions that were in place when plaintiffs filed

their Complaint. Defendants do not concede that the previous conditions violated the

Constitution and argue that given the current conditions, there is no reason to either decide the

constitutional question or to impose an injunction. The motions have been fully briefed and

argued. For the reasons that follow, defendants' motion will be granted and plaintiffs' motion will be denied.

## I.   PROCEDURAL BACKGROUND

Plaintiffs are four individuals currently incarcerated on death row at SISP. Mem. in Supp. of Defs.' Mot. for Summ. J. [hereinafter Defs.' Br.], Ex. 1, Aff. of Harold C. Clarke [Dkt. No. 110-1] ¶ 10, Dec. 21, 2015 ("Clarke Aff.").[1] Plaintiff Mark Lawlor ("Lawlor") has spent more than four years on death row, plaintiff Thomas Porter ("Porter") has spent more than eight years on death row, plaintiff Ricky Gray ("Gray") has spent more than nine years on death row, and plaintiff Anthony Juniper ("Juniper") has spent more than ten years on death row.[2] Mem. in Supp. of Pls.' Mot. for Summ. J. [hereinafter Pls.' Br.], Pls.' Statement of Undisputed Material Facts [Dkt. No. 115] ¶ 1, Dec. 21, 2015 ("Pls.' SOF"); see also Resp. in Opp'n to Pls.' Mot. for Summ. J. [hereinafter Defs.' Opp'n], Contested Factual Representations & Statement of Genuine Issues [Dkt. No. 125], Jan. 11, 2016 ("Defs.' Resp. to Pls.' SOF") (not contesting these facts).

Plaintiffs initially filed a three-count Complaint against defendants Harold W. Clarke ("Clarke"), who has been the director of the Virginia Department of Corrections ("VDOC")

---

[1] Seven inmates are currently assigned to death row, but one is currently receiving mental health services at a separate facility and therefore is not currently housed at SISP. Defs.' Br., Ex. 4, Aff. of Tawanda Lyons [Dkt. No. 110-4] ¶ 13, Dec. 21, 2015 ("Lyons Aff."). An additional death row inmate, Ivan Teleguz, was one of the plaintiffs who filed this action, but he was voluntarily dismissed from the action on April 1, 2015. Notice of Dismissal of Pl. Ivan Teleguz [Dkt. No. 34], April 1, 2015. When this action was filed, eight inmates were assigned to death row; however, Alfredo Prieto was executed during the pendency of this litigation. See infra n.4.

[2] Inmates spend an average of seven years on Virginia's death row before being executed. Defs.' Br., Statement of Undisputed Material Facts [Dkt. No. 110] ¶ 7, Dec. 21, 2015 ("Defs.' SOF"); see also Pls.' Mem. Opposing Defs.' Mot. for Summ. J. [hereinafter Pls.' Opp'n], App. I, Pls.' Resp. to Defs.' List of Undisputed Facts [Dkt. No. 124], Jan. 11, 2016 ("Pls.' Resp. to Defs.' SOF") (stating that "[p]laintiffs do not dispute the factual assertions" made in paragraph 11 of defendants' Statement of Undisputed Material Facts).

since 2010, and Keith Davis ("Davis"), who was the warden of SISP until May 11, 2015,[3] in their official capacities and pursuant to 42 U.S.C. § 1983, claiming that the conditions of their confinement on death row and the procedures for placing them there violated the Eighth and Fourteenth Amendments. See Compl. [Dkt. No. 1] ¶¶ 3-4, Nov. 20, 2014; Answer [Dkt. No. 49] ¶¶ 3-4, May 5, 2015; see also Clarke Aff. ¶ 53. Specifically, in Count I of their Complaint, plaintiffs alleged that defendants had denied them due process of law, Count II alleged that defendants denied plaintiffs equal protection of the law, and Count III alleged that defendants violated the Eighth Amendment by subjecting plaintiffs to cruel and unusual punishment. Compl. ¶¶ 14-16.[4]

This litigation is related to an earlier civil action brought by a former Virginia death row inmate, Alfredo Prieto, who claimed that his "automatic and permanent placement in the restrictive conditions of confinement prevailing on death row violated his rights under the Due Process Clause of the Fourteenth Amendment." Prieto v. Clarke, No. 1:12cv1199, 2013 WL 6019215, at *3 (E.D. Va. Nov. 12, 2013), rev'd, 780 F.3d 245 (4th Cir. 2015), cert. dismissed, 136 S.Ct. 319 (2015).[5] Finding that the "dehumanizing conditions" on Virginia's death row were "undeniably extreme," id. at *6-8, and that automatically imposing those conditions on death row

---

[3] David Zook ("Zook") is now the warden of SISP, Defs.' Br., Ex. 4, Aff. of David Zook [Dkt. No. 110-3] ¶ 7, Dec. 21, 2015 ("Zook Aff."), and was substituted as a defendant in place of Davis. Order [Dkt. No. 151], Mar. 24, 2016. Additionally, Clarke was originally misnamed in the Complaint as Harold C. Clarke, and his name was later corrected. Id.

[4] Defendants initially moved to dismiss plaintiffs' Eighth Amendment and equal protection claims, Mem. in Supp. of Defs.' Mot. to Dismiss [Dkt. No. 21], Feb. 4, 2015, which motion was denied. Order [Dkt. No. 41], Apr. 17, 2015.

[5] Prieto also initially raised a claim that SISP's visitation policies violated the Eighth Amendment. Prieto, 2013 WL 6019215, at *3. The Court dismissed that claim pursuant to 28 U.S.C. § 1915A(b)(1), and although Prieto appealed, he failed to prosecute the claim and the appeal was dismissed. Id.

inmates violated the Fourteenth Amendment, this Court granted summary judgment to Prieto and

ordered that the defendants either provide an "individualized classification determination" to

Prieto or improve the conditions on death row, "if only slightly." Id. at *10-11. Following that

decision, the VDOC granted Prieto additional privileges not extended to the other death row

inmates, which spurred plaintiffs' equal protection claim in this action. Compl. ¶¶ 8-11, 15.

In a split panel decision, the Fourth Circuit reversed the Prieto ruling, although in doing

so the court acknowledged that the conditions under which Prieto was confined were

"undeniably severe." Prieto v. Clarke, 780 F.3d 245, 254-55 (4th Cir. 2015), cert. dismissed, 136

S.Ct. 319 (2015).[6] Furthermore, in his dissent, Judge Wynn found that Prieto had a liberty

interest in avoiding "the highly restrictive conditions of Virginia's death row," which "deprived

[Prieto] of almost all human contact" and "stimuli." Id. at 255-56 (Wynn, J., dissenting). In light

of the majority decision in Prieto, the parties in this action stipulated to the dismissal of the

Fourteenth Amendment due process and equal protection claims, leaving only the Eighth

Amendment claim in Count III for litigation. Stipulation of Voluntary Dismissal Pursuant to

F.R.C.P. 41(a)(1)(A)(ii) [Dkt. No. 30], Mar. 19, 2015 ("Stipulation of Dismissal").[7]

---

[6] Prieto filed a petition for a writ of certiorari, but the Commonwealth of Virginia scheduled Prieto's execution date while that petition was pending, leading Lawlor to seek leave to intervene in the action to prevent it from becoming moot. See Mem. in Supp. of Emergency Mot. for Clarification [Dkt. No. 94] 2-3, Aug. 31, 2015; Mot. for Leave to Intervene, Prieto v. Clarke, 136 S.Ct. 319 (Sept. 9, 2015) (No. 15-31). On October 1, 2015, Prieto was executed, see Tom Jackman, Triple Murderer Alfredo Prieto is Executed in Virginia, WASH. POST, Oct. 1, 2015, available at https://www.washingtonpost.com/local/public-safety/judge-allows-execution-of-alfredo-prieto-to-proceed/2015/10/01/eaec9f28-67c6-11e5-9223-70cb36460919_story.html, and on October 13, 2015, the Supreme Court denied Lawlor's motion for leave to intervene and dismissed Prieto's petition for a writ of certiorari as moot. Prieto v. Clarke, 136 S.Ct. 319 (Oct. 13, 2015), 2015 WL 4105028.

[7] The parties stipulated that Count I, the due process claim, was dismissed without prejudice, but plaintiffs preserved the claim for appeal and reserved the right to refile the claim should the

## II.    FACTUAL BACKGROUND

When this civil action began, the conditions on death row were essentially identical to

those described in the Prieto decision. See Pls.' Br., Ex. 7, Report of Michael L. Hendricks,

Ph.D., ABPP [Dkt. No. 115-9] 7, Dec. 21, 2015 ("Hendricks Report") ("The District Court's

description of the conditions of Virginia's death row in its Prieto decision captured the essence

of Virginia's death row and lines up with my observations."); see also Prieto, 2013 WL 6019215,

at *1 (describing the conditions on death row). Death row inmates at SISP are housed in a "pod"

that is separate from the ones that house the general population of the prison. Clarke Aff. ¶¶ 9,

11;[8] see also Defs.' Br., Ex. 23, Va. Dep't of Corr. Operating Procedure [Dkt. No. 122-2] III,

Dec. 23, 2015 ("OP 460A") (defining the "Death Row Unit" as "[a] separate housing unit set

aside for the custodial control and management of offenders under the sentence of death").[9] The

VDOC defines the pod as a kind of "segregated" housing but does not use the term "solitary

confinement" or characterize any of its facilities or housing as "solitary confinement." Id. ¶¶ 8-9

(internal quotation marks omitted). The death row pod consists of two tiers, each holding 22 cells

---

Fourth Circuit's decision be reversed. Stipulation of Dismissal. Count II, the equal protection claim, was dismissed with prejudice. Id.

[8] Much of the factual material contained in Clarke's affidavit is mirrored in defendants' Statement of Undisputed Material Facts and is undisputed by plaintiffs. See generally, Defs.' SOF; Pls.' Resp. to Defs.' SOF; see also Pls.' SOF; Defs.' Resp. to Pls.' SOF. Where there is disagreement between the parties over facts relevant to the decision contained in this Memorandum Opinion, that disagreement is noted.

[9] OP 460A, photographs of SISP facilities, and other materials were filed under seal to ensure the security of VDOC facilities and SISP; however, that sealing was intended to protect from public dissemination the actual photographs of facilities as well as information pertaining to "the manner of restraining and transporting inmates." See, e.g., Mem. in Supp. of Mot. to Submit Exs. to Mem. in Supp. of Defs.' Mot. for Summ. J. Under Seal [Dkt. No. 108] ¶¶ 4-5, Dec. 21, 2015. Although this Memorandum Opinion will cite to certain materials that are under seal, it will only discuss aspects of those materials that are either discussed in public filings by both parties or that can be discussed without jeopardizing SISP security, and therefore, the entirety of this Memorandum Opinion will be filed on the public docket.

and three showers. Id. ¶ 11. Each cell measures 71 square feet, with a 10.5-foot-high ceiling. Id. ¶ 12. The cells "are comparable in size" to those shared by general population inmates, but death row inmates do not share cells and are not housed in adjacent cells. Id. ¶¶ 12-13; Compl. ¶ 5; Answer ¶ 5. Each cell has a bed, "a small 'desk' adjacent to the bed, and a commode/sink combination."[10] Hendricks Report 8.

The cells have windows that are 5 inches high by 41.5 inches long. Clarke Aff. ¶ 14. Even though the windows are covered in wire mesh for security reasons, they do allow some natural light to come through and inmates can see out of them. Id.[11] The cell lights turn on at 5:30 a.m. and stay on until 10:30 p.m., at which time a "low-level 'night light'" is turned on "for security purposes and for the safety of the inmate." Id. ¶¶ 16-17. Each cell door has a tray slot as well as a "rectangular in-set window" from which inmates can look into the pod from their cells. Id. ¶ 15. The cell doors are not sound-proof, and inmates do attempt to communicate with other inmates while in their cells, although the parties disagree over how effectively inmates can communicate. See id.; Hendricks Report 7; see also Defs.' SOF ¶ 14; Pls.' Resp. to Defs.' SOF ¶ 14. Plaintiffs may have a television and a compact disc player in their cells, and they may request "materials from the law library and the regular library" in addition to ordering "approved publications" to read. Clarke Aff. ¶¶ 41, 45.

---

[10] Plaintiffs claim that because there is no additional seating in the cells, they were forced to eat their meals while sitting on the toilet. Pls.' SOF ¶ 18. In support of this assertion, plaintiffs cite the declaration submitted by Juniper, which states that he "was required to eat sitting on the toilet or [his] bed." Pls.' Br., Ex. 3, Decl. of Anthony Juniper [Dkt. No. 115-3] ¶ 9, Dec. 21, 2015 ("Juniper Decl."). Juniper also avers that he has now been given a stool on which to sit. Id.

[11] The parties dispute how much light comes through the cell windows and how clearly inmates can see out of them. Defs.' SOF ¶ 13; Pls.' Resp. to Defs.' SOF ¶ 13.

When this lawsuit was filed, VDOC Operating Procedure 460A ("OP 460A"), effective

March 1, 2010, and the SISP Institutional Rules and Regulations for Offenders, effective

February 3, 2010, governed the daily lives of the death row inmates. Id. ¶¶ 21-22. Under these

procedures and regulations, inmates were allowed one hour of outdoor recreation, five days a

week, which they spent in individual enclosures "made of steel interlocking mesh" that measured

7.9 feet wide by 20 feet long and 10 feet high. Id. ¶ 23; see also OP 460A IV.J.[12] The enclosures

lacked any exercise equipment and inmates were prohibited from using adjacent enclosures;

nonetheless, some inmates coordinated exercises with one another from their individual

enclosures. Defs.' SOF ¶¶ 19-20; Pls.' Resp. to Defs.' SOF ¶¶ 19-20. Inmates were also

permitted to leave their cells for a ten-minute shower a minimum of three times a week, OP

460A IV.L., and two inmates, Porter and Gray, were allowed out of their cells to perform their

respective institutional jobs as the houseman and the barber for death row. Clarke Aff. ¶¶ 26-28.

Inmates were permitted to have non-contact visitation on weekends and state holidays,

OP 460A IV.N, and could request contact visitation with immediate family members if "extreme

circumstances exist[ed]," but the Warden had discretion to grant or deny such requests.[13] OP

460A IV.N.2; see also Clarke Aff. ¶ 51. They also had access to wireless telephones that could

be brought to their cell and used seven days per week, between 8:00 a.m. and 9:30 p.m., with

each call generally limited to 20 minutes. Clarke Aff. ¶¶ 43-44; see also Defs.' Br., Ex. 7, Aff. of

---

[12] Plaintiffs contend that these "privileges were routinely suspended" because of "the frequent
lockdowns" of SISP. Pls.' Resp. to Defs.' SOF ¶ 19.

[13] Such requests could "only be submitted once every six (6) months." OP 460A IV.N.2.
Plaintiffs repeatedly emphasize that despite having discretion to allow contact visits, one former
warden would only allow such visits "if a prisoner's death were imminent." See, e.g., Pls.' Br.
26. Defendants respond that different wardens exercised their discretion pursuant to this policy in
different ways. Defs.' Resp. to Pls.' SOF ¶ 11.

Joycetine Boone [Dkt. No. 110-7] ¶ 13, Dec. 21, 2015 ("Boone Aff.") ("[O]ffenders were given virtually unlimited access to the telephone.").[14]

Besides these limited interactions with fellow inmates and the outside world, death row inmates had contact with prison staff, including mental health counselors, and could request to have contact visitation with their attorneys on weekdays from 8:00 a.m. to 3:00 p.m., for approximately one hour at a time. Id. ¶¶ 47-48; see also OP 460A IV.I. Corrections officers walked through the death row pod performing security checks every 30 minutes, medical personnel made rounds through the pod twice a day, nurses came through the pod twice a day to distribute medications, the mental health practitioner visited once a week, each inmate's case counselor visited the pod daily, and inmates could request additional medical or mental health care from those practitioners.[15] Id. ¶¶ 30-36; see also Lyons Aff. ¶ 4; Zook Aff. ¶ 21. Additionally, inmates could request meetings with the chaplain and other "[a]pproved religious volunteers." Id. ¶¶ 38-40.[16] Although death row provided these minimal opportunities for human interaction, plaintiffs spent "almost all of [their] time alone"—approximately 22 to 23 hours a day in their cells. Prieto, 2013 WL 6019215, at *1.

Defendants and other VDOC officials maintain that these policies were necessary due to the heightened security risks posed by death row inmates and argue that the impact of such

---

[14] Plaintiffs "[d]ispute that there [were] no limitations on the number of telephone calls prisoners [could] make, because phone calls [from death row] must be made collect, [can only be made] to a limited number of recipients, [and are billed] at high rates." Pls.' Resp. to Defs.' SOF ¶ 30.

[15] Plaintiffs assert that "requests for medical care routinely go unaddressed," and further characterize these interactions with prison staff as "brief," "cursory," and "pro forma." Pls.' Resp. to Defs.' SOF ¶¶ 22-23, 25, 27.

[16] Plaintiffs contend that "requests for religious volunteers" are also "routinely denied." Pls.' Resp. to Defs.' SOF ¶ 27.

policies on plaintiffs has not been constitutionally unacceptable. For example, A. David

Robinson ("Robinson"), the VDOC's Chief of Corrections Operations, avers that "[w]hen

devising policies pertaining to death row inmates, the nature of their underlying crime, as well as

the sentence they are facing, necessitates certain precautions" and "the risk of escape or violence

must . . . be taken into account," particularly because "[t]hese offenders have already shown

themselves to be capable of murder." Defs.' Br., Ex. 2, Aff. of A. David Robinson [Dkt. No.

110-2] ¶ 23, Dec. 21, 2015 ("Robinson Aff."). Robinson highlights the escape of six prisoners

that occurred when Virginia's death row was located at Mecklenburg Correctional Center, and he

attributes the lack of similar incidents at SISP to the policies and regulations that were in place

until 2015.[17] Id. ¶¶ 16-20. Similarly, Zook describes the murder of two inmates by two others

during group recreation at a Florida prison where he worked as "illustrative of what can happen

when death-row offenders are allowed to congregate in larger groups." Zook Aff. ¶ 18. Clarke

avers that he too is "ever-cognizant . . . of the security risk posed by convicted murderers who

are awaiting the imposition of a death sentence" and particularly of the "heightened risk of

attempted escape" among that population. Clarke Aff. ¶ 63.

 In addition to justifying the pre-2015 conditions as necessary security precautions,

defendants also contend that those conditions had no harmful effects on plaintiffs. In multiple

affidavits submitted by defendants, VDOC officials aver that they have not witnessed any

---

[17] Virginia's death row inmates were previously housed at the Mecklenburg Correctional Center.
Robinson Aff. ¶ 16. In 1984, six death row inmates escaped from that correctional center, and
some of those escapees were not caught for several weeks. Id. Other incidents occurred while the
unit was located at the Mecklenburg facility, including violent encounters between inmates, as
well as one inmate's suicide. Id. ¶ 18. Virginia moved its death row unit from Mecklenburg to
SISP in August 1998, and "virtually no serious security-related incidents" have occurred on
death row since the move, with one exception being a former inmate's unsuccessful attempt "to
set his cell on fire prior to his execution in 2009." Id. ¶ 19.

"mental deterioration" or other mental health problems among plaintiffs during their incarceration under the pre-2015 conditions. See, e.g., Zook Aff. ¶ 19.

Despite defendants' belief that the pre-litigation conditions were not harmful to plaintiffs and were necessary to ensure the facility's security, Clarke began considering changing some of those conditions as early as 2011. Clarke Aff. ¶ 57.[18] Clarke avers that he chose not to move forward with any changes while the Prieto litigation was pending, but then decided in mid-2014 to implement changes and continued in that effort even after the instant litigation began on November 20, 2014. Id. ¶ 58. Zook and Clarke eventually approved a number of interim rules and regulations for death row in August 2015, id. ¶ 59, and then moved to stay these proceedings for 90 days while they implemented the new regulations, with the additional request that any remaining issues at the end of those 90 days be referred for mediation. Defs.' Mot. for Stay & to Refer Remaining Issues to Mediation [Dkt. No. 84], Aug. 10, 2015. The plaintiffs did not oppose the motion, and the Court granted the requested relief. Order [Dkt. No. 88], Aug. 12, 2015.

The interim regulations provided for a number of significant changes to plaintiffs' conditions of confinement. See generally, Mem. in Supp. of Defs.' Mot. for Stay & to Refer Remaining Issues to Mediation [hereinafter Mot. for Stay], Ex. 1, Aff. of Harold Clarke [hereinafter Clarke Aff. 2], Ex. A, Interim Offender Rules and Regulations – Death Row [Dkt. No. 85-1] Aug. 10, 2015 ("Interim Regulations"). With respect to visitation, the interim regulations allowed death row inmates to "have contact visits with immediate family members" every Friday for 1 hour and 30 minutes," and "non-contact visits with any approved visitor on

---

[18] Clarke avers that beginning in 2011 and continuing through the present litigation, he "held numerous discussions with [his] staff regarding whether and how . . . modifications should occur." Clarke Aff. ¶ 57.

Saturdays, Sundays, and holidays for 1 hour and 30 minutes." Id. at 3. The interim regulations allowed inmates to shower seven days a week, for fifteen minutes each time, and inmates were permitted to engage in daily congregate recreation within the death row pod "with a maximum of three other offenders" for at least an hour at a time. Id. at 4.

To implement this "in-pod" recreation, the VDOC began "constructing a multi-purpose day room" in the death row pod with tables on which inmates could play games, several telephones and a television, and a J-PAY kiosk from which inmates could send email and purchase books and movies. Clarke Aff. 2 ¶ 11. The VDOC planned to "us[e] the day room for congregate religious services, behavioral programming, and additional employment opportunities" for the death row inmates. Id. With respect to these additional employment opportunities, the VDOC immediately created an additional job cleaning the pod and showers, and Clarke averred that the VDOC was working to create another job that would involve "wrapping sporks for offender meals." Id. ¶ 12.

In addition to the new opportunities for in-pod recreation and congregation, the interim regulations provided for increased outdoor recreation, permitting inmates to engage "in outdoor recreation five days per week for a minimum of 1 hour and 30 minutes per day." Interim Regulations 4. Although the regulations themselves did not refer to congregate outdoor recreation, Clarke averred that the VDOC was in the process of constructing a "covered outdoor recreation yard specifically for Death Row offenders," which would be "separated into two sections, each" with "a basketball court and an area for stationary exercise equipment," and would allow for a maximum of four death row inmates to congregate in each section of the yard, unrestrained, "for a minimum of one hour and thirty (30) minutes per day, five (5) days per week." Clarke Aff. 2 ¶ 10.

Following the promulgation and partial implementation of these interim regulations, the parties participated in a settlement conference, but failed to resolve the action. Joint Status Report [Dkt. No. 102], Nov. 13, 2015. Accordingly, the parties filed the pending cross-motions for summary judgment. Since the filing of those motions, the parties have provided multiple updates regarding the progress of the policy changes. These submissions demonstrate that defendants have finalized the interim regulations and have implemented most, if not all, of the promised changes, at significant expense.

Specifically, Zook approved finalizing the interim regulations as Operating Procedure 425.A ("OP 425.A") in May 2016, and OP 425.A was signed into effect by the VDOC's Regional Operations Chief on June 2, 2016. Resp., Ex. A, Aff. of David Zook [Dkt. No. 161-1] ¶ 20, June 3, 2016 ("Zook Aff. 3"); see also Resp., Ex. 8, Va. Dep't of Corr. Operating Procedure 425.A [Dkt. No. 158], June 3, 2016 ("OP 425.A"). Pursuant to OP 425.A, death row inmates who are in compliance with grooming and other standards "will receive at least 1 ½ hours of outside recreation, 5 days a week and 1 hour of [in-]pod recreation per day." OP 425.A.V.C.1.[19] During in-pod recreation, groups of up to four inmates may use the newly constructed day room to "watch television, play board games, and use the telephone[20] and [J-PAY] kiosk." OP 425.A.V.C.4.h.[21]

---

[19] Inmates who are not in compliance with the grooming standards and standards for cell maintenance will still receive outdoor recreation time, but only in the individual pens used before the construction of the outdoor facility. OP 425.A.V.C.2.

[20] Specifically, inmates are allowed "routine phone calls," each of which "has a 20 minute time limit." OP 425.A.IV.C.9.

[21] Zook previously averred that a specific group behavioral program titled "Thinking for a Change" would become available to death row inmates starting the week of February 8, 2016 and would take place in the day room. Mot. to Supplement the Record, Ex. 2, Aff. of David Zook [Dkt. No. 139-2] ¶ 11, Feb. 10, 2016 ("Zook Aff. 2"). Although defendants' most recent

Inmates may have visitation with immediate family members as well as with one non-family member. OP 425.A.VII.D.1. Contact visitation with approved visitors is permitted for one hour and 30 minutes every Friday, and non-contact visitation occurs on weekends and holidays. OP 425.A.VII.D.2-3. Inmates may also request extended visits, which requests the Assistant Warden can evaluate and approve "on a case-by-case basis." OP 425.A.VII.D.5. Although OP 425.A is now the official operating procedure for death row, its terms require the VDOC to review the procedure on an annual basis and to "re-write it no later than three years after [its] effective date." OP 425.A.X.

Defendants have further shown that VDOC has spent a total of $1,974,995.00 on the planning and construction of the physical changes made to death row[22] and has set aside another $200,000.00 for anticipated "design and permitting fees, as well as construction of an indoor divider wall adjacent to the attorney visitation room" on death row. Zook Aff. 3 ¶¶ 22-23. One of the more significant physical changes involved the construction of the outdoor recreation facility, which "passed its final inspection and permitting on Friday, January 8, 2016," and was first used by inmates on Tuesday, January 12, 2016. Id. ¶ 17.[23] Photographs submitted under seal by defendants demonstrate that the facility is completely enclosed in wire mesh, with additional

---

submission to the Court does not reference this programming, information regarding the program was not requested. Moreover, because plaintiffs concede that the current conditions meet constitutional standards, it is irrelevant whether all the promised changes have been implemented.

[22] Zook avers that this sum "does not include miscellaneous facility expenditures, such as the cost of the basketball goals and the television" in the dayroom. Zook Aff. 3 ¶ 22.

[23] During oral argument on the summary judgment motions, defendants' counsel represented that the inmates were given an extra hour and a half of recreation in the day room when snow had made outdoor recreation time undesirable. Tr. of Mots. Hr'g [Dkt. No. 131] 10:13-11:13, Feb. 8, 2016.

roofing on the top, but that it allows some natural light to come in through the sides. See Resp., Exs. 1-7 [Dkt. No. 158], June 3, 2016. The facility is divided in half by another wall of wire mesh, and each half contains a basketball hoop, a table with four seats, and a piece of stationary exercise equipment.[24] Id. Death row inmates are permitted to congregate in small groups in each half of the facility, and although the finalized regulations state only that outdoor recreation occurs "at least" five days a week, earlier submissions by defendants indicate that it may be available up to seven days a week. See Clarke Aff. ¶ 60.

Plaintiffs do not contest the accuracy of these photographs; however, they submitted an affidavit in which one of plaintiffs' attorneys avers that he was told by an unnamed prison official that inmates housed in a building adjacent to the death row pod will also be permitted to use the outdoor facility. Pls.' Reply to Defs.' Resp. to Ct.'s Order of May 20, 2016 [hereinafter Pls.' Reply], Ex. 1, Decl. of Steven D. Rosenfield [Dkt. No. 163-1] ¶ 4, June 15, 2016 ("Rosenfield Decl.").[25]

### III.   DISCUSSION

Plaintiffs concede that the changes implemented by the VDOC addressed their concerns, and they do not contend that the current conditions of confinement at SISP violate the Eighth Amendment. Instead, plaintiffs move for summary judgment based on their argument that the previous conditions were unconstitutional. Pls.' Br. 2. The only relief they seek is an injunction barring defendants from reinstating those conditions, which they argue is not only necessary but

---

[24] The exercise equipment "can be used for chin-ups and similar physical exercises." Zook Aff. 3 ¶ 7.

[25] Rosenfeld also avers that he found the outdoor facility to be "rather dark, although ambient light allowed some lighting through the sides," but that he was later informed by his clients "that lighting has been added to the outdoor facility." Rosenfield Decl. ¶ 5.

is also narrowly drawn and the least intrusive means available, as required by the PLRA. Id. at

27-29; see also 18 U.S.C. § 3626(a)(1)(A). Defendants argue that they should be awarded

summary judgment because the current conditions under which plaintiffs are housed do not

violate the Constitution, that it is unnecessary to decide the constitutionality of the previous

conditions, which they maintain were in fact constitutional, and that an injunction is not

appropriate. Defs.' Br. 18-19, 22.

### A. **Standard of Review**

A party is entitled to summary judgment if the record shows that "there is no genuine

dispute as to any material fact and that the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). ). In ruling on cross-motions for summary judgment, the court must

evaluate "each motion separately on its own merits 'to determine whether either of the parties

deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir.

2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Although

the court "must draw any permissible inference from the underlying facts in the light most

favorable to the party opposing the motion," any inferences drawn "must, in every case, fall

within the range of reasonable probability and not be so tenuous as to amount to speculation or

conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir.

1995) (quoting Tuck v. Henkel Corp., 973 F.2d 371, 374 (4th Cir. 1992)) (internal quotation

marks omitted). Moreover, "[t]he mere existence of a scintilla of evidence in support of the

[nonmovant's] position will be insufficient" to defeat a summary judgment motion; instead,

"there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d

78, 82 (4th Cir. 2009) ("[A] nonmovant cannot defeat summary judgment with merely a scintilla

of evidence."). Similarly, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment; the dispute must be both "material" and "genuine," meaning that it "might affect the outcome of the suit under the governing law." Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001) (emphasis omitted).

### B. Mootness

The parties primarily focus on the questions of whether the pre-2015 conditions were unconstitutional and whether injunctive relief should issue, but an initial matter to be considered, and one which the Court deems determinative, is whether these questions have been mooted by the VDOC's voluntary change in policies. Plaintiffs concede that the "VDOC's voluntary adoption of the Interim Regulations has already brought VDOC into compliance," and they seek only an injunction barring the defendants from returning to the earlier policies. Pls.' Br. 28. Defendants respond that "at this juncture" they are not seeking "outright dismissal on the grounds of mootness" because doing so would require them "to shoulder" the "heavy burden" established by the Fourth Circuit in Wall v. Wade, 741 F.3d 492 (4th Cir. 2014). Defs.' Opp'n 24 n.54 (internal quotation marks omitted). Instead, defendants invoke the doctrine of constitutional avoidance to argue that injunctive relief is unnecessary and that the injunction sought by plaintiffs is not narrowly tailored as required by the PLRA. Defs.' Br. 22-23.

Although the doctrine of constitutional avoidance is not applicable here,[26] defendants' contentions that injunctive relief is unnecessary and that the Court should abstain from

---

[26] Under the doctrine of constitutional avoidance, federal courts should avoid deciding questions of constitutional law when there are uncertain questions of state law that would require "guesswork," Spector Motor Serv. v. McLaughlin, 323 U.S. 101, 105 (1944), or when state law or a statute provides an alternative basis on which to decide the case, making adjudication of the constitutional question avoidable. See Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502,

determining the constitutionality of the previous conditions are, at their core, arguments about mootness. It is apparent to the Court that the issues raised by plaintiffs' Complaint have in fact been mooted by the changes voluntarily implemented by defendants and that it is unnecessary and inappropriate for the Court to reach the merits of the constitutional dispute. The relevant case law cited by both parties supports this conclusion. For example, the defendants in Wall, who were also VDOC officials, argued that their voluntary cessation of a policy prohibiting inmates who did not possess certain religious materials from participating in Ramadan observances mooted the inmate plaintiff's claim that the practice violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Wall, 741 F.3d at 496-97. The allegedly wrongful policy had required inmates "to provide some physical indicia of Islamic faith" to be able to participate in Ramadan, and the new policy allowed for participation in Ramadan if an inmate could show that he or she had "in the past borrowed religious materials" from the facility's chaplain. Id. at 494-96. Accordingly, the "new policy very closely mirrored the old policy." See Smith v. United States Congress, No. 3:12CV45, 2015 WL 1011545, at *9 (E.D. Va. Mar. 6, 2015).

The Wall court held that official defendants seeking to establish mootness after they voluntarily end a challenged practice must demonstrate that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," and found that the defendants failed to meet their "heavy burden" in making that showing because they had not produced any evidence demonstrating that the allegedly wrongful practice had actually ended "once and for all." Wall, 741 F.3d at 497 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl.

---

516 (2009) ("The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts."). Defendants fail to demonstrate how this doctrine applies in the context of this litigation.

Servs., Inc., 528 U.S. 167, 189 (2000)) (internal quotation marks omitted). The court also emphasized that "when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot," and found that nothing would prevent the VDOC from reinstating the Ramadan policy, particularly because the use of three different policies over the course of several years made it doubtful "that the new policy [would] remain in place for long." Id. (citations omitted).

Similarly, in Prison Legal News v. Stolle, No. 2:13CV424, 2015 WL 1487190 (E.D. Va. Mar. 31, 2015), a case cited by plaintiffs, the defendants, which included the Sheriff for Virginia Beach, Virginia and employees of the Virginia Beach Sheriff's Office ("VBSO"), argued that because the VBSO had changed its policies regarding sexually explicit publications sent to prisoners at the Virginia Beach Correctional Center ("VBCC"), the publisher plaintiff's claim that previous publication policies were unconstitutional had become moot. Id. at *1, 4. The court disagreed, citing Wall's description of the "heavy burden" on the defendants, and pointing to the defendants' failure to "acknowledge[] that the prior VBSO policies [were] unconstitutional" or "at least constitutionally suspect, and therefore, [would] never be reimplemented by the VBSO." Id. at *4. The court found that because the defendants failed to identify "any legal or practical barrier preventing them from readopting the disputed polices" and similarly "failed to even offer a bald conclusory pledge not to return to such policies," they had failed to demonstrate that the plaintiff's claims were moot. Id.

The situation at bar is distinct from those involved in Wall and Prison Legal News. Although defendants here decline to explicitly acknowledge that the pre-2015 conditions of confinement were unconstitutional or to offer explicit guarantees that the VDOC will not return to those conditions, the policies at issue in the instant litigation and the actions taken by

defendants are easily distinguished from those at issue in <u>Wall</u> and <u>Prison Legal News</u>. Unlike the prison officials in those cases, defendants here have made significant, costly, and concrete changes to numerous facets of plaintiffs' conditions of confinement, including not just policy and procedural changes, but also physical changes to the death row facilities.

The policies at issue in <u>Wall</u> and <u>Prison Legal News</u> affected relatively limited aspects of inmate life: in <u>Wall</u>, participation in a specific religious holiday, and in <u>Prison Legal News</u>, the type of publications that prisoners could receive. In contrast, the VDOC's new regulations for death row inmates reach almost every facet of inmate life. In particular, the new regulations have changed the quantity and quality of plaintiffs' recreational time and visiting hours, allowed for more time spent outside of plaintiffs' cells, and supplied new opportunities for interaction with other inmates. Moreover, defendants have constructed new physical facilities at SISP for plaintiffs' use. These policies and structural changes are not only broad-ranging, but were and are extremely costly to implement. Defendants have spent nearly $2 million on planning and construction, including the building of an outdoor recreation yard and indoor recreation room, both of which include costly pieces of equipment and technology.[27] Such physical changes and monetary investments are strong indicators that defendants will not revert to the previous conditions. As defendants contend, "[s]tate agencies do not spend $1.6 million on new construction simply as a matter of 'litigation strategy.'" Defs.' Opp'n 24 n.54. Although plaintiffs correctly argue that "[c]onstitutional rights cannot be bought and sold," Pls.' Reply 4,

---

[27] That the outdoor facility may be used at times by other SISP prisoners does not undermine or conflict with defendants' intention to provide it for use by death row inmates for at least one hour and 30 minutes, five days a week. Moreover, defendants aver that the day room was constructed inside the death row pod because they "have no plans to limit or otherwise revoke" the policy permitting its use by prisoners who are in compliance with VDOC policies. Zook Aff. 2 ¶ 10.

defendants' monetary outlay is a strong indicator that defendants intend to maintain their new policies, which plaintiffs have admitted meet constitutional standards.

Furthermore, these changes were implemented without court intervention and were under consideration before this litigation even began. Clarke's unrebutted affidavit demonstrates that he began considering changing the previous VDOC policies as early as 2011, before either the Prieto lawsuit or this lawsuit began. Clarke Aff. ¶ 57. There is no basis in this record for questioning Clarke's sworn statement to that effect. Moreover, Clarke and the other VDOC officials continued implementing changes after plaintiffs' Complaint was filed, without any court order requiring that they do so. Defendants steadily advanced the progress of these changes, ultimately finalizing the new and undisputedly constitutional regulations in June 2016. These actions serve as an implicit acknowledgement that the earlier conditions were undesirable, if not unconstitutional.

Plaintiffs counter that the timing of the changes is suspicious and shows that the defendants were only motivated by this litigation, and further argue that even the official finalization of the new regulations is insufficient to ensure that defendants will not revert to the earlier conditions.[28] Pls.' Reply 2-3. That the new regulations were only recently finalized does

---

[28] After filing their reply to defendants' last supplemental report, plaintiffs filed materials they received as a result of their request under Virginia's Freedom of Information Act. See Mot. for Leave to Supplement Pls.' Resp. to Defs.' Evidentiary Submission [hereinafter Mot. to Supplement], Ex. A, Pls.' Supplemental Evidentiary Submission [Dkt. No. 164-1], June, 23, 2016; see also Order [Dkt. No. 165], June 23, 2016 (granting plaintiffs' Motion for Leave to Supplement and making the supplementary submission part of the record). Plaintiffs' submission relates entirely to the construction of the outdoor facility, and largely consists of emails sent by VDOC staff to other state officials and employees, in addition to an approved "Emergency Declaration Request Form" and a Fire Marshal report. Id. Plaintiffs contend that these materials "confirm[] the wholly reactive nature of the Death Row improvements" and demonstrate that the changes made were not voluntary, Mot. to Supplement 1-2; however, these materials do not carry such persuasive weight. Defendants' apparent rush to complete the outdoor facility does

not cast doubt on their voluntariness; rather, it demonstrates that defendants engaged in a deliberative process to ensure that the new regulations were both workable and firmly established. Meaningful change comes slowly within bureaucracy, particularly comprehensive change of the kind made by defendants, and a more limited or half-hearted approach like the ones taken in Wall or Prison Legal News would be far more concerning.

Furthermore, neither the frequent turnover in prison officials nor the new regulations' provision for annual review and a revision in three years shows that these changes will be easily or casually reversed. Plaintiffs emphasize that OP 425.A provides that it will be revised in three years, id. at 4; however, three years is a significant length of time, particularly in light of the required time limit on the injunction plaintiffs seek under § 3626(a) of the PLRA, which "establishes [the] standards for the entry and termination of prospective relief in civil actions challenging prison conditions." Miller v. French, 530 U.S. 327, 331 (2000); see also 18 U.S.C. § 3626(a). Although neither party addressed this issue or seemed aware of it when the Court raised the issue during oral argument, see Tr. of Mots. Hr'ng [Dkt. No. 131] 5:22-6:11, Feb. 8, 2016, § 3626(b)(1) of the PLRA provides that "[i]n any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener" beginning two years from "the date the court granted or approved the prospective relief," 18 U.S.C. § 3626(b)(1)(A)(i), unless "the court makes written findings based

---

not contradict Clarke's sworn statement that he had been considering making changes for years, nor does it negate the comprehensive changes made to many of the VDOC's death row regulations and facilities, from visitation policies to congregate recreation—none of which are referenced in the supplementary materials. Moreover, the VDOC's apparent urgency indicates that defendants sought to implement the most costly and logistically complicated change—constructing a secure outdoor facility—as quickly as possible so as to resolve this litigation. That motivation does not demonstrate any bad faith and instead provides further assurance of defendants' willingness to maintain the improved conditions on death row.

on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right" and meets the other requirements for injunctive relief under the PLRA. 18 U.S.C. § 3626(b)(3). Even if an ongoing constitutional violation is found such that the prospective relief needs to remain in effect, after one year the relief again becomes terminable upon a party or intervener's motion. 18 U.S.C. § 3626(b)(1)(A)(ii).[29]

Accordingly, even if plaintiffs received the requested injunction, and the current, undisputedly constitutional conditions remained in place (or continued to improve), any party or intervener could move to terminate that injunction after two years. See, e.g., Morales Feliciano v. Rullán, 378 F.3d 42, 52 (1st Cir. 2004) ("Upon a motion to terminate prospective injunctive relief under the PLRA, a court may continue the relief only if it supportably finds that there are ongoing constitutional violations."), cert. denied, Rullan v. Feliciano, 543 U.S. 1054 (2005); Cason v. Seckinger, 231 F.3d 777, 780 (11th Cir. 2000) ("[T]he PLRA limits a court's authority to continue to enforce previously entered prospective relief in prison litigation reform cases" by "establish[ing] specified time frames under which prospective relief is terminable upon motion of a party."). The three-year revision requirement in OP 425.A is therefore a lengthy period of time in the context of prison reform litigation. The turnover in SISP and VDOC leadership occurs on a similar timeframe: seven individuals have served as the warden at SISP since 2005, and two individuals have served as director of the VDOC during that time. Pls.' Br. 26. Although plaintiffs contend that this turnover leads to "instability" in policies and regulations at SISP, id.,

---

[29] Parties may also agree "to terminate or modify relief" before the two year period expires. 18 U.S.C. § 3626(b)(1)(B).

it is no greater instability than that permitted under the PLRA.[30] Plaintiffs' arguments, therefore, fail to overcome the conclusion that this action is moot.

IV.    CONCLUSION

Because the improvements voluntarily made by defendants have rendered plaintiffs' claims moot, it would be inappropriate under the specific facts of this action to reach the merits of plaintiffs' claims or to invoke the injunction authority of the Court. Accordingly, plaintiffs' Motion for Summary Judgment will be denied as moot and defendants' Motion for Summary Judgment will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 8th day of July, 2016.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge

---

[30] The same is true with respect to plaintiffs' argument that because the VDOC is not subject to Virginia's Administrative Process Act, it may "revoke the regulations for any reason and at any time without procedural due process or notice and comment." Pls.' Reply 3.