IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

THOMAS PORTER, et al.,          )
                                )
            Plaintiffs,          )
                                )
    v.                           )          No. 1:14-cv-1588 (LMB/IDD)
                                )
HAROLD W. CLARKE, et al.,        )
                                )
            Defendants.          )

<u>MEMORANDUM OPINION</u>

Before the Court are plaintiffs' and defendants' renewed cross-motions for summary

judgment. Plaintiffs argue that the conditions of confinement that existed on Virginia's death row

at the initiation of this litigation violated the Eighth Amendment of the United States

Constitution and that they are entitled to an injunction preventing defendants from returning to

those conditions. Defendants argue that those conditions of confinement were constitutional and

that this Court should decline to issue injunctive relief even if it finds a constitutional violation.

For the reasons that follow, the Court will grant summary judgment for plaintiffs and issue an

injunction preventing defendants from returning to the unconstitutional conditions of

confinement.

## I.   BACKGROUND

All of the plaintiffs in this civil action have been convicted of capital murder and

sentenced to death and remain confined in a single unit ("death row") at Virginia's Sussex I State

Prison ("SISP") while their sentences are litigated. Plaintiffs Thomas Porter ("Porter"), Anthony

Juniper ("Juniper"), and Mark Lawlor ("Lawlor") have respectively spent over ten, twelve, and

six years on death row, and former plaintiff Ricky Gray ("Gray") had spent more than ten years

on death row before being executed in January 2017. Compl. [Dkt. No. 1] ¶ 2; Answer [Dkt. No. 49] ¶ 2. Plaintiffs filed this civil action against defendants Harold Clarke ("Clarke"), the director of the Virginia Department of Corrections ("VDOC"), and Keith W. Davis, the former warden of SISP,[1] claiming that the conditions of their confinement on death row violate the Eighth Amendment and the Fourteenth Amendment. The still-living plaintiffs are three of the four inmates currently housed on death row in Virginia.[2]

This litigation is related to an earlier civil action brought by a former death row inmate, Alfred Prieto, who claimed that his automatic placement onto death row, combined with the severe conditions death row inmates faced, violated the Due Process Clause of the Fourteenth Amendment. The Court found that the placement procedure violated the Fourteenth Amendment and granted Prieto summary judgment. Prieto v. Clarke, No. 1:12-cv-1199, 2013 WL 6019215 (E.D. Va. Nov. 12, 2013). That judgment was reversed by the Fourth Circuit. See Prieto v. Clarke, 780 F.3d 245 (4th Cir. 2015).[3] In response to that decision, the plaintiffs in this action stipulated to the dismissal of their Fourteenth Amendment Claim. Stipulation of Voluntary Dismissal [Dkt. No. 30].

When this civil action began, the conditions on death row were identical to those described in Prieto. Death row inmates were housed in a separate "pod" from the ones housing

---

[1] In March 2016, the Court substituted David Zook, the current warden, for Keith Davis, the former warden, under Fed. R. Civ. P. 25(d).

[2] An additional death row inmate, Ivan Teleguz, had originally joined the action, but was voluntarily dismissed on April 1, 2015. Notice of Dismissal of Pl. Ivan Teleguz [Dkt. No. 34]. Last year, Teleguz's sentence was commuted to life in prison without the possibility of parole, removing him from death row.

[3] Prieto filed a petition for a writ of certiorari, but while that petition was pending before the Supreme Court, Prieto's execution date was set, leading Lawlor to seek leave to intervene in the Prieto action to prevent it from becoming moot. On October 2, 2015, Prieto was executed, and on October 13, 2015, the Supreme Court denied Lawlor's motion for leave to intervene and dismissed Prieto's petition for writ of certiorari as moot. Prieto v. Clarke, No. 15-31, 2015 WL 4105028 (Oct. 13, 2015).

the general population of the prison. This pod consisted of two tiers, each holding 22 cells and three showers. Orig. Def. Mem.[4] [Dkt. No. 110] Ex. 1 ("Clarke Aff.") ¶ 11. The cells' size of 71 square feet, with a 10.5 foot-high ceiling, was comparable to the size of cells housing general population inmates; however, unlike those inmates, death row inmates were isolated from other inmates in that they did not share cells and were not housed in adjacent cells. Id. ¶¶ 12-13; Compl. ¶ 5; Answer ¶ 5. The cells had windows that were 5 inches high by 41.5 inches long and covered by wire mesh, although natural light came through and inmates could see out of them. Clarke Aff. ¶ 14. Each cell door had a rectangular in-set window that allowed inmates to look outside of their cell into the pod. Id. ¶ 15. The doors were not soundproof, and inmates did attempt to communicate to other inmates while in their cells, but there is disagreement over how effectively they could do so. See id. ¶ 15; Orig. Pl. Mem. [Dkt. No. 115] Ex. 7 ("Hendricks Report") 11. While in their cells, inmates were permitted to have a television and a compact disc player, and they could request books from the law library.

VDOC Operating Procedure 460A ("OP 460A"), effective March 1, 2010, governed the daily lives of death row inmates, as did the SISP Institutional Rules and Regulations for Offenders, effective February 3, 2010. Clarke Aff. ¶¶ 21-22. Under these regulations, death row inmates were allowed one hour of outdoor recreation five days per week, but such recreation was confined to individual enclosures that measured 7.9 feet by 20 feet and lacked any exercise equipment. Id. ¶ 23. During that outdoor recreation time, some plaintiffs coordinated exercises with one another, despite not being permitted to use adjacent enclosures. Plaintiffs were also

---

[4] Due to the history of this case, there are two full sets of briefing: the parties' original (2015) summary judgment briefs, which mainly address the substantive Eighth Amendment question, and the parties' renewed (2017) summary judgment briefs, which mainly address whether plaintiffs are entitled to injunctive relief if they can demonstrate an Eighth Amendment violation. For purposes of clarity, the 2015 briefs will be denoted as "Orig." and the 2017 briefs will be denoted as "Ren."

permitted to leave their cells to shower at least three times each week, and two inmates, Porter

and Gray, were allowed out of their cells to perform their institutional jobs as houseman and

barber, respectively. Id. ¶¶ 25-28. Visitation was limited to noncontact visitation on weekends

and approved holidays; however, an inmate could request contact visitation, which the warden

had the discretion to grant or deny. Id. ¶ 51.[5] Plaintiffs also had access to wireless telephones that

could be brought to their cell and used any day of the week between 8:00 a.m. and 9:30 p.m.,

with each call generally limited to 20 minutes. Id. ¶¶ 43-44.  Other than these limited out-of-cell

interactions, death row inmates were generally not permitted to leave their cells. In particular,

they were denied access to any form of congregate recreation, either indoor or outdoor; they

were not allowed to eat meals outside of their cells; and they could not participate in congregate

religious services or prison programming. Cf. OP 460A; Prieto, 2013 WL 6019215, at *1.

Plaintiffs had interaction with prison staff, including mental health counselors, and could

have essentially unlimited contact visitation with their attorneys. Corrections officers made

rounds through the unit every 30 minutes and were allowed to converse with the inmates,

medical personnel came through the pod twice each day, nurses came through the pod twice each

day to perform a "pill pass," the mental health practitioner visited once each week, each inmate's

case counselor visited the pod daily, and inmates could request medical or mental health care at

any point as well as meet with the chaplain as frequently as they wanted. Clarke Aff. ¶¶ 30-38.

Each inmate was screened for mental health problems upon entering the facility for the first time

and received a mental health code that was reviewed at least annually. Orig. Def. Mem. Ex. 4

¶¶ 7-8. According to the results of this screening, Porter and Juniper were (as of 2015) classified

---

[5] In practice, the SISP warden at the time, Keith Davis, only approved contact visits when an inmate was about to be executed or was otherwise "on his deathbed." Orig. Pl. Mem. Ex. 8, at 100, 119.

as MH-0, meaning they had no mental health issues or need for treatment in the preceding year, and Lawlor was classified as MH-2, meaning he had mild to moderate, but stable, mental health issues. Id. ¶ 10.

According to Clarke, he began considering changes to some of these policies as early as 2011 but decided not to move forward with any changes after the Prieto litigation began in 2012; however, in mid-2014, he began solidifying plans to implement changes and decided to move forward with those changes even after this civil action began. Clarke Aff. ¶¶ 57-58. On August 6, 2015, Zook approved a number of interim rules and regulations for death row. Id. ¶ 59. In light of these changes, the Court granted the parties' motion to stay the litigation and to refer the matter to mediation should any disagreements remain after the changes were implemented. See Order [Dkt. No. 88].

Some of the changes took effect immediately. By the initial round of summary judgment briefing, inmates were permitted to have contact visitation with immediate family members one day per week for one and a half hours at a time, while still being permitted to have non-contact visitation on weekends and holidays with immediate family members and one approved non-family member. Outdoor recreation time was increased to 90 minutes five days each week; showers became daily; and plaintiffs were allowed to congregate indoors for one hour each day, without restraints and in groups of up to four inmates at a time. This indoor congregation occurred in a newly screened off area of the death row pod that contained a television, two tables with seating, a bench, various games, and a JPAY kiosk that enabled inmates to download music, purchase books and movies, and send e-mails. The interim regulations anticipated that the day room would be used "for congregate religious services, behavioral programming, and additional

employment opportunities for Death Row Offenders," and at least one additional job for inmates was created with at least one more anticipated. See Stay Def. Mem. [Dkt. No. 85] Ex. 1.

In addition to the immediate changes, the interim regulations called for the construction of a covered outdoor recreation yard that would include two sections, each equipped with a basketball court and stationary exercise equipment, in which groups of up to four death row inmates could congregate. Clarke Aff. ¶ 57-60. Although the interim regulations anticipated that construction of the recreation yard would be completed by October 1, 2015, it had not been completed by the time the original summary judgment motions were filed. See Orig. Pl. Mem. Ex. 3 ¶ 23. Since then, the construction has been completed and death row inmates may now use the outdoor recreation yard; in addition, the interim regulations have been adopted into final regulations, which took effect in June 2016. See Dkt. No. 161-1 ¶¶ 12-13; id. Ex. 8 (Operating Procedure 425.A).

After failing to resolve the litigation, the parties filed cross-motions for summary judgment, primarily focusing on whether the prior conditions of confinement violated the Eighth Amendment. Based on the improvements made by defendants to the death row conditions, which satisfied plaintiffs' demands, the Court issued an Order and Memorandum Opinion, in which it found that the adoption of the interim regulations and the physical improvements had rendered plaintiffs' action moot. See Order & Mem. Op. [Dkt. Nos. 166 & 167]. As such, the Court denied plaintiffs' motion for summary judgment, granted defendants' motion, and ordered that judgment be entered in favor of defendants. Id.

Plaintiffs appealed to the Fourth Circuit, see Dkt. No. 171, which reversed that decision and remanded, holding that under the voluntary cessation doctrine, plaintiffs' action was not constitutionally moot, see Dkt. No. 174; Porter v. Clarke, 852 F.3d 358 (4th Cir. 2017). On

6

remand, plaintiffs engaged in limited additional discovery and the parties have filed new briefs

focusing "on the question of whether equitable relief would be appropriate, presupposing (but

not conceding) the existence of a constitutional violation." Dkt. No. 189. Both parties have

expressly adopted and reincorporated their original briefing on the merits of the Eighth

Amendment claims. Id. These renewed motions are now before the Court.

## II.   STANDARD OF REVIEW

A party is entitled to summary judgment if the party can show "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 249 (1986). In general, bare allegations or assertions by the nonmoving party are not

sufficient to generate a genuine dispute; instead, the nonmoving party must produce

"significantly probative" evidence to avoid summary judgment. Abcor Corp. v. AM Int'l, Inc.,

916 F.2d 924, 929-30 (4th Cir. 1990) (quoting Anderson, 477 U.S. at 249). That being said, in

ruling on a motion for summary judgment, a court should accept the evidence of the nonmovant,

and all justifiable inferences must be drawn in her favor.  Anderson, 477 U.S. at 255.

In determining whether to grant or deny injunctive relief, the district court must exercise

its equitable discretion. eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006). Because

injunctive relief is equitable, "[f]lexibility rather than rigidity has distinguished it." Weinberger

v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (internal quotation marks omitted). An injunction

is appropriate where the plaintiff demonstrates he has suffered an irreparable injury, remedies at

law cannot compensate for that injury, balancing the hardships between the parties inclines in

favor of an equitable remedy, and the public interest is not disserved by an injunction. eBay, 547

U.S. at 391. In addition, if a defendant has voluntarily discontinued challenged conduct, an

injunction is permissible as long as "there exists some cognizable danger of recurrent violation."

United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953). Moreover, in the prison conditions

context, any injunction must conform with the requirements laid out in the Prison Litigation

Reform Act ("PLRA").

### III.   PLAINTIFFS' EIGHTH AMENDMENT CLAIM

Before determining whether injunctive relief is available to plaintiffs, the Court must first

determine whether plaintiffs have proven their substantive Eighth Amendment claim: that the

conditions of confinement on death row before 2015 violated the Eighth Amendment's cruel and

unusual punishment clause.

#### A. **Eighth Amendment Standard**

The Eighth Amendment's prohibition of "cruel and unusual punishments" applies to the

treatment of prisoners and the conditions of their confinement. Williams v. Benjamin, 77 F.3d

756, 761 (4th Cir. 1996). To make out an Eighth Amendment claim, plaintiffs must demonstrate

both an objective and a subjective element. Id. First, they must prove "that objectively the

deprivation of a basic human need was sufficiently serious." Johnson v. Quinones, 145 F.3d 164,

167 (4th Cir. 1998) (internal quotation marks omitted). Second, they must prove "that

subjectively the prison officials acted with a sufficiently culpable state of mind." Id. (internal

quotation marks omitted).

The objective prong is "contextual and responsive to 'contemporary standards of

decency.'" Hudson v. McMillian, 503 U.S. 1, 8 (1992) (quoting Estelle v. Gamble, 429 U.S. 97,

103 (1976)). To be deemed "sufficiently serious," defendants' conduct must have resulted "in the

denial of 'the minimal civilized measure of life's necessities." Farmer v. Brennan, 511 U.S. 825,

834 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981) (discussing cases where conditions were found unconstitutional "because they resulted in unquestioned and serious deprivation of basic human needs")). The deprivation must have been "extreme," meaning that the conditions caused a "serious or significant physical or emotional injury" or a "substantial risk" of such an injury. De'Lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (quoting De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003)). Conditions that are not deemed cruel and unusual according to contemporary standards cannot be found unconstitutional, even if they are "restrictive and even harsh," because "they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes, 452 U.S. at 347.

With respect to the subjective prong, plaintiffs must show that defendants acted with "deliberate indifference," a standard that "requires proof of more than mere negligence but less than malice." Williams, 77 F.3d at 761. Specifically, plaintiffs must show that defendants "actually [knew] of and disregard[ed] an objectively serious condition . . . or risk of harm."[6] Angelone, 330 F.3d at 634. If the risk of harm was "obvious," the Court "may infer the existence of this subjective state of mind." Hope v. Pelzer, 536 U.S. 730, 738 (2002). Similarly, if the challenged conditions lacked any legitimate law enforcement or penological purpose, the

---

[6] Defendants argue that because plaintiffs' suit is against defendants in their official capacities, plaintiffs must show not that defendants themselves personally knew of and disregarded a risk of harm, but that VDOC's policies and regulations demonstrated deliberate indifference. Orig. Def. Mem. 21-22. Although defendants appear to misread the applicable Eighth Amendment authority, see Farmer, 511 U.S. at 840-42, the distinction is not relevant here because plaintiffs argue that VDOC's operating policies and regulations were developed and enforced by defendants despite their actual knowledge of the harm or risk of harm to plaintiffs. Plaintiffs do not premise their arguments solely on "the alleged professional failings of an individual employee" simply because one of their arguments is that the mental health staff should conduct more than "drive by" visits to inmates. Cf. Orig. Def. Reply [Dkt. No. 127] 10. Instead, the Court understands their arguments as asserting that VDOC's policies regarding mental health care were, as a whole, an insufficient response to the serious risk of harm to plaintiffs' mental health that the various challenged conditions created.

decision to impose and enforce the conditions may itself serve as "sufficient evidence of a culpable state of mind." Ball v. Bailey, No. 7:15-cv-3, 2015 WL 4591410, at *9 (W.D. Va. July 29, 2015) (applying the subjective test in the context of alleged sexual abuse by a prison guard) (quoting Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997)); however, if defendants knew of the substantial risk and acted reasonably in response, they may not be held liable, even if plaintiffs can show that they ultimately suffered some harm, Farmer, 511 U.S. at 844.

### B. Objective Prong: Substantial Risk of Harm

With respect to the first, objective prong of their Eighth Amendment claim, plaintiffs argue that the pre-2015 death row conditions deprived them of the fundamental human needs of environmental stimulation and social interaction, which caused them serious emotional, psychological, and physical harm. Orig. Pl. Mem. 1-2. Defendants respond that the conditions of confinement were not objectively intolerable and did not subject plaintiffs to any harm or risk of harm. Orig. Def. Mem. 24-30. The question for the Court is whether the deprivation of human contact and stimulation was an "extreme" deprivation—that is, whether it caused a "serious or significant physical or emotional injury" or the "substantial risk" of such an injury.

Preliminarily, the parties dispute whether the pre-2015 conditions constituted "solitary confinement" in "the legal sense." Id. at 25-26. Defendants argue that the Supreme Court has "interpreted" the phrase "solitary confinement" to mean the "complete isolation of the prisoner from all human society, and his confinement in a cell of considerable size, so arranged that he had no direct intercourse with or sight of any human being, and no employment or instruction." Id. (quoting In re Medley, 134 U.S. 160, 167 (1890)). Similarly, they claim that Justice Kennedy has defined "solitary confinement" as spending "20 years or more in a windowless cell no larger than a typical parking spot for 23 hours a day; and in the one hour when [the inmate] leaves it, he

10

likely is allowed little or no opportunity for conversation or interaction with anyone." <u>Davis v.</u>
<u>Ayala</u>, 135 S. Ct. 2187, 2208 (2015) (Kennedy, J., concurring); <u>see also</u> Orig. Def. Opp. [Dkt.
No. 125] 14-15. Accordingly, they claim that plaintiffs were not "placed in 'solitary
confinement'" because they "were not overwhelmingly deprived of 'direct intercourse with or
sight of any human being.'" Orig. Def. Mem. 26 (quoting <u>In re Medley</u>, 134 U.S. at 167).
Instead, defendants argue, plaintiffs had interaction with each other, with prison officials, and
with outside visitors and attorneys and were able to entertain themselves with the personal
property they could possess in their cells. <u>See id.</u>; Orig. Def. Opp. 15.

This Court previously found that the 71 square foot cells measure less than half the size
of a parking space, that the window is a "window in name only," and that the "rudimentary
privileges" provided to death row inmates did not "mitigate the overwhelming fact of isolation."
<u>Prieto</u>, 2013 WL 6019215, at *1, 7.[7] The limited communication, stimulation, and contact
provided to plaintiffs before 2015 does not overcome plaintiffs' showing that the vast majority of
their time—almost every hour of the day—was spent alone, in a small, practically windowless,
cell. When they were outdoors for five hours a week, they remained alone in an outdoor cage.
Although they had access to television, music, and books, they had no access to congregate
religious, educational, or social programming.

Different sources provide different definitions for "solitary confinement" and associated
terms. For example, when describing particularly restrictive prison conditions, the United States

---

[7] Defendants argue that plaintiffs and the Court should not rely on the Court's findings in <u>Prieto</u>
because it was a separate case based on different claims and a different record. Orig. Def. Opp.
16. Although <u>Prieto</u> did not implicate the Eighth Amendment, it did involve identical physical
conditions to the ones at issue in this litigation (<u>i.e.</u>, the cells have gotten no bigger and the
windows have not changed) and therefore the Court's findings are informative in this action, if
not determinative. Moreover, defendants do not contest the truth of the facts underlying the
Court's findings in <u>Prieto</u>.

Department of Justice's Report and Recommendations Concerning the Use of Restrictive

Housing (Jan. 2016) ("DOJ Report") declines to use the term "solitary confinement" because it

can be misleading and instead refers to segregated housing as "restrictive housing" and

"segregation."  DOJ Report 3. The Report defines restrictive housing as "any type of detention

that involves three basic elements:" "[r]emoval from the general inmate population,"

"[p]lacement in a locked room or cell," and "[i]nability to leave the room or cell for the vast

majority of the day, typically 22 hours or more." Id. This definition corresponds with the pre-

2015 conditions at VDOC, where prisoners spent between 23 and 24 hours per day in their cells,

although it does not account for the presence or absence of other aspects of the pre-2015 policies

like telephone privileges.

Therefore, plaintiffs have sufficiently shown that the pre-2015 conditions of confinement

constituted "solitary confinement" or "segregated" or "restricted" housing, as those terms are

understood by contemporary observers. But in any event, whether the conditions at issue here

meet Justice Kennedy's (or any specific court's or expert's) description of "solitary

confinement" is irrelevant. To the extent plaintiffs can show that they were sufficiently deprived

of a basic human need such as human interaction and that the deprivation caused a significant

harm or risk of harm, they have made out at least the objective prong of an Eighth Amendment

claim. Trying to determine whether these conditions are, under any given metric, worse or better

than the conditions discussed in Ayala or in In re Medley is missing the forest for the trees.

Moving to the substantive objective inquiry, defendants argue that Fourth Circuit

precedent establishes that "the isolation inherent in administrative segregation or maximum

custody is not itself constitutionally objectionable," even when it lasts for an "indefinite

duration." Orig. Def. Mem. 25 (citing Mickle v. Moore (In re Long Term Admin. Segregation of

Inmates Designated as Five Percenters), 174 F.3d 464, 471-72 (4th Cir. 1999); and Sweet v. S.C.

Dep't of Corr., 529 F.2d 854, 861 (4th Cir. 1975)). The plaintiffs in Mickle were subjected to

conditions even more restrictive than those in place on death row before 2015: they were

"confined to their cells for twenty-three hours per day without radio or television," they

"receive[d] only five hours of exercise per week," and they were not permitted to "participate in

prison work, school or study programs." Mickle, 174 F.3d at 471. The Mickle court also found

that the prison's "periodic visits by medical personnel" and policies allowing "referral of inmates

displaying mental health problems for treatment" showed that the officials were not deliberately

indifferent. Id. at 472. Similarly, the Sweet court ruled that without "other illegitimate

deprivations," simply isolating inmates and restricting stimulation and activity were

constitutional. Sweet, 529 F.2d at 861.

     In addition, defendants argue that the plaintiffs have objected only to "amorphous . . .

overall conditions"—rather than the "deprivation of a single, identifiable human need such a[s]

food, warmth, or exercise"—and therefore their claim fails. Orig. Def. Reply 4 (quoting Wilson

v. Seiter, 501 U.S. 294, 304 (1991)).

     In response, plaintiffs argue that defendants rely on "stale Eighth Amendment

jurisprudence" and that the Court must instead evaluate the pre-2015 conditions according to the

"evolving standards of decency that mark the progress of a maturing society." Orig. Pl. Opp.

[Dkt. No. 124] 8 (formatting and capitalization altered) (quoting Hall v. Florida, 134 S. Ct. 1986,

1992 (2014)). These standards, plaintiffs contend, have changed greatly, not only since 1890

when In re Medley was decided, but also in the decades since Sweet and Mickle were decided.

Id. at 9. In this vein, the plaintiffs provide supplementary materials pertaining to President

Obama's decision to ban the use of solitary confinement for juveniles in federal prisons. Orig. Pl. Supp. [Dkt. No. 128].

Given the rapidly evolving information available about the potential harmful effects of solitary confinement—and the explicit incorporation of contemporary standards of decency into the Eighth Amendment standard—it is clear that this Court is not bound by the decades-old determinations made by the Fourth Circuit and the Supreme Court on which defendants rely. Instead, as the following discussion makes clear, there is a substantial quantity of relatively recent information demonstrating the harms of extended solitary confinement that was not available to the Fourth Circuit in 1999—or, of course, to the Supreme Court in 1890.[8]

To demonstrate the significant psychological and emotional harm that their solitary confinement has caused, plaintiffs rely primarily on a group of expert reports. First, plaintiffs submitted an expert report from Dr. Michael Hendricks, a clinical psychologist who evaluated each of the four plaintiffs and reviewed numerous records to assess whether plaintiffs have experienced any mental health consequences from the conditions of their confinement. See Hendricks Report 1. Dr. Hendricks found that "each plaintiff has developed serious psychological and/or physical distress and impairment in functioning" that "exceeds any distress and impairment that was evident prior to each man's arrival on death row." Id. at 19. In particular, prolonged isolation has "led to clinical levels of depression that include dysphoric mood, constricted affect, hopelessness, feelings of worthlessness, anhedonia (loss of enjoyment

---

[8] Because the parties have not engaged in substantial additional briefing after this action was remanded by the Fourth Circuit, the bulk of the cited "contemporary" understanding is from 2015 or early 2016. If anything, plaintiffs' claim has only become stronger in the last two years, as recognition of the harms of solitary confinement has become more widespread. See, e.g., Ruiz v. Texas, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting from denial of stay of execution) (quoting Justice Kennedy's concurrence Ayala, 135 S. Ct. 2187, and indicating that he believes the Supreme Court should examine "whether extended solitary confinement survives Eighth Amendment scrutiny").

in even basic pleasures), anergia (a low level or lack of energy), and suicidal ideation." Id. at 20.

Moreover, the restrictive confinement has caused a substantial reduction in plaintiffs' "initiative

and motivation to maintain contact with family members and other loved ones"; reduced

plaintiffs' "initiative and motivation to maintain a healthy physical condition"; and "created a

profound disturbance in sleep patterns and" quantities. Id. In addition, the conditions have caused

plaintiffs to develop a variety of "coping strategies for dealing with the effects of isolation over a

long period of time." Id. at 19. For example, plaintiffs have found "creative use[s] of the limited

items available to them" and have devised "ways of distracting themselves from boredom by

relying on forms of self-entertainment." Id. Although these coping mechanisms allow plaintiffs

to deal with the negative effects of their restrictive confinement on a day-to-day basis, the cruel

irony is that, over time, they "thwart basic desire for human interaction" by making plaintiffs

reliant on "internal resources that have no connection with meaningful social interaction with

others." Id. As a result, the coping mechanisms "have ultimately deprived [plaintiffs] of a core

element of what it means to be human" in a "lasting" way that Dr. Hendricks compared to the

effects of war on soldiers' mental health. Id.

In addition to his personal evaluations of the plaintiffs and the conditions on death row,

Dr. Hendricks also discussed the scientific findings relating to the effects of isolation, although

most of the scientific literature examines "the effects of isolation for a period of a few days up to

a month," and not the results of years-long isolation, which "far exceeds the duration of isolation

examined under typical experimental procedures." Id. at 18. Even so, the scientific literature has

shown that "[e]xtended periods of isolation lead to adverse mental health, and sometimes

physical health, consequences in even previously healthy individuals." Id. Given plaintiffs'

extremely long period of isolation, Dr. Hendricks found that it is to be expected that they would

experience similar consequences "but with a greater magnitude of symptomatology." Id. Dr.

Hendricks's summary of the relevant scientific literature is bolstered by an expert declaration

submitted by Dr. Mark Cunningham, a certified forensic and clinical psychologist. Orig. Pl.

Mem. Ex. 10, at 1. Drawing on a comprehensive review of the relevant literature, Dr.

Cunningham found that empirical research on isolating conditions like those experienced by

plaintiffs has "consistently and unequivocally" demonstrated that these conditions lead to

psychological harm—and that "as isolation and stimulus deprivation increase, psychological

deterioration and disorders correspondingly increase." See id. at 20-26 (internal quotation marks

omitted).

To counter the conclusions presented by Dr. Hendricks, defendants introduce an expert

report from Dr. Gregory Saathoff, a licensed psychiatrist who has provided "regular weekly

consultation services within" VDOC since 1991. Orig. Def. Mem. Ex. 9, at 1-2.[9] To form his

opinions, Dr. Saathoff interviewed each plaintiff, with the exception of Lawlor, performed some

psychological testing, and reviewed the conditions of death row and SISP's institutional and

medical files relating to plaintiffs. See id. at 21-22. Based on his research, Dr. Saathoff

concluded that "the conditions on Death Row have not caused mental, social or behavioral

deterioration in" plaintiffs. Id. at 29.

The parties engage in extensive debate about the methodologies used by Drs. Hendricks

and Saathoff as well as the accuracy of each expert's conclusions. See, e.g., id. at 25-28; Orig.

Pl. Opp. Ex. 1. Based on these dueling experts, there is a genuine dispute of fact about the actual

effects the death row housing conditions have had on plaintiffs' emotional and psychological

---

[9] Defendants do not rebut Dr. Cunningham's review of the scientific literature in a substantive way; instead, they "dispute the applicability of this research to the" plaintiffs, because Dr. Cunningham's "report does not review the actual conditions of Virginia's death row inmates." Orig. Def. Opp. 7.

health. But there is no genuine dispute about the significant risk that these conditions created. As Dr. Cunningham's report as well as the scientific evidence discussed in Dr. Hendricks's report make clear, prolonged isolation and lack of stimulation can have devastating psychological and emotional consequences. And although defendants dispute Dr. Hendricks's conclusions about the mental health of plaintiffs, his interviews and report provide at least a concrete contextualization of the harm that solitary confinement can wreak. Therefore, because the objective prong of the Eighth Amendment standard does not require the actual infliction of a "serious or significant physical or emotional injury," but only conditions producing a "substantial risk" of such an injury, Johnson, 708 F.3d at 525 (quoting Angelone, 330 F.3d at 634), the dispute between Drs. Hendricks and Saathoff about the actual harm plaintiffs have suffered is not dispositive.[10]

This commonsense conclusion is not only supported by scientific research and the expert reports submitted in this case but has also begun to achieve recognition in legal circles. For example, the Fourth Circuit and at least one Supreme Court justice have recognized the impact that solitary or segregated confinement exerts on an inmate.[11] In his concurrence in Ayala, Justice Kennedy discussed the "factual circumstance" of the plaintiff's solitary confinement even though it had "no direct bearing" on the legal issues of the action, referred to the "new and growing awareness" of the problems attendant to solitary confinement, and cited research

---

[10] In addition, the Court observes that because plaintiffs are only requesting declaratory and injunctive relief, rather than damages, there is no right to a jury trial in this civil action. Accordingly, at trial, the task of evaluating the competing experts' opinions would be left to the Court, and both experts' reports and various supporting materials have been entered into the summary judgment record. Based on a review of the experts' reports, the Court finds Dr. Hendricks's methodology is more sound than Dr. Saathoff's, and his conclusions are likewise more persuasive. Therefore, to the extent that the harm actually experienced by plaintiffs is material, the Court credits Dr. Hendricks's report rather than Dr. Saathoff's.

[11] Plaintiffs contend that there is less case law on this question than would be expected because many solitary confinement cases end in settlement. Orig. Pl. Mem. 12 n.2. Since the original briefing, Justice Breyer has joined Justice Kennedy in commenting on the potential constitutional infirmity of extended solitary confinement, as noted above.

confirming that "[y]ears on end of near-total isolation exact a terrible price" on the psychological
health of inmates. Ayala, 135 S. Ct. at 2208-10 (Kennedy, J., concurring).

In Incumaa v. Stirling, 791 F.3d 517 (4th Cir. 2015), the Fourth Circuit cited Justice
Kennedy's Ayala concurrence for the proposition that "[p]rolonged solitary confinement exacts a
heavy psychological toll that often continues to plague an inmate's mind even after he is
resocialized" and therefore determined that the prisoner's due process claim could survive
summary judgment in part because the prisoner had a "significant private interest in leaving the
restrictive conditions" of segregated confinement. Incumaa, 791 F.3d at 534. The Third Circuit
has also cited Justice Kennedy's concurrence, observing that a mentally ill prisoner's excessive
force claim might also be cognizable under the Eighth Amendment's conditions of confinement
test and that it made "palpable '[t]he human toll wrought by extended terms of isolation.'"
Young v. Martin, 801 F.3d 172, 180 n.8 (3d Cir. 2015) (alteration in original) (quoting Ayala,
135 S. Ct. at 2209 (Kennedy, J., concurring)). In addition to this case law,[12] plaintiffs point to
other jurisdictions that are reevaluating the way in which they handle death row prisoners,
demonstrating the ongoing evolution in correctional and societal attitudes towards solitary
confinement. Orig. Pl. Mem. 13 (discussing changes in Colorado, Missouri, and North Carolina).

As the undisputed evidence in this record makes clear, and as courts and corrections
officers across the country have begun to recognize, the years-long isolation that the pre-2015
conditions of confinement forced on plaintiffs created, at the least, a significant risk of
substantial psychological and emotional harm. Therefore, plaintiffs have met the objective prong
of the Eighth Amendment test.

---

[12] Since the parties originally briefed the issue, the Seventh and Ninth Circuits have echoed
Justice Kennedy's concerns. See Isby v. Brown, 856 F.3d 508, 524 (7th Cir. 2017); Shepard v.
Quillen, 840 F.3d 686, 691 (9th Cir. 2016).

### C. Subjective Prong: Deliberate Indifference

With respect to the subjective prong of the Eighth Amendment standard, plaintiffs must show that defendants acted with "deliberate indifference," a standard that "requires proof of more than mere negligence but less than malice." Williams, 77 F.3d at 761. Specifically, plaintiffs must show that defendants "actually [knew] of and disregard[ed] an objectively serious condition . . . or risk of harm." Angelone, 330 F.3d at 634. In addition to direct evidence of defendants' knowledge, plaintiffs may be able to prove deliberate indifference with circumstantial evidence, such as a particularly obvious risk of harm or the lack of a penological objective for the conditions of confinement. See Hope, 536 U.S. at 737-38 (2002); Wilkerson v. Stalder, 639 F. Supp. 2d 654, 680 (M.D. La. 2007). Here, plaintiffs point to the obviousness of the potential for harm, defendants' own policies acknowledging these risks in other contexts, and the lack of a legitimate penological objective to prove deliberate indifference. Orig. Pl. Mem. 16-22. In response, defendants argue that their policies were tailored to mitigate any danger by providing constant mental health assistance and that the policies were justified by legitimate security risks. Orig. Def. Mem. 28-30.

Plaintiffs have the better argument. First, as discussed above, there is a large and growing body of literature—both academic and legal—discussing the potentially devastating effects of prolonged periods of isolation. As one district court put it nearly two decades ago: "A conclusion . . . that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science." McClary v. Kelly, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998). Given defendants' status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction on death row could cause. In fact, defendants' policies demonstrate their full

awareness of this harm. VDOC procedures do not allow non-death row prisoners to stay in

disciplinary segregation for longer than thirty days in a row. Orig. Def. Mem. Ex. 19, at 10.[13] As

such, defendants are certainly aware that extended stays in segregation can have harmful

emotional and psychological effects. Moreover, defendants' argument hurts, rather than helps,

their case. Although the provision of mental health services can help identify (and, hopefully,

ameliorate) the harm caused by extended segregation, defendants' practice to have death row

inmates "constantly checked by medical and mental-health personnel," Orig. Def. Mem. 28,

evinces their awareness that those conditions create a significant risk of harm for the death row

inmates.[14]

Therefore, plaintiffs have demonstrated that defendants acted with deliberate indifference

to a substantial risk of harm when imposing the pre-2015 conditions of confinement. As such,

given that plaintiffs have already met the objective prong of the test, plaintiffs have shown that

those conditions violated the Eighth Amendment.

## IV.    PLAINTIFFS' ENTITLEMENT TO INJUNCTIVE RELIEF

Although plaintiffs have demonstrated that the pre-2015 conditions of confinement

violated the Eighth Amendment, they must also show that they are entitled to injunctive relief.

To demonstrate the appropriateness of an injunction, plaintiffs must show that they suffered an

---

[13] Defendants contend that this is misleading because offenders housed in administrative, rather than disciplinary, segregation are continuously confined in segregated housing without the thirty-day limit. Orig. Def. Opp. 9-10. This statement is a red herring: defendants' use of a "rest period" with respect to some offenders placed in segregation indicates their awareness that isolation can be harmful, and their decision to forgo the rest period for a different category of offenders does not change that awareness.

[14] As discussed above, the parties also disagree about whether these conditions of confinement had a legitimate penological objective. Given the degree of evidence marshalled by both sides, this issue would not be amenable to resolution at the summary judgment stage; in any event, it is unnecessary to resolve the issue given the variety of other evidence that defendants knew of the potentially harmful effects of the pre-2015 conditions.

irreparable injury, for which remedies at law cannot adequately compensate them, that balancing

the hardships between the parties inclines in favor of an equitable remedy, and that the public

interest is not disserved by an injunction. eBay, 547 U.S. at 391. In addition, because defendants

here have voluntarily ceased the challenged conduct, plaintiffs must show that "there exists some

cognizable danger of recurrent violation." W.T. Grant Co., 345 U.S. at 633. Finally, because this

litigation challenges the conditions of confinement in a prison, the requested injunction must

conform with the requirements laid out in the PLRA. Defendants challenge plaintiffs' ability to

demonstrate their entitlement to an injunction at each step of this analysis.

### A. Irreparable Harm and Adequate Remedies at Law

To satisfy the first two elements of the permanent injunction analysis, plaintiffs must

demonstrate that they have suffered irreparable harm and that there are not adequate remedies

available at law to compensate them. As a general rule, "the denial of a constitutional right . . .

constitutes irreparable harm for purposes of equitable jurisdiction." Ross v. Meese, 818 F.2d

1132, 1135 (4th Cir. 1987). Here, plaintiffs have established that the pre-2015 conditions of

confinement violated their Eighth Amendment rights and, as such, have made a clear showing

that they would be irreparably harmed if the conditions were to be reimposed. Moreover, the

reason the pre-2015 conditions violated the Eighth Amendment points to another, more concrete,

form of irreparable harm. The potential emotional and psychological harm that prolonged

periods of isolation, like those plaintiffs endured, can wreak on prisoners is paradigmatic

irreparable harm.[15]

---

[15] Neither party makes a specific argument addressing the "adequate remedies available at law" prong of the analysis, but the very nature of irreparable harm is that there is no adequate remedy for it. In any event, it is clear that money damages cannot adequately compensate plaintiffs for either the deprivation of their constitutional rights or the potential risk of psychological and emotional harm that the pre-2015 conditions of confinement present.

In response, defendants do not contend that the violation of plaintiffs' Eighth Amendment rights is not an irreparable injury. Instead, they argue that, particularly given their status as state officials, the Court should hesitate before granting an injunction based on the mere possibility of future irreparable injury. Ren. Def. Opp. [Dkt. No. 199] 18-19. As discussed above, this contention is addressed by the W.T. Grant line of cases and, as will be explained below, plaintiffs have met their burden by showing a cognizable danger of a recurrent violation. Nothing defendants argue in this section alters that analysis. As such, plaintiffs have met the first two prongs of the injunction analysis.

### B. Balancing the Hardships and the Public Interest

To obtain an injunction, plaintiffs must also show that the balance of the hardships weighs in favor of injunctive relief and that the public interest would not be disserved by an injunction. Plaintiffs argue here that an injunction will impose practically no burden on defendants, who have already made the requested changes. Instead, what the injunction would accomplish would be to prevent defendants from returning to the pre-2015 conditions, as opposed to being forced to take some affirmative action. Ren. Pl. Mem. [Dkt. No. 192] 20. In addition, they argue that the public interest is served by an injunction because there is a strong public interest in upholding constitutional rights. Id. at 21 (citing Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003) ("Surely, upholding constitutional rights serves the public interest.")). On the other hand, defendants argue that plaintiffs inadequately account for the federalism principles that counsel against federal courts issuing injunctions against state officials, the doctrine that prison officials should receive deference, and the public interest the citizens of Virginia have in ensuring their prison administrators can run their death row without undue interference. Ren. Def. Opp. 19-21.

Although defendants' arguments have some merit, they cannot overcome plaintiffs' strong showing. Given the minimally intrusive nature of the requested injunction, and even considering traditional principles of federalism and comity, the negligible hardship state officials might have to endure in complying with the injunction cannot outweigh the hardships plaintiffs would suffer if forced to endure unconstitutional conditions of confinement. Moreover, although the citizens of Virginia certainly have an interest in their prison officials being able to exercise their professional discretion in setting policies, the injunction requested here barely intrudes on that discretion and barely offends the public interest. When this intrusion is considered against the strong public interest in vindicating constitutional rights and preventing future violations, it is clear that an injunction would not disserve the public interest. Therefore, plaintiffs have made the requisite showing and are entitled to an injunction.

## C. Prison Litigation Reform Act Requirements

Under the PLRA, "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs" and a court may not grant or approve any prospective relief unless it "finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Defendants make two conceptually distinct arguments relying on this language. First, they argue that, as a matter of law, the PLRA bars injunctive relief unless there is an ongoing constitutional or statutory violation. Ren. Def. Mem. [Dkt. No. 194] 18-20. Second, they argue that, under the circumstances of this litigation,

plaintiffs' requested injunction does not fit the need-narrowness-intrusiveness requirement. Ren. Def. Opp. 17-18.[16]

### 1. Ongoing Violation

Defendants argue that, as a matter of law, in "situations where the alleged constitutional violation no longer exists," prospective relief would "violate the express terms of the PLRA" because, absent an ongoing violation, prospective relief cannot be necessary to "correct the violation of the Federal right." Ren. Def. Mem. 18-20, 22-23. In support of this proposition, defendants turn primarily to three sources. First, they focus on the plain language of the PLRA, which they describe as foreclosing injunctive relief when it is not necessary to correct the violation of a federal right. Defendants argue that logic dictates that relief cannot be necessary to correct a violation if there is in fact no ongoing violation. Id. at 19-20. Second, they cite portions of the legislative history and context surrounding passage of the PLRA to argue that the point of the legislation was to "eliminate unwanted federal-court interference with the administration of prisons." Id. at 19 (quoting Woodford v. Ngo, 548 U.S. 81, 93 (2006)). Given this view of the PLRA, they argue that federal courts should abstain from issuing injunctive relief in the absence of an ongoing violation. Third, defendants cite a Ninth Circuit case, Hallett v. Morgan, 296 F.3d 732, 743 (9th Cir. 2002), in which the court held: "The text of § 3626(a)(1)(A) suggests that, in the absence of a 'current and ongoing' violation, there is no occasion to fashion prospective

---

[16] The need-narrowness-intrusiveness argument appears more clearly in defendants' brief in opposition to plaintiffs' motion for summary judgment than in defendants' brief in support of their own motion for summary judgment. Given that the need-narrowness-intrusiveness requirement has been thoroughly briefed (both at the renewed motions stage and at the original motions stage) and that the PLRA appears to require a court to satisfy itself (even in the absence of argument) that the requested injunction complies with the requirement, the Court will fully consider defendants' argument, regardless of where it was most clearly raised.

relief to cure the violation. In other words, if a violation no longer exists, the statute does not permit the court to order prospective relief."[17] Ren. Def. Mem. 22-23 & 23 n.105.

In response, plaintiffs offer three basic arguments. First, a "bedrock principle of equity" is that "where a defendant has voluntarily discontinued conduct that caused irreparable harm, an injunction remains appropriate where 'there exists some cognizable danger of recurrent violation.'" Ren. Pl. Opp. 14-15 (quoting W.T. Grant Co., 345 U.S. at 633). As such, plaintiffs argue, the Court should not interpret the PLRA to alter this bedrock principle in the absence of clear language indicating such a congressional intent. Id. at 15. Second, plaintiffs argue that the differences in language between § 3626(a)(1)(A) and § 3626(b)(3), which limits a court's authority to extend prospective relief to situations where it "remains necessary to correct a current and ongoing violation of a Federal right," indicate a difference in intent. If Congress had wished to import the "current and ongoing" requirement into the initial relief inquiry, it would not have used different language in the two provisions. Id. at 15-16. Third, plaintiffs point to a variety of case law in support of their position, including an Eleventh Circuit case explicitly holding that the "current and ongoing" requirement is not applicable to the question of initial prospective relief[18] and a case in this district where the court "found that an injunction

---

[17] Plaintiffs argue that this case is inapposite because it was about the extension of a consent decree rather than the initial entry of injunctive relief and, as such, "does not address the issue here: whether the PLRA eliminates the Court's equitable authority to grant an injunction in the first instance." Ren. Pl. Opp. [Dkt. No. 198] 17. Although plaintiffs correctly describe the factual circumstances in Hallett, the Ninth Circuit made clear that it was interpreting § 3626(a)(1)(A)— the provision at issue here.

[18] This case, Thomas v. Bryant, 614 F.3d 1288 (11th Cir. 2010), postdates Cason v. Seckinger, 231 F.3d 777 (11th Cir. 2000), an Eleventh Circuit case cited by defendants in support of their position. Defendants' interpretation of Cason as supporting the idea that relief may not be entered in the first instance in the absence of an ongoing violation is questionable at best, see Thomas, 614 F.3d at 1320 ("Our circuit has previously recognized that the 'current and ongoing' requirement is distinct from the standard governing the initial entry of injunctive relief." (citing

'precluding Defendants from returning to a specific prior policy that is no longer in force and has

been found to be unconstitutional comports with the requirements set forth in 18 U.S.C.

§ 3625(a)' [sic] that an injunction must be narrowly drawn, necessary, and the least intrusive

means of granting relief."[19] Id. at 16-17.

Plaintiffs' view is correct. As an initial matter, the case law cited by both parties is not

particularly helpful. There are cases going both ways and none of the cited cases is binding on

this court. The better approach is first to recognize the background equitable rule that courts have

the authority to issue prospective relief even in the absence of an ongoing violation, see W.T.

Grant, 345 U.S. at 633, and that the Supreme Court has counseled that courts "should not

construe a statute to displace courts' traditional equitable authority absent the clearest command

or an inescapable inference to the contrary," Miller v. French, 530 U.S. 327, 340 (2000) (internal

quotation marks and citations omitted).

In the PLRA context, Congress has demonstrated that it knows how to give courts a

"clear command" not to grant equitable relief except in cases of an ongoing violation because it

did exactly that in the termination provision. In the termination section of the PLRA, Congress

provided that defendants can move to terminate an injunction related to prison conditions after

two years and a court must grant such a termination motion unless "the court makes written

findings based on the record" that, among other things, "prospective relief remains necessary to

correct a current and ongoing violation of the Federal right." 18 U.S.C. § 3626(b)(3). Congress

---

Cason)), but in any event, Thomas makes clear that the Eleventh Circuit believes there is no
"current and ongoing" requirement for the initial entry of relief, see id.

[19] In this case, Prison Legal News v. Stolle, No. 2:13-cv-424, 2015 WL 1487190 (E.D. Va. Mar.
31, 2015), the court granted an injunction stopping defendants from reinstating a former policy,
but it did not analyze the question whether such an injunction is appropriate under the PLRA in
the absence of an ongoing violation. Instead, it recited at the end of the merits analysis its finding
that the injunction complied with the need-narrowness-intrusiveness requirement.

used a different test—the need-narrowness-intrusiveness test—in the PLRA provision governing whether a court may grant prospective relief in the first instance. See id. § 3626(a)(1)(A) ("The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."). That Congress explicitly included an "ongoing violation" requirement in the termination provision and omitted it from the initial relief provision implies that Congress did not intend for courts to be bound by the "ongoing violation" requirement when determining whether equitable relief is initially available. At the least, the difference between the two provisions means that Congress did not give the "clearest command" that initial relief requires an ongoing violation.

Neither of defendants' remaining arguments is persuasive. As discussed above, the "plain language" of the PLRA does not in fact indicate that an ongoing violation is necessary to support the initial entry of an injunction, and although the context of the enactment of the PLRA is relevant and does incline toward a more onerous standard for the entry of injunctive relief, this context can neither provide the "clearest command" necessary to overcome the background legal rule that vests courts with the ability to issue prospective relief even in the absence of an ongoing violation nor overcome the implication from the language of the PLRA that different standards apply in the initial entry and termination contexts.

As such, the Court finds that an ongoing violation of a constitutional right is not a prerequisite for the initial entry of injunctive relief under the PLRA.

2. Need-Narrowness-Intrusiveness Requirement

Defendants also argue that plaintiffs' requested injunction does not meet the need-narrowness-intrusiveness requirement because it is not "sufficiently narrow" and "would not be

the least intrusive means" to correct the violation. Ren. Def. Opp. 17. Although plaintiffs request

only an injunction prohibiting VDOC from reinstating the pre-2015 conditions of confinement,

defendants have a host of questions: "But what conditions? And as to which inmates? And for

what duration? Would the injunction just require occasional contact visitation? More recreation

time? Group recreation? Or just recreation in a gymnasium, as was afforded Mr. Prieto during

the pendency of his appeal? . . . [And h]ow would VDOC comply with any command for

congregate recreation if the number of death row inmates dwindled—as it may soon—to a single

inmate?" Id. at 17-18.

As plaintiffs have explained, they "seek to enjoin a specific set of conditions on Death

Row—namely, their solitary confinement, as characterized by the combination of: (1) twenty-

three hours per day alone in cells; (2) no contact visitation; (3) no congregate recreation or

programming; [and] (4) only five hours per week of outdoor recreation in separate cages." Orig.

Pl. Reply [Dkt. No. 126] 19 (emphasis added). This explanation answers the bulk of defendants'

rhetorical questions, as it specifically delineates the combination of conditions that plaintiffs

want an injunction to prohibit. Moreover, by focusing on a prohibition of this combination of

conditions, plaintiffs' request is both narrow and minimally intrusive: rather than ordering

specific affirmative steps, it leaves defendants free to craft any other set of policies relating to

cell time, visitation, and recreation that defendants, in their professional expertise, believe satisfy

both the Eighth Amendment and the prison's need for security.[20] Finally, with respect to

duration, the requested injunction will only remain in effect for two years absent a finding by the

---

[20] And, indeed, defendants appear to have already crafted a set of policies that both parties agree
are constitutional and practically workable. Therefore, at this point, complying with the
injunction will require no affirmative steps at all on the part of defendants, much less any
substantial financial outlay.

Court in a future termination proceeding that "prospective relief remains necessary to correct a current and ongoing violation." 18 U.S.C. § 3626(b)(3).

### D. Equitable Mootness

Defendants also raise an argument grounded in "prudential" or "equitable" mootness, in which they argue that various prudential considerations—including the inability to fashion effective relief given the intervening change in policy, the "difficult and sensitive" legal issues involved in the case, and the "deference traditionally afforded the administrative and security judgments of prison officials"—should persuade the Court to, "in the exercise of its discretion, stay its hand and decline to consider an award of equitable relief." Ren. Def. Mem. 20-24 (internal quotation marks omitted). In response, plaintiffs argue that the continued vitality of equitable mootness has been placed in question by recent Supreme Court decisions, Ren. Pl. Opp. 11-12, and that the request for injunctive relief is not equitably moot because there is a significant possibility of reversion, id. at 12-14. In reply, defendants cite to W.T. Grant and argue that it has never been overruled and remains binding on this Court. Ren. Def. Reply [Dkt. No. 205] 2-6.

Unfortunately, defendants have pushed together two distinct inquiries that are better left apart. First, as all parties agree, plaintiffs must make a threshold showing that "there exists some cognizable danger of recurrent violation," W.T. Grant, 345 U.S. at 633, to obtain an injunction. Second, and where the parties disagree about the appropriate legal test, defendants appear to argue that even if plaintiffs can make this showing, additional "prudential" considerations should convince the Court to stay its hand and refuse to issue an injunction. It is the continued vitality of this "equitable mootness" doctrine that plaintiffs attack. The Court will consider the threshold W.T. Grant showing and the potential additional "prudential" considerations in turn.

29

1. Possibility of Recurrent Violation

All parties agree that W.T. Grant establishes the appropriate preliminary test: plaintiffs cannot obtain an injunction unless they can demonstrate that "there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." W.T. Grant, 345 U.S. at 633; see also Ren. Pl. Mem. 15; Def. Reply 2-6.[21]

Although the parties agree on the legal standard,[22] they vehemently disagree on plaintiffs' ability to meet it. Plaintiffs argue that this litigation was the catalyst for the changes made by defendants, who continue to believe that the pre-2015 conditions of confinement were justified by legitimate security concerns. Ren. Pl. Mem. 16-19. Plaintiffs contend that once this litigation is not hanging over defendants' heads, they may be willing to revert to the pre-2015 conditions. See id. Plaintiffs also point out that, without an injunction, there is no "legal barrier to prevent VDOC from reinstating more restrictive conditions," because VDOC may "promulgate and revoke regulations without notice, comment, or judicial review." Id. at 19. Therefore, plaintiffs

---

[21] There is some ambiguity about whether the Fourth Circuit has decided this issue. Compare Fourth Circuit Op. 13 ("[I]t is more than a 'mere possibility' that Defendants will alter Plaintiffs' current conditions of confinement." (citing W.T. Grant, 345 U.S. at 633)), with id. at 15 n.4 ("On remand in this case, the city may attempt to show that the likelihood of its engaging in similar constitutional violations is sufficiently remote to make injunctive relief unnecessary." (internal quotation marks omitted)). Despite the Fourth Circuit's language that plaintiffs had satisfied the W.T. Grant standard, it seems that the court did not intend to hold anything with respect to whether plaintiffs had shown a cognizable danger of recurrent harm, a reading of the opinion supported by both parties' decision to expend substantial resources on briefing the W.T. Grant question for this Court. Moreover, the parties have engaged in additional discovery and briefing tied to this question, and the Court will address the question anew.

[22] In their reply brief, defendants jump on a purported "concession" by plaintiffs that they have to show a "substantial risk" of future harm. Ren. Def. Reply 6. Although plaintiffs do say at one point in their response brief that "an injunction is appropriate where substantial risk of future irreparable harm is shown," Ren. Pl. Opp. 16, this appears to be a loose bit of drafting. Reading the briefing as a whole, it is clear that plaintiffs and defendants correctly agree that the W.T. Grant standard is the appropriate standard.

believe that any change of heart on defendants' parts will be easily implementable and difficult to challenge in a timely fashion.[23]

In response, defendants largely contend that there is no cognizable danger of recurrent violation, because Clarke, Zook, and Chief of Corrections Operations A. David Robinson ("Robinson") "have all stated, under oath, that they do not intend to return to the prior policies" and there is no evidence suggesting that these statements are false. Ren. Def. Reply 6. Moreover, defendants contest plaintiffs' characterization of the timeline of change, pointing to deposition testimony from Clarke and Robinson indicating that they had begun conversations about changing death row conditions as early as 2011, well before this civil action was filed, even though those changes were not implemented until 2015. See Ren. Pl. Mem. Ex. 1, at 139-42; id. Ex. 2, at 42-51.

The undisputed facts partially support both parties' version of events. On the one hand, plaintiffs are unable to produce any evidence to suggest that Clarke and Robinson did not begin engaging in conversations about death row conditions soon after Clarke was hired in 2010, and Clarke and Robinson have given sworn testimony consistent with each other that those conversations did take place. At the same time, those conversations were described only as preliminary and there is no documentary evidence indicating their content nor was the VDOC Executive Team looped in until 2015, after the litigation was started. Moreover, it is clear that there was at least some pressure put on VDOC by the pending litigation. For example, the record includes a variety of emails from Kimberly Lipp, Chief of VDOC's Architectural and Engineering Services Department, that discuss the death row project being particularly time-

---

[23] Plaintiffs' argument that even if the current officials in charge of VDOC are committed to the changes, it is likely that one or more of these officials will soon be replaced, Ren. Pl. Mem. 19-20, has been rendered moot because the recently elected governor reappointed Clarke to remain the Director of VDOC, Def. Mot. to Supp. the Record [Dkt. No. 214] Ex. 1.

sensitive in reference to pending litigation. See id. Ex. 8 (discussing how the death row

construction project had previously "avoided a major legal issue" for VDOC and informing a

colleague that VDOC was "again under serious threat of being sued" for issues relating to the

project). Defendants do not dispute that there is no legal barrier to a future Director reinstating

the pre-2015 policies nor do defendants dispute that the Director serves at the pleasure of the

governor. The most persuasive evidence in this record, as recognized by the Fourth Circuit, is the

"significant[]" fact that "throughout the course of this litigation, Defendants have refused to

commit to keep the revised policies in place and not revert to the challenged practices." Fourth

Circuit Op. 13-14.

Taken together, these facts are sufficient to establish that (1) defendants' change from the

pre-2015 conditions of confinement to the current conditions was influenced, although not

entirely dependent on, the current litigation; (2) there is no legal barrier to defendants' returning

to the pre-2015 conditions nor is there any pre-implementation mechanism for plaintiffs to

challenge such a return; and (3) although defendants individually state they do not currently

intend to return to the pre-2015 conditions, they have declined to commit VDOC to this

nonreversion promise. Given these facts, plaintiffs have met their burden of showing a

"cognizable danger of recurrent violation" in the absence of injunctive relief because many

different changed circumstances could lead VDOC to revert to the pre-2015 conditions. In

particular, VDOC's consistent refusal to represent to the Court that it will not revert to the pre-

2015 conditions and there being no way for plaintiffs to adequately and timely challenge a future

reversal support the need for an injunction.

2. Prudential Concerns

The various "prudential considerations" cited by defendants do not convince this Court to

forgo the exercise of its equitable discretion and decline to issue an injunction. The Fourth

Circuit has, in the past, recognized the existence of a "prudential" or "equitable" mootness

doctrine that is separate from constitutional mootness. See, e.g., S-1 & S-2 v. Spangler, 832 F.2d

294, 297 (4th Cir. 1987). In Spangler, the Fourth Circuit declined to grant injunctive relief based

on three prudential considerations: a lack of a "present need for remedial relief from the federal

courts," the "difficulty and sensitivity of the constitutional issue at the core" of the action, and

the ability for future plaintiffs to challenge the underlying conduct if it were to reoccur. Id. at

297-98. Although defendants here primarily base their prudential arguments around these three

factors, and plaintiffs seem to agree that the "Fourth Circuit historically has looked to" these

three factors in deciding equitable mootness, Ren. Pl. Opp. 12, the Court reads Spangler to allow

courts to evaluate any prudential considerations that might weigh in favor of or against granting

equitable relief.

To support their position that this action is equitably moot, defendants primarily argue

that there is no immediate need for relief because the challenged conduct will likely not reoccur,

as discussed above, and that the constitutional issues here are "difficult and sensitive from [a]

legal perspective, and a practical one." Ren. Def. Mem. 20-24. Plaintiffs respond that there is a

legitimate risk of reversion to the unconstitutional conditions, Ren. Pl. Opp. 12-14,[24] and stress

---

[24] Plaintiffs also argue that recent Supreme Court decisions "call into question the continued
vitality of the equitable mootness doctrine." Ren. Pl. Opp. 11 (formatting altered). In the
decisions they identify, Lexmark International, Inc. v. Static Control Components, Inc., 134 S.
Ct. 1377 (2014), and Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334 (2014), the Supreme
Court looked with disfavor on the use of prudential considerations in deciding standing and
ripeness. These doctrines, the Court commented, are in "tension" with "the principle that a
federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging."

that the injunction they seek is minimally intrusive, requiring only that defendants not revert to

the pre-2015 conditions, not that they take specific affirmative steps to alter conditions now or in

the future, and allowing for the possibility of temporarily reinstituting restrictive conditions in

the event of an emergency, see id. at 17-18; Ren. Pl. Mem. 21-22.

In addition, amici curiae the American Civil Liberties Union Foundation of Virginia and

the Rutherford Institute have filed a Statement of Position focused on the equitable mootness

question. They argue that the use of equitable mootness to avoid reaching the merits of plaintiffs'

claim would "undermine the system established by Congress and the Supreme Court to ensure

that important civil rights are properly vindicated." Statement of Position [Dkt. No. 207] 1. As

amici explain, Congress has passed a number of fee-shifting statutes, including 42 U.S.C.

§ 1988, to enable private parties adequately to enforce federal civil rights. See id. The Supreme

Court has interpreted these statutes only to allow for parties to recover attorney's fees when they

have obtained a judgment or other court order cementing their victory. See Buckhannon Bd. &

Care Home, Inc. v. W.V. Dep't of Health & Human Resources, 532 U.S. 598 (2001). In doing

so, the Supreme Court explicitly considered the possibility of tactical mooting, where defendants

might be encouraged by a lawsuit to make structural changes that vindicate plaintiffs' rights but

that they might do so before a court decides the case to avoid attorney's fee awards. This

situation, the Supreme Court explained, is unlikely to occur frequently because the high

constitutional standard for mootness ensures it is very difficult for a defendant unilaterally to

moot a civil action. See id. at 608-09.

---

Lexmark, 134 S. Ct. at 1386 (internal quotation marks omitted). Neither case squarely addressed
the doctrine of equitable mootness, and the Fourth Circuit's decisions blessing equitable
mootness are still binding on this Court. At the same time, these cases remind the Court that
equitable mootness is the exception rather than the rule; in the ordinary case, a court is obligated
to reach the merits.

As <u>amici</u> explain, dismissing plaintiffs' claims on equitable mootness grounds would undercut this logic, as it would lower the bar for mootness and allow both the specific defendants in this action and future potential defendants to moot a case to avoid having to pay attorney's fees. This outcome would undermine the structure of private civil rights enforcement that Congress has established, which is predicated on the ability of private litigants to recover their attorney's fees.[25]

Taken together, these prudential considerations do not convince the Court to stay its hand. Although the constitutional issues here are relatively sensitive and prison administrators typically receive broad deference from the courts in making security determinations, the particular circumstances of this action demonstrate that a ruling for plaintiffs on the merits would not overly intrude on defendants' ability to manage the prison system safely. At this point, discovery is complete, the constitutional issues are fully framed for the Court, the legal standard is clear, and the injunction plaintiffs request would require extremely little affirmative action from defendants. Moreover, as discussed above, plaintiffs have shown at least a cognizable danger that VDOC administrators, present or future, may revert to the pre-2015 conditions, and defendants refuse to allay this concern by representing to the court that reversion will not occur. Finally, the concerns expressed by <u>amici</u> about the danger that a broad application of equitable mootness poses to the carefully structured federal civil rights regime are well-taken and counsel against dismissing plaintiffs' claims on prudential grounds. Therefore, the Court rejects defendants' argument that this action should be dismissed on prudential mootness grounds.

---

[25] Although neither party discusses the attorney's fees issues, it was addressed by the <u>Spangler</u> court in a footnote. In that pre-<u>Buckhannon</u> case, the Fourth Circuit observed that "a determination of mootness of the action on the merits [does not] preclude an award of attorney's fees on remand." <u>Spangler</u>, 832 F.2d at 297 n.1. As such, the connection between attorney's fee awards, underenforcement of federal civil rights, and tactical mooting introduces an additional prudential wrinkle that deserves serious consideration from the Court.

35

## V.    CONCLUSION

For the reasons stated above, plaintiffs' Motion for Summary Judgment will be

GRANTED and defendants' Motion for Summary Judgment will be DENIED by an appropriate

Order to be issued with this Memorandum Opinion.

Entered this 21 day of February, 2018.


Alexandria, Virginia


/s/

Leonie M. Brinkema
United States District Judge

36

/s/
Leonie M. Brinkema
United States District Judge