## PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

### No. 18-6257

———————

THOMAS PORTER; ANTHONY BERNARD JUNIPER; MARK LAWLOR,

Plaintiffs - Appellees,

and

RICKY GRAY; IVAN TELEGUZ,

Plaintiffs,

v.

HAROLD W. CLARKE; DAVID ZOOK,

Defendants - Appellants.

------------------------------

AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, INCORPORATED;
THE RUTHERFORD INSTITUTE; PROFESSORS AND PRACTITIONERS OF
PSYCHIATRY AND PSYCHOLOGY,

Amici Supporting Appellee.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  Leonie M. Brinkema, District Judge.  (1:14-cv-01588-LMB-IDD)

———————

Argued:  December 13, 2018                          Decided:  May 3, 2019
                          Amended:  May 6, 2019

———————

Before NIEMEYER, KING, and WYNN, Circuit Judges.

––––––––––––––––

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Judge King joined.  Judge Niemeyer wrote a dissenting opinion.

––––––––––––––––

**ARGUED:**  Matthew Robert McGuire, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants.  Catherine Emily Stetson, HOGAN LOVELLS US LLP, Washington, D.C., for Appellees.  **ON BRIEF:**  Mark R. Herring, Attorney General, Victoria N. Pearson, Deputy Attorney General, Margaret Hoehl O'Shea, Assistant Attorney General, Toby J. Heytens, Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Kathryn M. Ali, Yuri Fuchs, Elizabeth C. Lockwood, W. David Maxwell, Ryan J. Stephenson, HOGAN LOVELLS US LLP, Washington, D.C.; Victor M. Glasberg, VICTOR M. GLASBERG & ASSOC., Alexandria, Virginia; Steven D. Rosenfield, Jeffrey E. Fogel, Charlottesville, Virginia, for Appellees.  David W. DeBruin, Washington, D.C., Jeffrey A. Atteberry, JENNER & BLOCK LLP, Los Angeles, California, for Amici American Civil Liberties Union Foundation of Virginia, Inc. and The Rutherford Institute.  Eden Heilman, Claire Guthrie Gastañaga, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, INC., Richmond, Virginia, for Amicus American Civil Liberties Union Foundation of Virginia, Inc.  John W. Whitehead, Doug R. McKusick, THE RUTHERFORD INSTITUTE, Charlottesville, Virginia, for Amicus The Rutherford Institute.  Daniel M. Greenfield, Roderick and Solange MacArthur Justice Center, NORTHWESTERN PRITZKER SCHOOL OF LAW, Chicago, Illinois, for Amici Curiae Professors and Practitioners of Psychiatry and Psychology.

WYNN, Circuit Judge:

Defendants Harold W. Clarke, in his official capacity as director of the Virginia Department of Corrections, and David Zook, in his official capacity as warden of Virginia's Sussex I State Prison (collectively, "State Defendants"), appeal a decision by the U.S. District Court for the Eastern District of Virginia holding that conditions of confinement on Virginia's death row violated the Eighth Amendment and enjoining reinstatement of those conditions.  The district court held that the death row inmates' long-term detention in conditions amounting to solitary confinement created a "substantial risk" of psychological and emotional harm and that State Defendants were "deliberately indifferent" to that risk.  *See Porter v. Clarke*, 290 F. Supp. 3d 518, 530–33 (E.D. Va. 2018).  For the reasons that follow, we affirm.

I.

Plaintiffs Thomas Porter, Anthony Juniper, and Mark Lawlor (collectively, "Plaintiffs") are housed on Virginia's death row at Sussex I State Prison ("Sussex Prison").  Death row consists of two tiers, with each tier holding twenty-two cells and three showers.  *Porter*, 290 F. Supp. 3d at 522.  Each death row inmate is housed in a separate cell, and no inmates are housed in adjacent cells.  Each cell is 71 square feet— approximately one-half the size of a parking space—and has a 10.5-foot-high ceiling.  Cells contain a bed, a small desk adjacent to the bed, and a commode/sink combination.  Each cell has a window that is 5 inches high by 41.5 inches long, which is covered by a wire mesh that allows natural light to pass through into the cell.  Each cell's door is made

of solid steel, includes a tray slot that is bolted shut when not in use, and a "rectangular in-set window that allow[s] inmates to look outside their cell into the pod." *Id.* at 523.

In November 2014—when Plaintiffs filed this lawsuit—two documents governed Plaintiffs' conditions of confinement on death row: Virginia Department of Corrections ("Corrections Department") Operating Procedure 460A, effective March 2010, and the Sussex Prison Institutional Rules and Regulations for Offenders, effective February 2010. These procedures and regulations allowed death row inmates one hour of outdoor recreation five days a week, and a ten-minute shower three days a week. During their outdoor recreation, inmates were confined to individual enclosures with concrete floors and enclosed by a steel and wire mesh cage. Each enclosure measured 7.9 feet wide by 20 feet long—approximately the size of a parking space—and 10 feet high. *Id.* None of the enclosures had exercise equipment. Inmates could not simultaneously use adjacent recreation enclosures.

Under the governing procedures and regulations, cells on death row were always lit: during the day, cells were illuminated by a main light mounted on the wall, and at night a low-level night light provided illumination for security and safety purposes. Inmates housed on death row could keep a television and compact disc player in their cell and borrow approved publications and library materials to read. Additionally, inmates could request and use wireless telephones any day of the week between 8:00 a.m. and 9:30 p.m.

The governing regulations and procedures allowed death row inmates to have non-contact visitation on weekends and state holidays. Inmates also could request contact

visitation with immediate family members in "extreme circumstances" once every six months, which request the warden had unconstrained discretion to grant or deny.  J.A. 997. In practice, the warden would grant a request for contact visitation only when an inmate was approaching "death."  J.A. 997.  Additionally, inmates had limited contact with prison staff.  Corrections officers made rounds through the death row pod to perform security checks on inmates every thirty minutes and could—and sometimes would—speak with inmates to see if they needed assistance or had requests.  Medical personnel and nurses also made rounds through the pod twice a day to provide inmates with medication.  And death row inmates received visits from a mental-health practitioner at least once a week, and case counselors made rounds through the pod once a day.

Two inmates housed on death row, Plaintiff Porter and former Plaintiff Ricky Gray,[1] were allowed out of their cells to perform institutional jobs.  "Other than these limited out-of-cell interactions, death row inmates were generally not permitted to leave their cells." *Porter*, 290 F. Supp. 3d at 523.  "In particular, they were denied access to any form of congregate recreation, either indoor or outdoor; they were not allowed to eat meals outside of their cells; and they could not participate in congregate religious services or prison programming." *Id.*  Due to these restrictions, death row inmates spent between 23 and 24 hours per day in their cells. *Id.* at 528.

In November 2014, Plaintiffs filed suit against Clarke, in his official capacity as director of the Corrections Department, and Keith Davis, who, at that time, served as

---

[1] Virginia executed Gray on January 18, 2017.

warden of Sussex Prison.   Plaintiffs alleged that the then-existing conditions of confinement on Virginia's death row violated the Eighth Amendment and sought injunctive and declaratory relief.

On February 21, 2018, the district court awarded summary judgment in Plaintiffs' favor on their Eighth Amendment claim.  *Porter*, 290 F. Supp. 3d at 533.  In reaching that conclusion, the district court held that, under the undisputed evidence, the conditions of confinement on Virginia's death row—particularly inmates' prolonged periods of isolation—"created, at the least, a significant risk of substantial psychological or emotional harm."  *Id.* at 532.  The district court further held that, under the undisputed evidence, that State Defendants were "deliberate[ly] indifferen[t]" to that risk of harm. *Id.* at 533.   The district court awarded Plaintiffs injunctive and declaratory relief, concluding that such relief was available under the Prison Litigation Reform Act ("PLRA") and was necessary because there "exist[ed] some cognizable danger of recurrent violation."  *Id.* at 534–42 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).  State Defendants timely appealed.

## II.

On appeal, State Defendants argue that the district court erred (A) in awarding summary judgment to Plaintiffs on their Eighth Amendment claim and (B) in awarding Plaintiffs injunctive relief.  We address each argument in turn.

## A.

At the outset, State Defendants argue that the district court erred in awarding Plaintiffs summary judgment on their Eighth Amendment conditions of confinement

claim.  Summary judgment is proper when there are no material disputes of fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  This Court reviews de novo a district court's award of summary judgment.  *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 312 (4th Cir. 2018).

The Eighth Amendment, which prohibits infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, applies to claims by prisoners against corrections officials challenging conditions of confinement.  *See Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) ("[T]he Eighth Amendment imposes a duty on prison officials to 'provide humane conditions of confinement . . . [and] ensure that inmates receive adequate food, clothing, shelter, and medical care." (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994))); *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).  Whether an inmate's conditions of confinement amount to "cruel and unusual punishment" must be measured against "the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).  Like any other Eighth Amendment claim, an Eighth Amendment conditions of confinement claim has (1) "objective" and (2) "subjective" components.  *Scinto*, 841 F.3d at 225 (citing *Farmer*, 511 U.S. at 834).

1.

To satisfy the "objective" prong, a plaintiff inmate must "demonstrate that 'the deprivation alleged [was], objectively, sufficiently serious.'"  *Id.* at 225. (quoting *Farmer*, 511 U.S. at 834).  "To be 'sufficiently serious,' the deprivation must be 'extreme'—meaning that it poses a 'serious or significant physical or emotional injury

7

resulting from the challenged conditions,' or 'a substantial risk of serious harm resulting from . . . exposure to the challenged conditions.'"   *Id.* (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)).

More than a century ago, the Supreme Court recognized the adverse consequences to inmates' mental health posed by prolonged detention in conditions akin to solitary confinement.   According to the Court, "experience demonstrated" that, when placed in isolation, "[a] considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."   *In re Medley*, 134 U.S. 160, 168 (1890).

In recent years, advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions materially indistinguishable from the challenged conditions on Virginia's death row.   For example, a report submitted by one of Plaintiffs' experts in clinical and forensic psychology, Dr. Mark Cunningham, notes "that the associated adverse psychological reactions to solitary confinement detailed in th[e] literature include psychotic-spectrum symptoms of paranoia and hallucinations; mood-spectrum symptoms of depression, withdrawal, appetite and sleep disturbance, fatigue and lethargy, and suicidal ideation; anxiety spectrum symptoms of subjective distress, feelings of

impending doom, somatic complaints, dissociative experience, and ruminative thoughts; affective lability characterized by irritability, rage, and aggressive impulses; and behavioral self-control symptoms of aggression, assaults, and self-mutilation."   J.A. 1041.

Numerous studies reveal that prolonged detention of inmates in conditions akin to those Plaintiffs faced on Virginia's death row also leads to "psychological deterioration," including "'declines in mental functioning,'" "'difficulties in thinking, concentration and memory problems, and problems with impulse control.'"   J.A. 1042 (quoting Jesenia Pizarro & Vanja M. K. Stenius, *Supermax Prisons: Their Rise, Current Practices, and Effect on Inmates*, 84 Prison J. 248, 256 (2004)).   Similarly, another expert in forensic and clinical psychology retained by Plaintiffs, Dr. Michael Hendricks, reports that "common adverse psychological effects of isolation housing in prison and jail settings (i.e., typically found to have been experienced by at least half of inmates in these settings) include anxiety, headaches and other psychosomatic symptoms, lethargy, insomnia, decreased appetite, and nightmares."   J.A. 925.

Notwithstanding that scholars have conducted dozens of studies on the psychological and emotional effects of solitary and segregated confinement, the leading survey of the literature regarding such confinement found that "there is *not a single published study* of solitary or supermax-like confinement in which nonvoluntary confinement lasted for longer than 10 days, where participants were unable to terminate their isolation at will, *that failed to result in negative psychological effects*."   J.A. 1041 (emphases added) (quoting Craig Haney, *Mental Health Issues in Long-Term Solitary*

*and "Supermax" Confinement*, 49 Crime & Delinquency 124, 132 (2003)).  Based on this extensive body of literature, scholars have concluded that "solitary confinement has potentially serious psychiatric risks." J.A. 1042 (quoting Pizarro & Stenius, *supra* at 256); *see also* Br. *Amici Curiae* Profs. & Practitioners of Psychiatry & Psychology in Supp. of Pls.–Apps. and Affirmance ("Amici Br.") at 8–9 ("Scientific research, regardless of methodology, has produced strikingly consistent results: the deprivation of meaningful social contact and positive environmental stimulation characteristic of solitary confinement subjects prisoners to grave psychological and physiological harms." (internal quotation marks omitted)).  Notably, State Defendants adduced no evidence refuting Plaintiffs' expert evidence establishing the risks and serious adverse psychological and emotional effects of prolonged solitary confinement, or the surveys of the scholarly literature supporting that evidence.

Courts have taken note of this extensive—and growing—body of literature.  In recent years, Justice Kennedy and Justice Breyer authored separate opinions highlighting the serious psychological and emotional harm caused by segregated or solitary confinement under conditions materially indistinguishable from those that existed on Virginia's death row.  *See Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting from denial of stay of execution) (stating that evidence demonstrated that the petitioner, an inmate held on Texas's death row, "ha[d] developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting) (reviewing literature and

stating that "it is well documented that . . . prolonged solitary confinement produces numerous deleterious harms"); *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price.").

Likewise, this Court stated that "[p]rolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015). And the Third Circuit recently reviewed the "robust body of scientific research on the effects of solitary confinement" and found a "scientific consensus" that such confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage." *Williams v. Sec'y Penn. Dep't of Corr.*, 848 F.3d 549, 566–67 (3d Cir. 2017), *cert denied sub nom. Walker v. Farnam*, 138 S. Ct. 357 (2017), *and cert denied sub nom. Williams v. Wetzel*, 138 S. Ct. 357 (2017); *see also, e.g.*, *Grissom v. Roberts*, 902 F.3d 1162, 1176–77 (10th Cir. 2018) (Lucero, J., concurring) (reviewing academic literature and determining that "solitary confinement, even over relatively short periods, renders prisoners physically sick and mentally ill. . . . These harms, which are persistent and may become permanent, become more severe the longer a person is exposed to solitary confinement.").

Of particular relevance, several courts have found—based on the empirical evidence set forth above—that solitary confinement poses an objective risk of serious psychological and emotional harm to inmates, and therefore can violate the Eighth Amendment. *See, e.g.*, *Palakovic v. Wetzel*, 854 F.3d 209, 225–26 (3d Cir. 2017)

("acknowledg[ing] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement"); *Ashker v. Brown*, No. C 09-5796, 2013 WL 1435148, at \*4–5 (N.D. Cal. Apr. 9, 2013); *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678–79 (M.D. La. 2007) ("It is obvious that being housed in isolation in a tiny cell for 23 hours a day for over three decades results in serious deprivations of basic human needs."); *McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998) ("[T]hat prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science.").

We agree. The challenged conditions of confinement on Virginia's death row—under which Plaintiffs spent, for years, between 23 and 24 hours a day "alone, in a small . . . cell" with "no access to congregate religious, educational, or social programming"—pose a "substantial risk" of serious psychological and emotional harm. *Porter*, 290 F. Supp. 3d at 527–28.

State Defendants nevertheless argue that the district court erred in holding that the undisputed evidence satisfied Plaintiffs' burden under the objective prong for three reasons: (1) this Court previously has found that the placement of inmates in conditions of confinement as or more isolating than those faced by Plaintiffs did not pose an objective risk of serious harm; (2) Plaintiffs were not, as a matter of fact, held in "solitary" confinement; and (3) Plaintiffs' "generalized" evidence of the risks posed by solitary confinement does not establish that Plaintiffs, in particular, experienced such harms. Appellants' Br. at 43–48.

First, State Defendants maintain—and our colleague in dissent agrees—that the district court erred because this Court's decisions in *Sweet v. South Carolina Department of Correction*, 529 F.2d 854 (4th Cir. 1975) (en banc), and *Mickle v. Moore*, 174 F.3d 464 (4th Cir. 1999), upheld conditions of confinement that are "squarely analogous" to the challenged conditions on Virginia's death row.  Appellants' Br. at 44.  In *Sweet*, this Court stated that "'isolation from companionship,' 'restriction on intellectual stimulation and prolonged inactivity,' inescapable accompaniments of segregated confinement, will not render segregated confinement unconstitutional absent other illegitimate deprivations. Nor will the fact that the segregated confinement is prolonged and indefinite be sufficient in itself to command constitutional protection, though it is a factor to be considered." 529 F.3d at 861.  But *Sweet* significantly predated *all* the Supreme Court's conditions of confinement decisions—including *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), which first set forth the standard for satisfying the objective component of a conditions of confinement claim—and lacked the benefit of the recent academic literature surveyed by Plaintiffs' experts concerning the harmful psychological and emotional effects of prolonged solitary confinement.  Because *Sweet* was decided under a different legal standard, we agree with the district court that *Sweet* cannot—does not—control this case.

*Mickle* involved an Eighth Amendment challenge by members of the "Five Percenters" gang who the South Carolina Department of Correction transferred to "long-term segregated confinement" after a series of violent incidents perpetrated by incarcerated members of the gang.  174 F.3d at 466–67, 471.  Under the terms of their segregated confinement, the gang members were "confined to their cells for twenty-three

hours per day without radio or television," received "only five hours of exercise per week," and could not "participate in prison work, school, or study programs." *Id.* at 471. Citing *Sweet*, *Mickle* held that the Five Percenters failed to show that their conditions of confinement amounted to "a serious deprivation of a basic human need" because "the isolation inherent in administrative segregation or maximum custody is not itself constitutionally objectionable." *Id.* at 472. This Court also rejected the Five Percenters' claim that the indefinite duration of their confinement in segregation rendered it unconstitutional, emphasizing that the Five Percenters failed to demonstrate that they had suffered a serious mental illness or psychological injury. *Id.* (further stating that the Five Percenters' subjective claims of anxiety and depression were insufficient).

Like *Sweet*, we do not believe *Mickle* controls this case. To begin, Plaintiffs introduced two expert reports derived from surveying dozens of empirical analyses as well as observations of the challenged conditions on Virginia's death row. Those reports demonstrated the serious psychological and emotional risks posed by conditions of confinement materially indistinguishable from those Plaintiffs' faced on Virginia's death row. Significantly, much of that research post-dates *Mickle*. *See* J.A. 924 (Hendricks report) ("[T]he research, particularly as it relates to special housing units in jails and prisons, has advanced greatly in the last 15 years, furthering the scientific understanding of the harmful effects of solitary confinement and social isolation in these facilities"); J.A. 1041 (Cunningham report) (listing key studies of the adverse impact of solitary and segregated confinement post-dating *Mickle*). By contrast, the *Mickle* plaintiffs did not introduce any expert reports or analyses concerning the risks of serious psychological and

emotional harms attributable to long-term solitary confinement.  *Mickle*, 174 F.3d at 472.

Put simply, unlike Plaintiffs, the *Mickle* plaintiffs failed to establish an evidentiary record

that would have allowed this Court to find that prolonged solitary confinement poses a

serious risk of psychological and emotional harm.

Equally significant, the Five Percenters were placed in segregation based on their

*in-prison conduct* and were removed from segregation if they renounced their

membership with the group.   *Id.* at 466–67.   By contrast, the challenged Virginia

procedures and regulations place death row inmates in solitary confinement based on

their sentence alone and do not provide death row inmates with an avenue for removing

themselves from segregation.   Because *Mickle* involved a different set of facts than those

adduced by Plaintiffs, our decision cannot—and does not—overrule *Mickle*.   *See United

States v. Floresca*, 38 F.3d 706, 711 (4th Cir. 1994) ("Because *Bledsoe* is on different

facts than the instant case, . . . *Bledsoe* does not control our holding in this case."); *Cal. v.

Anglim*, 129 F.2d 455, 460 (9th Cir. 1942) (explaining that a later decision "does not

overrule" an earlier decision when "[e]ach decision rests on different facts").

Second, State Defendants argue that Plaintiffs were not, as a matter of fact, held in

"solitary" confinement.   In particular, State Defendants argue that Plaintiffs were not

placed in the type of "solitary" confinement that the experts warned about because

Plaintiffs were not "subject to 'prolonged isolation' or 'lack of stimulation.'"  Appellants'

Br. at 44.   The undisputed facts belie that contention.

State Defendants do not dispute—nor could they—that the challenged procedures

and regulations restricted death row inmates to their cells for between 23 and 24 hours a

day.  State Defendants also do not dispute that the challenged procedures and regulations denied death row inmates the opportunity for any form of congregate programming, recreation, or religious practice.  And State Defendants do not dispute that, at the time they filed this case, Plaintiffs already had been housed in such isolated confinement for years.  Dr. Hendricks' unrebutted report avers that these and other challenged conditions on Virginia's death row "hew closely to the sensory deprivation described in the studies in the research literature" finding and quantifying the adverse psychological and emotional effects associated with prolonged confinement in such conditions.  J.A. 926–27.  Accordingly, under the undisputed facts, the scholarly articles regarding the consequences of prolonged solitary confinement relied on by Plaintiffs' experts bear directly on the risks attributable to the challenged conditions of confinement on Virginia's death row.

Additionally, in *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court characterized Ohio's "administrative control" unit as "a highly restrictive form of solitary confinement," *id.* at 214 (citing *Austin v. Wilkinson*, 189 F. Supp. 2d 719, 724–25 & n.5 (N.D. Ohio 2002)).  Notably, the conditions of confinement for Ohio inmates housed in administrative control were materially less isolating than those faced by Plaintiffs on Virginia's death row.  Whereas Virginia's death row inmates were housed in non-adjacent cells with solid steel doors—which, former Sussex Prison warden Davis concedes, pose a significant "imped[iment]," if not absolute barrier, to communication, J.A. 975—Ohio inmates housed in administrative control lived in "open-faced cells" or "cells with bars, not solid doors," allowing inmates to "easily communicate," *Austin*, 189

F. Supp. 2d at 725–26.   Whereas inmates on Virginia's death row were entitled to outdoor exercise only five days a week, Ohio inmates housed in administrative control "ha[d] outside recreation available every day."   *Id.* at 725.   Whereas Virginia denied death row inmates access to exercise equipment, Ohio inmates in administrative control had "access to basketball courts and work-out areas."   *Id.*   And whereas the challenged procedures and regulations denied Virginia death row inmates access to congregate programming, Ohio allowed even those inmates housed in conditions more restrictive than administrative control to engage in some congregate activities, such as counseling. *Id.* at 725.   Accordingly, under governing law, the challenged conditions on Virginia's death row amount to, at a minimum, "a highly restrictive form of solitary confinement." *Wilkinson*, 545 U.S. at 214.

The Supreme Court's determination that Ohio's administrative control unit constituted "a highly restrictive form of solitary confinement" also refutes State Defendants' contention that Plaintiffs' visits from or access to corrections officials and health professionals distinguished the challenged conditions of confinement from those that scholars and courts have found pose a substantial risk of serious psychological and emotional harm.   Appellants' Br. at 42–43.   Put simply, if the ability to "easily communicate" with fellow inmates and engage in congregate programming did not prevent the Supreme Court from characterizing Ohio's administrative control unit as a "highly restrictive form of solitary confinement," then the limited contacts Virginia's death row inmates had with prison officials and health professionals do not render the

challenged conditions of confinement meaningfully less restrictive or isolating from a legal or factual perspective.

Third, State Defendants argue that Plaintiffs' "generalized" evidence of the harms posed by solitary confinement cannot be used to establish that these Plaintiffs were, in fact, harmed by the challenged conditions on *Virginia's* death row. State Defendants point out that their expert in psychiatry, Dr. Gregory B. Saathoff, evaluated most of the Plaintiffs and opined that none of them exhibited cognitive "instability or deterioration," and that "symptoms of anxiety, depression, insomnia and associated symptoms reported by [Plaintiffs] are not unlike those that are exhibited by the general population offenders serving life sentences." J.A. 193. By contrast, Plaintiffs' expert, Dr. Hendricks, diagnosed Plaintiffs with several psychological and emotional conditions, which he opined were attributable to Plaintiffs' conditions of confinement. Based on this conflicting evidence, the district court recognized that there is a dispute of fact as to whether Plaintiffs have, in fact, been harmed by their conditions of confinement. *Porter*, 290 F. Supp. 3d at 530–31.

But, as the district court held, that dispute of fact did not preclude a determination that the undisputed evidence established that Plaintiffs faced a "substantial risk" of serious harm from their conditions of confinement. *Id.* at 531. In particular, State Defendants never have offered evidence disputing the numerous studies and scholarly articles surveyed by Dr. Cunningham and Dr. Hendricks demonstrating that prolonged isolated confinement, under conditions closely analogous to those Plaintiffs challenge, creates a substantial *risk* of psychological and emotional harm, which risk is sufficient to

satisfy the objective prong.   J.A. 924–27; 1041–42.   Accordingly, the district court correctly held that, under the undisputed facts, the challenged conditions of confinement on Virginia's death row created a "substantial risk" of serious psychological and emotional harm.

2.

To satisfy the "subjective" prong in an Eighth Amendment case, a plaintiff challenging his conditions of confinement must demonstrate that prison officials acted with "deliberate indifference."   *Scinto*, 841 F.3d at 225.   "To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'"   *Id.* (quoting *Farmer*, 511 U.S. at 837). "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835).   A plaintiff may satisfy this standard by "prov[ing] by circumstantial evidence that a risk was so obvious that it had to have been known." *Makdessi v. Fields*, 789 F.3d 126, 136 (4th Cir. 2015).   Put differently, "[a]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate."   *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011).

Here, several undisputed facts established State Defendants' deliberate indifference.   To begin, Plaintiffs' evidence established that State Defendants, in fact, were aware of the substantial risk of psychological or emotional harm posed by solitary confinement.   Former defendant Davis, who served as warden of Sussex Prison until he

was replaced by Zook in March 2016, testified in June 2013—more than a year before Plaintiffs filed the instant case—that "being separated and alone from human contact, that we—as humans, we don't survive very well that way with lack of human contact." J.A. 972. And in that same case—in which defendant Clarke also was a named defendant—a November 2013 opinion issued by the district court characterized the challenged conditions of Virginia's death row as "dehumanizing." *Prieto v. Clarke*, No. 1:12-cv-1199, 2013 WL 6019125, at *6 (E.D. Va. Nov. 13, 2015), *rev'd on other grounds*, 780 F.3d 245, 254–55 (4th Cir. 2015). Likewise, Corrections Department procedures barring detention of non-death row prisoners in segregated confinement—akin to the challenged conditions on death row—for longer than thirty consecutive days constitute unrebutted evidence of State Defendants' awareness "that extended stays in segregation can have harmful emotional and psychological effects." *Porter*, 290 F. Supp. 3d at 532. Notwithstanding this awareness, State Defendants elected not to revisit the challenged conditions until after Plaintiffs filed suit.

Additionally, the extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm "was so obvious that it had to have been known." *Makdessi*, 789 F.3d at 136. As the district court correctly pointed out, "[g]iven [State D]efendants' status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction on death row could cause." *Porter*, 290 F. Supp. 3d at 532.

20

In determining that the undisputed evidence established State Defendants'
deliberate indifference, the district court disregarded State Defendants' argument "that
the policies were justified by legitimate security risks" and therefore had a "legitimate
penological objective." *Id.* at 532–33 & n.14. Although the court recognized that the
question of "whether these conditions had a legitimate penological objective . . . would
not be amenable to resolution at the summary judgment stage" because the parties
presented conflicting evidence, the court said resolution of that question was
"unnecessary . . . given the variety of other evidence that defendants knew of the
potentially harmful effects of the pre-2015 conditions." *Id.* at 33 n.14. Put differently,
the district court concluded that it need not consider penological justification if
independent evidence established that State Defendants acted with deliberate
indifference.

We believe that the district court erred in failing to consider State Defendants'
penological justification for housing death row inmates in conditions amounting to
solitary confinement. Both the Supreme Court and this Court have recognized that the
penological justification supporting a challenged condition is relevant in a conditions of
confinement case. *See Rhodes*, 452 U.S. at 346 ("Among 'unnecessary and wanton'
inflictions of pain are those that are 'totally without penological justification.'"); *see also
Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir. 1990) ("Prison conditions are
unconstitutional if they constitute an 'unnecessary and wanton' infliction of pain and are
'totally without penological justification.'"). To be sure, the exact role of penological
justification in analyzing an Eighth Amendment conditions of confinement case is

unsettled.  *See Grenning v. Miller-Stout*, 739 F.3d 1235, 1240 (9th Cir. 2014) (stating that "[t]he precise role of legitimate penological interests is not entirely clear in the context of an Eighth Amendment challenge to conditions of confinement," but noting that "[t]he existence of a legitimate penological justification has, however, been used in considering whether adverse treatment is sufficiently gratuitous to constitute punishment for Eighth Amendment purposes").

Perhaps the clearest way penological justification factors into "conditions of confinement cases" is through the subjective prong inquiry because, in a typical Eighth Amendment case, "[w]here there is no legitimate penological purpose for a prison official's conduct, courts have 'presum[ed] malicious and sadistic intent.'"  *Wood v. Beauclair*, 692 F.3d 1041, 1050 (9th Cir. 2012) (quoting *Giron v. Corr. Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999)); *see also, e.g.*, *Ricks v. Shover*, 891 F.3d 468, 475 (3d Cir. 2018).  Put differently, if a prison official lacks a legitimate penological justification for subjecting an inmate to a condition of confinement that poses a substantial risk of serious harm—like prolonged solitary confinement, *see supra* Part II.A.1—then the official is presumptively acting with deliberate indifference to that risk. But some opinions also treat penological justification as a component of the objective prong analysis.  *See, e.g.*, *Thomas v. Bryant*, 614 F.3d 1288, 1311 (11th Cir. 2010); *Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir. 2009).  And still others appear to treat it as a separate inquiry.  *See Rice ex rel. Rice v. Corr. Medical Svcs.*, 675 F.3d 650, 666 (7th Cir. 2012).

Notwithstanding the uncertain role of penological justification in conditions of confinement cases, we believe—contrary to the district court's opinion—that a legitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement, similar to the challenged conditions on Virginia's death row, even though such conditions create an objective risk of serious emotional and psychological harm.  Put simply, prison officials tasked with the difficult task of operating a detention center may reasonably determine that prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public or to serve some other legitimate penological objective.[2]  *Cf. Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012) ("The difficulties of operating a detention center must not be underestimated by the courts.").

We are not alone in this conclusion.  For example, in *Bass v. Perrin*, 170 F.3d 1312 (11th Cir. 1999), the Eleventh Circuit held that the placement of two prisoners in segregation without access to outdoor recreation did not violate the Eighth Amendment because the prisoners had engaged in violent crimes while incarcerated, *id.* at 1316.  "The pain inflicted on the plaintiffs, however, cannot be said to be unnecessary—in other

---

[2] Because we hold that a legitimate penological justification can support even prolonged solitary detention of a particular inmate, our colleague in dissent's suggestion that our opinion could "interfer[e]" with prison officials' ability to safely confine inmates housed at "the federal supermax prisons in Colorado and Illinois" is without merit.  *Post* at 44.  Put simply, if a prison official reasonably determines that, notwithstanding the emotional and psychological risks, prolonged solitary detention of an inmate is necessary to protect the well-being of prison employees, inmates, and the public, then confinement of the inmate in such conditions will not violate the Eighth Amendment.  As explained below, State Defendants simply chose to abandon any such argument in this case.

words, 'totally without penological justification,'" the court explained. *Id.* Likewise, the Seventh Circuit has held that "prolonged confinement in administrative segregation may constitute a violation of the Eighth Amendment . . ., depending on the duration and nature of the segregation and *whether there were feasible alternatives to that confinement*." *Rice*, 675 F.3d at 666 (emphasis added); *see also Grissom*, 902 F.3d at 1178 (Lucero, J., concurring) (explaining, in a case challenging a prisoner's prolonged placement in segregation, that "[a]t base, then, the question is whether the extreme nature of [the prisoner's] confinement is justified by legitimate penological interests").

Although we find that the district court erred in disregarding State Defendants' argument that legitimate penological considerations justified the challenged conditions on Virginia's death row, this error does not constitute a basis for vacating the district court's award of summary judgment.  State Defendants elected not to argue in their briefing to this Court that the district court erred in disregarding their previously asserted penological justifications. Perhaps State Defendants abandoned their penological justification argument on appeal because Plaintiffs presented unrebutted empirical evidence that, as a group, "[d]eath-sentenced inmates do not have disproportionate rates of serious violence when confined under general population security conditions." J.A. 1028–36 (Cunningham report).  Or perhaps, State Defendants elected not to pursue their penological justification argument because Virginia has not experienced, to date, any notable security incidents since it relaxed the challenged conditions on death row during the pendency of this litigation. *See infra* Part III.B.1.  Regardless, we must respect that decision—strategic or otherwise—and therefore treat the issue as waived.  *See United*

24

*States v. Washington*, 743 F.3d 938, 941 n.1 (4th Cir. 2014) ("Issues that [the appellant] failed to raise in his opening brief are waived.").

\* \* \* \* \*

In sum, the undisputed evidence established both that the challenged conditions of confinement on Virginia's death row created a substantial risk of serious psychological and emotional harm and that State Defendants were deliberately indifferent to that risk. Accordingly, the district court properly awarded summary judgment in Plaintiffs' favor on their Eighth Amendment claim.

### B.

State Defendants further argue that the district court reversibly erred in awarding Plaintiffs injunctive relief.  We review a district court's decision to award "equitable relief for abuse of discretion, accepting the court's factual findings absent clear error, while examining issues of law de novo."  *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002).  Additionally, the Supreme Court has emphasized that a district court's authority to award and fashion equitable relief is "necessarily broad and a strong showing of abuse must be made to reverse it."  *W.T. Grant*, 345 U.S. at 633.

Here, State Defendants contend that Plaintiffs were not entitled to injunctive relief because: (1) post-filing changes to the challenged conditions on Virginia's death row barred the award of equitable relief and (2) the PLRA permits district courts to impose injunctive or declaratory relief *only if* there is an "ongoing constitutional violation." Appellants' Br. at 25.

### 1.

State Defendants first argue—and our colleague in dissent agrees—that the district court abused its discretion in awarding Plaintiffs injunctive relief "because the conditions that they brought suit to challenge no longer exist and because there is no realistic possibility of their reoccurrence."  Appellants' Br. at 33–34.

On August 6, 2015—almost a year after Plaintiffs filed this action—the Corrections Department adopted revised procedures and regulations that provide death row inmates with several new privileges, including: (1) having "contact visitation with immediate family members one day per week for one and a half hours at a time"; (2) having "non-contact visitation on weekends and holidays with immediate family members and one approved non-family member"; (3) participating in in-pod recreation with a maximum of three other offenders seven days per week for a minimum of one hour per day; (4) participating in outdoor recreation five days per week for 90 minutes per day; and (5) showering seven days per week, for up to fifteen minutes.  *Porter*, 290 F. Supp. 3d at 524.  The in-pod, congregate recreation "occur[s] in a newly screened off area of the death row pod that contain[s] a television, two tables with seating, a bench, various games, and a JPAY kiosk that enable[s] inmates to download music, purchase books and movies, and send e-mails."  *Id.*  The Corrections Department also constructed "a covered outdoor recreation yard that . . . include[s] two sections, each equipped with a basketball court and stationary exercise equipment, in which groups of up to four death row inmates could congregate."  *Id.*  Plaintiffs concede that the relaxed conditions of confinement do not violate the Eighth Amendment.

State Defendants contend, correctly, that when a defendant discontinues illegal conduct, a party seeking injunctive relief must demonstrate that such relief is "needed," meaning that "there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *See W.T. Grant*, 345 U.S. at 633. That being said, "[c]ourts require 'clear proof' that an unlawful practice has been abandoned, and must guard against attempts to avoid injunctive relief 'by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption.'" *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 367 (7th Cir 1990) (quoting *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952)). According to State Defendants, there is no "cognizable danger of recurrent violation" because "corrections officials have testified under oath that they have no intention of reverting to the prior conditions, and that testimony is . . . undisputed." Appellant's Br. at 24.

Notwithstanding State Defendants' averred lack of present *intent* to revert to the challenged conditions, the district court found, as a matter of fact, that Plaintiffs satisfied their burden to demonstrate a "cognizable *danger* of recurrent violence." *Porter*, 290 F. Supp. 3d at 539–40 (emphasis added). In support of that determination, the district court first found that State Defendants' "change from the pre-2015 conditions of confinement to the current conditions was influenced, although not entirely dependent on, the current litigation." *Id.* at 540. The district court further found that "there is no legal barrier to defendants returning to the pre-2015 conditions nor is there any pre-implementation mechanism for plaintiffs to challenge such a return." *Id.* And the district court found

"most persuasive" that "although defendants individually state they do not currently *intend* to return to the pre-2015 conditions, they have declined to commit [the Corrections Department] to this nonreversion promise," despite being offered several opportunities to do so, including in earlier proceedings before this Court.  *Id.* at 524–25, 540 (emphasis added); *see also Porter v. Clarke*, 852 F.3d 358, 365 (4th Cir. 2017) (noting that "during oral argument, [State] Defendants' counsel said the Corrections Department could not foreswear a return to the challenged policies").  Additionally, State Defendants have repeatedly reaffirmed—including in their briefing to this Court—that they do not believe the challenged conditions violate the Eighth Amendment.

The record supports each of the district court's specific findings.  And the district court's ultimate factual finding of a "cognizable danger of recurrent violation" constitutes a reasonable inference from these well-supported facts and is therefore not subject to reversal under the applicable clear error standard of review.  *See Baxter v. Comm'r of I.R.S.*, 910 F.3d 150, 166–67 (4th Cir. 2018).  Likewise, our sister circuits have relied on similar facts in finding a cognizable danger of recurrence adequate to support a district court's award of injunctive relief.  *See, e.g.*, *Wilk*, 895 F.2d at 367–70 (holding that district court did not abuse its discretion in finding cognizable danger of recurrence— notwithstanding that it "wrongly placed the burden of proof on the [defendant]"—when defendant "expressed intent to comply" with the law, but also only discontinued challenged conduct as a result of litigation and "vigorously maintain[ed]" its challenged conduct was lawful); *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 857 (9th Cir. 1995) (holding that district court did not abuse its discretion in finding a cognizable

danger of recurrence when defendant introduced reforms "under protest" and because "past illegal conduct gives rise to an inference that future violations may occur").  By contrast, neither State Defendants nor our dissenting colleague identifies any case involving analogous facts in which the Supreme Court, this Court, or any other appellate court held that a district court abused its discretion in awarding prospective injunctive relief.

The district court's decision also is consistent with this Court's admonition that "[a]n injunction should not be refused upon the mere *ipse dixit* of a defendant that, notwithstanding his past misconduct, he is now repentant and will hereafter abide by the law."  *United States v. Hunter*, 459 F.2d 205, 220 (4th Cir. 1972).  Given that State Defendants have shown no "repentan[ce]"—they continue to argue, as they are entitled, that the challenged conditions comply with the Eighth Amendment—State Defendants' professed *intent* not to return to the challenged practices did not preclude the district court from exercising its discretion to award injunctive relief.

## 2.

Next, State Defendants argue that the district court erred in holding that the PLRA did not bar the award of prospective injunctive and declaratory relief.  Whether the PLRA authorized such relief presents a question of statutory interpretation that this Court reviews de novo.  *See Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 242–43 (4th Cir. 2009); *see also Dixon*, 290 F.3d at 710 (providing for de novo review of questions of law bearing on a district court's decision to award an injunction)

The PLRA provides that "in any civil action with respect to prison conditions . . . [t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1).  According to State Defendants, this language authorizes a court to award prospective relief *only if* there is an "ongoing constitutional violation."  Appellants' Br. at 29.  Emphasizing that Plaintiffs concede their current conditions of confinement comply with the Eighth Amendment, State Defendants argue that there is no longer an "ongoing constitutional violation" supporting the award of prospective relief.

In support of their position, State Defendants principally rely on the Ninth Circuit's opinion in *Hallett v. Morgan*, 296 F.3d 732 (9th Cir. 2002).  At issue in *Hallett* was a motion by a class of state prisoners to extend district court jurisdiction over a consent decree entered several years earlier in a case involving alleged Eighth Amendment violations at the prison.  *Id.* at 738–39.  After holding an evidentiary hearing, the district court concluded that the alleged constitutional violations at the prison no longer existed.  *Id.* at 739.  Relying on that finding, the state argued that Section 3626 barred extension of jurisdiction over the consent decree because there was no longer a "current and ongoing" violation.  *Id.* at 743.  The Ninth Circuit agreed, stating that "[t]he text of § 3626(a)(1)(A) suggests that in the absence of a 'current and ongoing' violation, there is no occasion to fashion prospective relief to cure the violation."  *Id.* at 743.  "In

other words, if a violation no longer exists, the statute does not permit the court to order prospective relief."  *Id.*

Although we have great respect for the Ninth Circuit's opinion in *Hallett*, we are not persuaded to follow it.  Specifically, *Hallett's* reference to "current and ongoing" violation—a phrase that does not appear in the text of Section 3626(a)(1)—appears to derive from Section 3626(b)(3), which provides that "[p]rospective relief shall not *terminate* if the court makes written findings based on the record that prospective relief remains necessary to correct a *current and ongoing* violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3) (emphases added).  By its plain terms, Section 3626(b)(3) addresses the *termination* of prospective relief, not the *initial* imposition of such relief, which is at issue here and governed by Section 3626(a)(1).  Notably, Section 3626(a)(1) does not include the "current and ongoing" language, notwithstanding that the rest of the language in Section 3626(a)(1) regarding when initial prospective relief is available tracks the language in Section 3626(b)(3).

Additionally, Congress's decision to omit the "current and ongoing" language from Section 3626(a)(1), when it used such language in Section 3626(b)(3), provides strong evidence that Congress did not intend for the "current and ongoing" standard to apply outside of the termination context.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it another section of the same Act, it is generally presumed that Congress acts

intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and alterations omitted)).  That is precisely what the district court in this case and the Eleventh Circuit concluded in rejecting *Hallett*'s reasoning.  *See Thomas v. Bryant*, 614 F.3d 1288, 1320 (11th Cir. 2010) ("[T]he 'current and ongoing' requirement is distinct from the standard governing the initial entry of injunctive relief."); *Porter*, 290 F. Supp. 3d at 537 ("That Congress explicitly included an 'ongoing violation' requirement in the termination provision and omitted it from the initial relief provision implies that Congress did not intend for courts to be bound by the 'ongoing violation' requirement when determining whether equitable relief is initially available.").

Congress's decision to use the "current and ongoing" language in Section 3626(b)(3), but not in Section 3626(a)(1), also undermines the argument by State Defendants and our colleague in dissent that the phrase "necessary to correct" in Section 3626(a)(1) precludes the award of prospective relief when a constitutional violation no longer exists.  Construing the phrase "necessary to correct" as demanding a "current and ongoing" violation would render redundant the phrase "current and ongoing" violation in Section 3626(b)(3), as that provision also requires that the court find the prospective relief "necessary to correct."  But "[g]eneral principles of statutory construction require a court to construe all parts to have meaning and to reject constructions that render a term redundant."  *PSINet, Inc. v. Chapman*, 362 F.3d 227, 232 (4th Cir. 2004) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).

Further supporting Plaintiffs' construction of Section 3626(a)(1) is the well-established rule that courts "should not construe a statute to displace courts' traditional

equitable authority absent the clearest command or an inescapable inference to the contrary." *Miller v. French*, 530 U.S. 327, 340 (2000). Congress's use of "current and ongoing" in Section 3626(b)(3) demonstrates that it knew how to "clear[ly] command" that courts may not use their equitable authority in the case of a violation that is not "current and ongoing." Because Congress chose not to use that language or similar language, we will not construe Section 3626(a)(1) as displacing courts' equitable authority to *initially* impose prospective relief, even when a violation is not "current and ongoing."

III.

Without question, "[m]aintaining safety and order at [a detention center] requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Florence*, 566 U.S. at 326. At the same time, one of the "essential principle[s]" protected by the Eighth Amendment is that "the State must respect the human attributes even of those who have committed serious crimes." *Graham v. Florida*, 560 U.S. 48, 59 (2010). The challenged conditions on Virginia's death row deprived inmates of the basic human need for "meaningful social interaction and positive environmental stimulation." Amici Br. at 4. The undisputed evidence established that that deprivation posed a substantial risk of serious psychological and emotional harm and that State Defendants were deliberately indifferent to that risk. Accordingly, we affirm the judgment of the district court.

*AFFIRMED*

NIEMEYER, Circuit Judge, dissenting:

In this case, Virginia death-row inmates are challenging conditions of confinement that *have not existed for over three years* — raising a concern that this case could now be only advisory.  Nonetheless, the district court sustained their challenge and ruled in February 2018 that pre-2015 death-row conditions violated the Eighth Amendment. Further, it entered an injunction prohibiting a return to those conditions.

Five inmates on Virginia's death row commenced this action in 2014 challenging the conditions of confinement then in effect on death row — namely, that they were housed in 71 square-foot cells for 23 hours per day and allowed limited contact with other persons.  Those restrictive conditions were imposed following serious incidents among death-row inmates in the 1980s and 1990s, when the inmates were allowed to congregate with each other for extended periods.

In early 2011, the newly appointed Director of the Virginia Department of Corrections ("VDOC"), Harold Clarke, decided to assess whether a new policy allowing death-row inmates to have more contact with others could again be offered.  His endeavor was grounded in his professional belief that "enhancing offenders' quality of life, when feasible, benefits staff and offenders alike."  During the next year or two, Director Clarke and David Robinson, VDOC's second highest official, looked at confinement conditions imposed on death-row inmates in other states and concluded that some relaxation of restrictions could safely be implemented on Virginia's death row.  The decision to proceed with less restrictive conditions, however, was put on hold in late 2012, on the advice of VDOC's lawyers, after one of the death-row inmates challenged

the procedure by which he was automatically assigned to death row.  That inmate obtained relief from the district court, but only for himself.  While VDOC pursued a successful appeal of that case, other inmates on death row commenced this action against Director Clarke and the Warden of the Sussex I State Prison (collectively, "VDOC") in November 2014, challenging more generally the conditions of confinement on death row, mainly under the Eighth Amendment's Cruel and Unusual Punishments Clause.  Despite the new litigation, however, Director Clarke decided in the spring of 2015 to move forward with his decision to change the conditions on death row.  Thereafter, VDOC adopted new Operating Procedure 425.A, which substantially increased the contact that death-row inmates were allowed to have with their family members and each other and increased the inmates' recreational opportunities.  In addition, beginning in the fall of 2015, VDOC undertook a $2 million construction project, creating a new dayroom and a new outdoor recreation yard for the death-row inmates.  The plaintiffs in this case now concede that the 2015 changes rendered the conditions on Virginia's death row constitutional.

Nonetheless, the district court, at the plaintiffs' urging, continued the litigation and issued a declaratory judgment that the prior conditions — the pre-2015 conditions at Sussex I — violated the inmates' Eighth Amendment rights.  And it also issued an injunction prohibiting VDOC from returning to the prior conditions.

VDOC has appealed the district court's order, contending (1) that the prior conditions did not violate the Eighth Amendment and (2) that, in any event, there was no basis for the district court to have issued a declaratory judgment and an injunction,

especially under the strict standards imposed for such relief by the Prison Litigation Reform Act of 1995 ("PLRA"), 18 U.S.C. § 3626.  The majority surprisingly rejects VDOC's modest arguments, concluding that despite the fact that the allegedly unconstitutional conditions have not existed on Virginia's death row for some three-and-a-half years, a prospective injunction should nonetheless be affirmed.

The record in this case clearly indicates that the entry of equitable relief was inappropriate because there was absolutely no reason to expect that VDOC was or is likely to return to the former conditions, having (1) adopted a policy for change; (2) invested considerable amounts of time in making changes; (3) formally adopted new procedures and regulations; and (4) expended substantial amounts of money improving the physical conditions for the inmates.  VDOC has stated that it does not intend to return to former conditions, with Director Clarke attesting to his belief that to do so would be a move in the "wrong direction."

Moreover, the district court's judgment is especially misguided in the face of the strict standards that Congress imposed in the PLRA for this type of litigation:

> Prospective relief in any civil action with respect to prison conditions shall extend *no further than necessary to correct the violation of the Federal right* of a particular plaintiff or plaintiffs.  The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends *no further than necessary to correct the violation of the Federal right*, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1) (emphasis added).  It simply cannot be claimed that the district court's award of equitable relief in 2018 was "necessary to correct" a violation of a

federal right when the 2015 changes had, by the plaintiffs' own concession, already corrected the alleged violation and no new violation was in any way being threatened.

Failing to recognize and therefore correct the district court's error in granting relief that was plainly unavailable, the majority proceeds further, reaching into the realm of advisory opinions to conclude that the pre-2015 conditions of confinement on Virginia's death row violated the Eighth Amendment.   In doing so, however, it remarkably ignores binding Fourth Circuit precedent.

It is readily apparent that the district court's judgment and the majority's affirmance cannot be seen as "the least intrusive means necessary to correct the [alleged] violation."  18 U.S.C. § 3626(a)(1).

I

In the 1980s and 1990s, Virginia's death-row inmates were housed in the Mecklenburg Correctional Center and allowed to congregate, eat, recreate, and work together.  During that period, however, several serious incidents followed from such an "open housing" policy.  In May 1984, six death-row inmates escaped, and it took weeks to recapture them all.  The final two to be taken back into custody were serial murderers who were ultimately captured in Philadelphia.   Moreover, while that manhunt was ongoing, prison officials discovered a "cache of homemade weapons and other contraband inside death row."   In 1988, two death-row inmates got into a fight, during which one inmate threw the other to the floor, knocking him unconscious.  In 1992, a death-row inmate died from a heroin overdose.  And in 1993, another death-row inmate

37

committed suicide after smuggling contraband into the death-row unit. Following incidents such as these, VDOC moved death row to Sussex I State Prison and implemented more restrictive conditions of confinement, substantially limiting the inmates' contacts with each other and with others. A VDOC official has noted that, since those changes were made, "there have been virtually no serious security-related incidents on death row."

The death-row cells at Sussex I are essentially the same as the cells used to house the general prison population, except that death-row inmates do not share their cells with another inmate. Each cell measures 71 square feet, with a 10.5-foot high ceiling, and is furnished with a steel bed, a small shelf, a toilet, a sink, and a mirror. The restrictions on contacts, however, are more restrictive on death-row inmates than those imposed on the general prison population. At the time that the plaintiffs commenced this action, the conditions of confinement on death row were governed by Operating Procedure 460.A and Sussex I's Institutional Rules and Regulations for Offenders, both of which became effective in early 2010. Under those procedures and regulations, inmates spent almost 23 hours a day in their cells, but they were permitted to have a television and CD player there. They were also allowed to purchase the same commissary items as general-population inmates, to request materials from the prison's library, and to order approved publications. They were allowed one hour of outdoor recreation five days per week, which they spent in individual enclosures slightly larger than their cells. During outdoor recreation, the inmates were separated but could converse with each other and coordinate their exercises. The inmates were also allowed to leave their cells for a ten-minute

shower three times per week, and two inmates were permitted to perform the institutional

jobs of houseman and barber.  As for contacts with other persons — apart from the one-

hour recreational period — death-row inmates were permitted to make telephone calls

from their cells seven days per week; to have noncontact visits with approved family

members on weekends and holidays; to have contact visits with family members "when

extreme circumstances exist[ed]"; to have face-to-face meetings with their attorneys in a

room designated for that purpose; to have religious visits with the prison's chaplain and

other approved religious volunteers; and to converse with prison staff as they visited the

unit.  Specifically, corrections officers assigned to death row made rounds through the

unit every 30 minutes to perform security checks, and during their rounds they often

conversed with inmates.  Medical personnel came through the unit twice each day to

assess whether an inmate had a medical need that should be addressed by a physician.

Nurses visited death row twice a day to distribute required medications.  Mental health

professionals visited the unit at least once per week, speaking with the inmates about any

mental health issues and looking for signs of mental distress.  Case counselors — staff

members who helped the inmates with paperwork associated with prison life — visited

the unit on a daily basis.  And prison administrators, including the Warden and Assistant

Warden, were encouraged to make rounds through death row on a weekly basis to check

on the inmates' welfare.

　　　In late 2010, Harold Clarke was appointed the new Director of VDOC, and soon

after his appointment he resolved to assess the existing policies and procedures "to

determine whether and where more latitude might be afforded to Virginia's death row

offenders."  Based on his 35 years of experience, he believed that Virginia's conditions of confinement satisfied the requirements of the Eighth Amendment, but he also believed that more relaxed policies could and should be applied, as he was convinced "that enhancing offenders' quality of life, when feasible, benefits staff and offenders alike." To this end, Director Clarke began discussing making changes to Virginia's death row with David Robinson, who was at first the Regional Director responsible for Sussex I but soon after became the Chief of Corrections Operations, VDOC's second highest official. After looking at the policies governing Nebraska's death row, which Clarke had previously helped to oversee in his capacity as the head of that State's corrections department, and after having conversations with a high-ranking prison official in Tennessee, Clarke and Robinson became convinced that VDOC could safely implement less restrictive conditions on Virginia's death row.

Their efforts were interrupted, however, when one of the death-row inmates commenced an action challenging the procedures relating to his conditions of confinement, and VDOC's lawyers advised Director Clarke not to make any changes to death row while the suit was ongoing.  Although the district court ruled in the inmate's favor in that case, we reversed the ruling.  *See Prieto v. Clarke*, 780 F.3d 245 (4th Cir. 2015).  Nonetheless, while that appeal was pending, other inmates commenced this action in November 2014, challenging their conditions of confinement under the Eighth and Fourteenth Amendments.  Notwithstanding their litigation, however, Director Clarke decided to move forward with developing and implementing his plan to change the conditions on Virginia's death row.  He explained that he decided that VDOC "should

40

move ahead and do what we thought, what we thought was the right thing to do, what we wanted to do all along."  And he decided to do so "despite the new lawsuit that had been filed by the present Plaintiffs" because VDOC "did not want to waste any additional time waiting for this litigation, too, to come to a conclusion."

Thereafter, VDOC adopted new Rules and Regulations for Death Row Offenders and a new Operating Procedure 425.A, making a host of significant changes to the conditions of confinement.  Under the new procedures and regulations, inmates were allowed to have contact visits with family members once per week; they were given an hour of indoor recreation every day, in addition to an hour and one-half of outdoor recreation; they were allowed to congregate on a limited basis in the outdoor recreation area; they were allowed to participate in a group behavioral program; and their showers were increased to every day and the time enlarged to fifteen minutes.  In addition, VDOC spent approximately $2 million constructing a new inside dayroom and a new outdoor recreation yard, thereby enabling the inmates to congregate during both recreation periods.  The new dayroom was equipped with a 60-inch television, two tables with seating, games of the type available to inmates in the general population, a kiosk from which inmates could send email and purchase music, and a telephone.  The plaintiffs have conceded that these new 2015 conditions of confinement are constitutional.

Notwithstanding the improvements, the plaintiffs continued to press for a ruling that the *prior* conditions violated the Eighth Amendment, and they also continued to seek an injunction to prohibit VDOC from returning to the prior conditions.  While VDOC clearly expressed its intent not to return to prior conditions, it refused to commit that it

41

would never do so because it did not wish to preclude future changes, should changed circumstances require them. But Director Clarke explained emphatically that he did not "know of any situation today that will cause me to have to go back to where we came from. We will manage in place." He explained his view that going back to the prior conditions would be "going [in] the wrong direction" and "going against what we espouse."

On cross-motions for summary judgment, the district court ruled in 2018 that the pre-2015 conditions violated the Eighth Amendment. It held that "the pre-2015 conditions of confinement forced on plaintiffs created, at the least, a significant risk of substantial psychological and emotional harm" and that VDOC had been deliberately indifferent to that risk of harm. The court also concluded that the plaintiffs had demonstrated an entitlement to a declaratory judgment and injunctive relief, rejecting VDOC's argument that the PLRA requires that there be an "ongoing violation" to justify such relief and instead concluding that the PLRA should be interpreted as consistent with "the background equitable rule that courts have the authority to issue prospective relief even in the absence of an ongoing violation." Moreover, the court concluded that the plaintiffs had established a need for injunctive relief because (1) VDOC's adoption of the new conditions was influenced in part by the litigation; (2) there were no legal barriers preventing VDOC from returning to the pre-2015 conditions; and (3) VDOC had declined to give a "nonreversion promise."

From the district court's order dated February 21, 2018, VDOC filed this appeal, and the majority now affirms without engaging in any meaningful analysis of the most critical issue.

## II

While the main issue in this appeal is whether there is any basis to justify the issuance of a declaratory judgment and injunction prohibiting the State from returning to prior conditions, it is relevant to note that this court previously held that conditions similar to, or even more restrictive than, the prior conditions in this case did not violate the Eighth Amendment. *See Mickle v. Moore*, 174 F.3d 464, 471–72 (4th Cir. 1999) (holding that no violation of the Eighth Amendment was shown for conditions of confinement where inmates were confined to their cells for 23 hours per day without a radio or television, received "only five hours of exercise per week," and were not allowed to "participate in prison work, school, or study programs"); *Sweet v. S.C. Dep't of Corr.*, 529 F.2d 854, 861 (4th Cir. 1975) (en banc) ("[I]solation from companionship, restriction on intellectual stimulation[,] and prolonged inactivity . . . will not render segregated confinement unconstitutional absent other illegitimate deprivations," even if the "segregated confinement is prolonged and indefinite" (cleaned up)).  The majority refuses to recognize these precedents, explaining that the record contains new academic literature that was not available when our precedents were decided.  *Ante* at 13–15.  But intervening academic literature does not empower a panel to overrule binding precedent.

The majority also cites two Supreme Court cases in support of its refusal to apply Fourth Circuit precedents, but neither case provides any support.  In *Rhodes v. Chapman*, 452 U.S. 337 (1981), the Court upheld conditions of confinement that involved double-celling of inmates in 63-square-foot cells.  And in *Wilkinson v. Austin*, 545 U.S. 209 (2005), where the Court was presented with a challenge to procedures for assigning inmates to a highly restrictive form of solitary confinement in Ohio, it held that inmates had a liberty interest in not being assigned to such confinement but that Ohio's procedures were constitutional.  Neither case can be cited to suggest that our prior cases need to be overruled or that analogous conditions violate the Eighth Amendment.

In short, the majority's Eighth Amendment ruling is unprecedented and runs the risk of interfering with the wide use of supermax-type prisons, including the federal supermax prisons in Colorado and Illinois where conditions are more restrictive than those that were imposed on Virginia's death row prior to the 2015 charges.  For instance, at the U.S. Penitentiary ADX Florence, in Fremont County, Colorado, inmates are housed in solitary confinement without the ability to communicate with other inmates, either during the 23-hour period while they are in their cells or during a one-hour recreation period.  And visits are more restricted than were visits to inmates on Virginia's death row before 2015.

But my opinion does not rest on this disagreement with the majority.  Rather, this disagreement only demonstrates how far afield the majority has moved in upholding the injunction against VDOC in the circumstances of this case, where the present conditions

of confinement are concededly constitutional and the pre-2015 conditions would undoubtedly have been upheld under binding Fourth Circuit precedent.

With these preliminary observations made, I now turn to address the lack of any basis for the entry of equitable relief in the circumstances of this case.

### III

VDOC's primary position on appeal is that the district court "should have dismissed this case for lack of a remedy."  It argues that the PLRA prohibits the entry of prospective relief "in the absence of any ongoing constitutional violation" and that, even under traditional principles governing equitable relief, there is no basis for awarding such relief here because there is not a "reasonable likelihood that the prior conditions of confinement will be reinstated."   VDOC emphasizes that "it is undisputed that the corrections officials have no intention of reinstating the old conditions" and argues that "[i]t is purely speculative that the district court's injunction will serve any purpose other than forcing the corrections officials to return to court in order to vacate the injunction in two years," as authorized by the PLRA.  *See* 18 U.S.C. § 3626(b)(1).

The Plaintiffs make a strained argument that the PLRA somehow only limits the "*scope* of an injunction" and therefore did not restrict the district court's issuance of the injunction in this case.  But in general they rely on the district court's broad equitable discretion to grant injunctions.

Congress enacted the PLRA "in 1996 in the wake of a sharp rise in prisoner litigation in the federal courts," and the Act "contains a variety of provisions designed to

bring this litigation under control." *Woodford v. Ngo*, 548 U.S. 81, 84 (2006).  As directly relevant here, "the PLRA attempt[ed] to eliminate unwarranted federal-court interference with the administration of prisons," *id*. at 93, by "establish[ing] standards for the entry and termination of prospective relief in civil actions challenging prison conditions," *Miller v. French*, 530 U.S. 327, 331 (2000).

Specifically, the PLRA provides that "[p]rospective relief in any civil action with respect to prison conditions *shall extend no further than necessary to correct the violation of the Federal right* of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1)(A) (emphasis added).  The term "prospective relief" is in turn defined as "all relief other than compensatory monetary damages."  *Id*. § 3626(g)(7).  The Act provides further that "[t]he court shall not grant or approve *any* prospective relief unless the court finds that such relief [1] is narrowly drawn, [2] extends no further than necessary to correct the violation of the Federal right, and [3] is the least intrusive means necessary to correct the violation of the Federal right."  *Id*. § 3626(a)(1)(A) (emphasis added).  In addition, if prospective relief is granted in the absence of such a finding by the court, the defendant is "entitled to the immediate termination of any prospective relief." *Id*. § 3626(b)(2).  Otherwise, prospective relief "shall be terminable upon the motion of any party or intervenor . . . 2 years after the date the court granted or approved [such] relief," *id*. § 3626(b)(1), *unless* "the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal

right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation," *id*. § 3626(b)(3).

It is thus patently clear that under the PLRA, *before* a district court can grant equitable relief with respect to prison conditions, there must be a "violation of [a] Federal right" in need of *correction*.  Yet, in this case, it is undisputed that VDOC had itself corrected the alleged Eighth Amendment violation more than two years before the district court awarded prospective relief.  That should have ended the matter.  Under the plain terms of the PLRA, the district court was barred from awarding prospective relief in the circumstances of this case.

The majority, however, fails to analyze meaningfully whether prospective relief was "necessary to correct" the Eighth Amendment violation alleged by the plaintiffs. Rather, it undertakes only to address and reject a linguistic argument made by VDOC in its brief, without addressing the explicit requirement of the PLRA itself that equitable relief, including an injunction, can only be issued "to correct [a] violation of [a] Federal right."  18 U.S.C. § 3626(a)(1)(A).

Moreover, even on the untenable proposition implicitly maintained by both the district court and the majority that the PLRA adds nothing to the traditional equitable principles for issuing injunctions, the record shows that the conditions of confinement that prompted the plaintiffs to commence this action were highly unlikely to recur, thus eliminating any justification for the entry of an injunction.

The Supreme Court has long recognized that "[t]he sole function of an action for injunction is to forestall future violations."  *United States v. Or. State Med. Soc'y*,

343 U.S. 326, 333 (1952).  Thus, to obtain an injunction, there must be "*a real threat of future violation* or a contemporary violation of a nature likely to continue or recur."  *Id*. (emphasis added).  In this type of "forward-looking action, . . . an examination of a great amount of archaeology is justified only when it illuminates or explains the present and predicts the shape of things to come."  *Id*. (cleaned up); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (explaining that "[t]he equitable remedy [of an injunction] is unavailable absent a showing of irreparable injury, *a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again*" (emphasis added)).

More specifically, in *United States v. W.T. Grant Co.*, the Supreme Court recognized that there may be instances where a defendant cannot meet its burden of demonstrating that its voluntary cessation of its allegedly illegal conduct has mooted the case, but where — in light of the defendant's changed conduct — the plaintiff also cannot meet *its* burden of establishing a need for an injunction.  345 U.S. 629, 633 (1953).  In this type of circumstance, the Court made clear that plaintiffs have the burden of "satisfy[ing] the court that relief is needed" and that "[t]he necessary determination is that there exists *some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive*."  *Id*.  (emphasis added).  Where the record discloses "no significant threat of future violation," *id.* at 635, the plaintiff fails to carry its burden of establishing that injunctive relief is warranted.

In this case, it is especially curious that the district court could genuinely believe that there was a real threat of a future violation when it had previously observed in this

litigation that VDOC had made "significant, costly, and concrete changes to numerous facets of plaintiffs' conditions of confinement," spending nearly $2 million on both outdoor and indoor recreation areas that were constructed specifically to allow death-row inmates to have congregate activities in a secure environment.  The district court had also observed that the new operating procedure "reach[ed] almost every facet of inmate life."  And, in addition to those observations, the court had before it undisputed sworn statements by Director Clarke that he was committed to bringing meaningful changes to Virginia's death row from early in his tenure, having previously overseen a less restrictive death-row environment in Nebraska.

Thus, the actions taken by VDOC "did not consist merely of pretentions or promises" but instead represented "an overt and visible reversal of policy, carried out by extensive operations which have every appearance of being permanent."  *Or. State Med. Soc'y*, 343 U.S. at 334.  VDOC's actions — especially when combined with the sworn statements from its top two officials that they believed such changes were in the best interests of both the inmates and the department — conclusively show that there was and is no "real threat" or "cognizable danger" that the alleged Eighth Amendment violation that prompted the plaintiffs to commence this action in 2014 will recur.  Indeed, after years of successfully operating Virginia's death row under the new conditions, it frankly borders on the preposterous to presume that, were it not for the district court's injunctive relief, Director Clarke and his team would upend all the changes that they had made to Virginia's death row and reimpose the precise combination of conditions challenged in this action.

49

Presumably because of this overwhelming evidence, the majority affirms by choosing to defer blindly to the district court's "factual" finding there was a "cognizable danger of recurrent violation." But in doing so, the majority not only fails to recognize that such a finding is a mixed question of law and fact that justifies greater scrutiny by us, *see W.T. Grant*, 345 U.S. at 632, but it also accepts uncritically the three reasons given by the district court. A critical analysis, however, would quickly have undermined those reasons' purported value.

First, the district court gave as a reason for the injunction that "there is no legal barrier to defendants' returning to the pre-2015 conditions nor is there any pre-implementation mechanism for plaintiffs to challenge such a return." But that conclusion could hardly have been determinative of whether there was a real danger that VDOC would actually reinstate the challenged conditions. To be sure, the lack of any legal barrier or pre-implementation mechanism might explain why the plaintiffs would like to have injunctive relief, but it had next to no bearing on the likelihood that the corrections officials would indeed reinstitute the prior conditions of confinement in the absence of equitable relief.

Second, while acknowledging that the "defendants [had] individually state[d] [that] they [did] not currently intend to return to the pre-2015 conditions," the district court emphasized that the "most persuasive" reason for an injunction was the prison officials' "consistent refusal to represent to the Court that [VDOC would] not revert to the pre-2015 conditions." Again, however, VDOC's refusal to make such a commitment does not indicate that VDOC was therefore likely to return to the prior conditions.

Indeed, Director Clarke stated under oath that he had no intent of doing so, testifying further that he believed that doing so would be "reversing course and going [in] the wrong direction."  His testimony and unwillingness to provide a promise was explained to be based only on his unwillingness to bind VDOC and future officials when they might in the future be faced with a serious breach in death row's security.  But yet, if such a breach were to occur, VDOC would then undoubtedly have a "legitimate penological justification" for making a change — a circumstance that the majority correctly recognizes would undermine any Eighth Amendment claim.  *Ante* at 22.

Third and finally, the district court relied on the fact that "defendants' change from the pre-2015 conditions of confinement to the current conditions was influenced, although not entirely dependent on, the current litigation."  To be sure, the record does indicate that once VDOC officials finally decided to begin implementing the long-discussed changes to death row, they were incentivized to do so on an emergency basis to minimize their legal exposure in this action.  But it does not follow that, having done the hard work of instituting the reforms, the corrections officials are likely to undo all their work in the absence of a court order.

In sum, fairly read, the record provides overwhelming evidence that VDOC made changes to the conditions of confinement on death row in the interest of both the inmates and the agency and that VDOC firmly believed that the changes were the right way to go. There is simply no indication of any intent by VDOC officials to return to the previous conditions, which they had resolved to change even before this litigation began.  In light of these circumstances, it appears that the only reason for the district court's injunction

was some effort to punish VDOC for having previously had in place conditions that the district court believed had violated the Eighth Amendment.  And the majority's opinion affirming is thus counterproductive and totally unnecessary.  I would reverse the district court's judgment and remand with instructions to dismiss the plaintiffs' action.